1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

8
9
10

LEAH ROSENFELD IRA, derivatively on behalf of ZILLOW GROUP, INC.,

11

Plaintiff,

12

vs.

13
14
15

RICHARD N. BARTON, ERIK BLACHFORD, AMY BOHUTINSKY, CLAIRE CORMIER THIELKE, LLOYD FRINK, JAY HOAG, GREGORY MAFFEI, GORDON STEPHENSON, and APRIL UNDERWOOD,

16

Defendants,

17

-and-

18

ZILLOW GROUP, INC.,

19

Nominal Defendant.

NO. 2:22-cv-288

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

**JURY DEMAND**

20
21
22
23
24

Plaintiff Leah Rosenfeld IRA, by her undersigned attorneys, brings this stockholder derivative action in the name and on behalf of nominal defendant Zillow Group, Inc. ("Zillow" or

25
26
27
28

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 1

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

the "Company") against the current members of the Company's Board of Directors (the "Board") for their breaches of fiduciary duties, violations of the federal securities laws, and other misconduct that resulted in material damage to the Company and its stockholders.  These allegations are made upon personal knowledge with respect to Plaintiff and, as to all other matters, upon information and belief based upon the investigation and analysis by Plaintiff's counsel, including, among other things, a review of the Company's press releases, public filings with the United States Securities and Exchange Commission ("SEC"), corporate governance documents published on the Company's website, transcripts of Zillow investor conference calls, news reports, financial analyst reports, and other publicly available information about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

I.      NATURE OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiff on behalf of nominal defendant Zillow against the members of its Board (the "Individual Defendants") for their breaches of fiduciary duty, violations of the federal securities laws, and other misconduct that resulted in material damage to the Company and its stockholders.

2.      Until a few years ago, Zillow concentrated on creating a user-friendly digital platform where users could easily list, buy, rent, or finance a property.  In 2017, Zillow embarked on a fundamental shift[1] by launching a new program aimed at flipping real estate, Zillow Offers.

---

[1]      Nat Levy, *'Zillow 2.0:' Real Estate Giant Embarks on Fundamental Shift, Geek Wire*,

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 2

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

As part of the new program, Zillow directly purchased properties from sellers, made repairs and renovations, then sold the property.  This business model of streamlining the home buying and selling process, known as "iBuying,"[2] is dependent on razor-thin profit margins, so proper execution is critical.[3]

3.    Zillow relied on data science and other resources to develop a "Zestimate," Zillow's estimate of a home's market value, which gave potential sellers a window into how much their homes were worth.  Properly collecting, analyzing, and utilizing real estate data to support the Company's business plan and manage inventory was crucial to Zillow Offers' core operations.  Failing to leverage the vast trove of data maintained by the Company would result in excess inventory and decreased revenue, forcing Zillow to sell off excess inventory at a loss.  The Individual Defendants were aware of these substantial risks, having recognized them in public filings with the SEC.  Indeed, the Individual Defendants repeatedly assured stockholders in the Company's quarterly reports that these risks were being properly managed and that proper internal controls and corporate governance practices to monitor these risks had been implemented.

4.    In the Company's Annual Report for fiscal year 2020 and reporting, Zillow touted the success of Zillow Offers.  However, the Individual Defendants, were aware of red flags

---

Feb. 21, 2019, https://www.geekwire.com/2019/zillow-2-0-real-estate-giant-embarks-fundamental-shift-projecting-home-sales-operation-will-become-20b-business/.

[2]    Aimee Rawlins, *Zillow is Losing Millions on Selling Homes. But Its Risk-Taking CEO Isn't Worried*, *CNN Business*, Feb. 21, 2020, https://www.cnn.com/2020/02/21/business/zillow-rich-barton-risk-takers/index.html and accompanying video.

[3]    *Id.*

---

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 3

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

demonstrating that the Company was failing to properly collect, analyze, and utilize real estate data to support its business plan and manage inventory.  The Individual Defendants failed to heed these red flags, allowed the Company to operate with inadequate internal controls and corporate governance procedures, and did not take action to prevent the harm to the Company and its stockholders caused thereby.

5.      In October 2021, the truth about Zillow Offers began to emerge when Zillow announced a moratorium on new contracts in the Zillow Offers division for the remainder of the year.

6.      In November 2021, Zillow reported that Zillow Offers lost close to $400 million and that the Company was winding down the segment over the next several quarters.  The Company admitted that its home valuation process was inadequate and that, as a result, Zillow would be forced to unload thousands of properties at drastically reduced prices. In February 2022, the Company reported additional losses amounting to more than $880 million in the Zillow Offers division.

7.      In the wake of the substantial losses incurred by the Company and its spiraling stock price caused thereby, three securities fraud class action lawsuits were filed against the Company that were consolidated in the United States District Court for the Western District of Washington (the "Securities Class Action").  The Securities Class Action alleges that the Company and several of its officers and directors made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's ability to leverage the extensive data it maintains to accurately assess the value of homes it was buying and selling and to manage

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 4

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

inventory.  As such, the Company is now subject to substantial liability and will be forced to expend substantial sums to defend itself and its officers.

8.      Through this action, Plaintiff seeks to recover for Zillow its damages caused by the Individual Defendants' breaches of fiduciary duty and violations of the federal securities laws pled herein.  The Individual Defendants owed and owe the highest fiduciary duties to Zillow and its stockholders.  They utterly failed to implement and maintain adequate internal controls and corporate governance practices critical to the Company's success in pivoting from operating as a pure digital platform to competing in the highly competitive iBuying space.  Likewise, the Individual Defendants were aware of the requirement to provide truthful, accurate, and complete information pursuant to the federal securities laws.  The Individual Defendants, however, utterly abdicated their fiduciary duties to Zillow and its stockholders.

9.      Since the Individual Defendants are neither disinterested nor independent, making a demand upon them would be futile and is thus excused.  In the absence of this lawsuit, Zillow will neither recover its damages nor properly remediate its internal control weaknesses.

## II.      JURISDICTION AND VENUE

10.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff alleges claims arising under the laws of the United States.  The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a) because they are related to the claims arising under this Court's original jurisdiction and part of the same case or controversy.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 5

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

11.     This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the dispute is between citizens of different States.

12.     This Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391. Zillow maintains its principal executive offices in this District.  Thus: (i) one or more of the Individual Defendants either resides or maintains executive offices in the District; (ii) a substantial portion of the transactions and wrongs complained of herein occurred in the District; and (iii) the Individual Defendants have received substantial compensation in the District by doing business and engaging in activities having an effect in the District.

## III.     PARTIES

### A.     Plaintiff

14.     Plaintiff Leah Rosenfeld IRA has been a shareholder of Zillow since November 2020 and has held Zillow common stock continuously since that time.  As such, Plaintiff was a shareholder at the time of the transactions complained of herein.  Plaintiff is a citizen of New York.

---

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 6

Case No. 2:22-cv-288

WEISSLAW LLP
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

**B.**     **Defendants**

**1.     Nominal Defendant Zillow Group, Inc.**

15.     Zillow is an online real estate marketplace company that provides additional services such as mortgage lending and closing services.  Zillow is incorporated under Washington law and headquartered at 1301 Second Avenue, Seattle, WA 98101.  Zillow's common stock trades on the Nasdaq Stock Market under the ticker symbol "ZG."

**2.     Individual Defendants**

**a.     Defendant Barton**

16.     Defendant Barton is a director of Zillow since 2005.  He co-founded Zillow in 2005 and served as Chief Executive Officer ("CEO") until 2010, when he became the Company's Executive Chairman.  Barton returned as CEO in 2019 From 2005 until 2018, Barton worked as a venture partner at Benchmark Capital, a venture capital fund.  Barton also sits on the boards of Netflix, Inc. ("Netflix"), and Qurate Retail Inc.("Qurate"), and he sat on the board of Avvo Inc. ("Avvo") from 2014 until 2018, until it was acquired by Internet Brands Inc.  Before Zillow, Barton founded Expedia Group, Inc. ("Expedia") within the Microsoft Corporation in 1996, where he was president and CEO from 1999 until 2003, and he successfully spun Expedia out as a public company in 1999.

17.     As of April 5, 2021,[4] Barton beneficially owns 7,956,125 Zillow Class A and Class B shares. Barton also beneficially owns 7,469,678 non-voting Class C shares.

---

[4]     All share figures include those shares that were exercisable as of April 5, 2021 or became

---

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 7

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

18.     According to the Company's proxy statement filed with the SEC on April 21, 2021 (the "2021 Proxy Statement"), Defendant Barton received the following compensation in 2020:

|  | Salary | Option Awards | Other Compensation | **Totals** |
|---|---|---|---|---|
| 2020 | $636,626 | $7,798,200 | $11,400 | $8,446,226 |

19.     Defendant Barton is a citizen of Washington.

### b.     Defendant Blachford

20.     Defendant Erik Blachford ("Blachford") is a Zillow director since 2005 and a member of its Nominating and Corporate Governance Committee and its Compensation Committee.  He is also a venture partner at Technology Crossover Ventures ("TCV") since March 2011. Zillow is a TCV portfolio company.  Blachford also sits on the board of Peloton Interactive, Inc. ("Peloton"), another TCV portfolio company.

21.     As of April 5, 2021, Blachford beneficially owns 146,497 Zillow Class A shares and 339,535 Zillow Class C shares.  Defendant Blachford received compensation of $250,000 as a director in 2020.

22.     Defendant Blachford is a citizen of the United Kingdom.

### c.     Defendant Bohutinsky

23.     Defendant Amy C. Bohutinsky ("Bohutinsky") is a Zillow director since 2018 and has served in several leadership roles at Zillow since 2005, including Chief Marketing Officer and

---

exercisable or vested within 60 days of April 5, 2021.

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 8

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

Chief Operating Officer ("COO").  Defendant Bohutinsky is a venture partner at TCV and sat on the board of Avvo from 2014 until 2018.

24.     As of April 5, 2021, Bohutinsky beneficially owns 31,250 Zillow Class A shares and 211,487 Zillow Class C shares.  Bohutinsky received compensation of $250,000 as a director in 2020.

25.     Defendant Bohutinsky is a citizen of Washington.

#### d.     Defendant Thielke

26.     Defendant Claire Cormier Thielke ("Thielke") is a Zillow director since 2020 and a member of its Audit Committee.

27.     As of April 5, 2021, Thielke beneficially owns 3,558 Zillow Class C shares. Thielke received compensation of $125,100 as a director in 2020.

28.     Defendant Thielke is a citizen of Texas.

#### e.     Defendant Frink

29.     Defendant Lloyd Frink ("Frink") is a co-founder of Zillow, Chairman of the Board and President since 2019, and a director of Zillow since 2005.  Since founding the Company, he has served in many leadership roles, including Treasurer and Chief Strategy Officer.  Frink also has sat on the board of Grubhub Inc. ("Grubhub") since 2013.  From 1999 until 2004, he was a Senior Vice President at Expedia, a company he helped Barton create.

30.     As of April 5, 2021, Frink beneficially owns 5,658,045 Zillow Class A and Class B shares.  Frink also beneficially owns 4,142,783 non-voting Class C shares.  According to the 2021 Proxy Statement, Defendant Frink received the following compensation in 2020:

---

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 9

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

| | Salary | Option Awards | Other Compensation | **Totals** |
|---|---|---|---|---|
| 2020 | $593,156 | $6,238,560 | $11,400 | $6,843,116 |

31.     Defendant Frink is a citizen of Washington.

### f.     Defendant Hoag

31.     Defendant Jay Hoag ("Hoag") is a Zillow director since 2005 and Chair of the Compensation Committee.  Hoag co-founded TCV in 1995 and continues to serve as a Founding General Partner.  Hoag also sits on the boards of Netflix, TripAdvisor, Inc. ("TripAdvisor"), and Peloton.

32.     As of April 5, 2021, Hoag beneficially owns 516,531 Zillow Class A shares and 5,918,975 Zillow Class C shares.  Hoag received compensation of $250,000 as a director in 2020.

33.     Defendant Hoag is a citizen of California.

### g.     Defendant Maffei

34.     Defendant Greg Maffei ("Maffei") is a Zillow director since 2005 and Chair of its Audit Committee.  He serves as Chairman of the Board of Qurate and as a director of TripAdvisor. He is also the CEO and Chairman of the Board of Liberty TripAdvisor Holdings, which holds a majority of the voting rights of TripAdvisor.

35.     As of April 5, 2021, Maffei beneficially owns 318,419 Zillow Class A shares and 705,425 Zillow Class C shares.  Maffei received compensation of $250,000 as a director in 2020.

36.     Defendant Maffei is a citizen of either Colorado or Idaho.

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 10

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

#### h.     Defendant Stephenson

37.     Defendant Gordon Stephenson ("Stephenson") is a Zillow director since 2005, Chair of its Nominating and Corporate Governance Committee, and a member of its Audit Committee.

38.     As of April 5, 2021, Stephenson beneficially owns 41,647 Zillow Class A shares and 140,263 Zillow Class C shares.  Stephenson received compensation of $250,000 as a director in 2020.

39.     Defendant Stephenson is a citizen of Washington.

#### i.     Defendant Underwood

40.     Defendant April Underwood ("Underwood") is a Zillow director since 2017 and a member of the Compensation Committee.

41.     As of April 5, 2021, Underwood beneficially owns 43,765 Zillow Class C shares. Underwood received compensation of $250,000 as a director in 2020.

42.     Defendant Underwood is a citizen of California.

## IV.    DUTIES OF THE INDIVIDUAL DEFENDANTS

43.     By reason of their positions as officers or directors of Zillow and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed and owe Zillow and its shareholders fiduciary obligations of loyalty, good faith, due care, and candor, and were and are required to use their utmost ability to control, manage and oversee Zillow in a fair, just, honest, and equitable manner.  The Individual Defendants were and are

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 11

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

required to act in furtherance of the best interests of Zillow and its shareholders to benefit all shareholders equally and not in furtherance of their own personal interests or benefit.

44.     To discharge their duties, the officers and directors of Zillow were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial and corporate affairs and assets of the Company.  By virtue of such duties, the directors of Zillow were required to, *inter alia*:

- oversee the Company's business affairs and integrity;

- perform an annual evaluation of the Company's Chief Executive Officer;

- oversee management succession planning; and

- assess Company risks and strategies for risk mitigation.[5]

## A.     Additional Duties Under The Code Of Business Conduct

45.     Zillow's Corporate Governance Guidelines state that "Directors must abide by the relevant provisions of the Company's Code of Business Conduct and Ethics" ("Code of Conduct").

46.     The Code of Conduct emphasizes the importance of honest and ethical conduct and fair dealing:

> Every person subject to this Code should endeavor to deal honestly, ethically and fairly with the Company's consumers, customers, suppliers, competitors and employees. Statements regarding the Company's products and services must not be false, misleading, deceptive or fraudulent. No person subject to this Code may take unfair advantage of anyone through manipulation, concealment, abuse of privileged

---

[5]     Zillow Group, Inc., Corporate Governance Guidelines, https://s24.q4cdn.com/723050407/files/doc_downloads/governance/Z_WebDoc_8887.pdf (last visited January 26, 2022).

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 12

Case No. 2:22-cv-288

WEISSLAW LLP
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

information, misrepresentation of material facts or any other unfair-dealing practice.

47.     The Code of Conduct also states that "the Company requires that all persons subject to this Code comply with all laws, rules and regulations applicable to the Company wherever it does business."

48.     The Code of Conduct delineates the obligation to report violations of any law, rule, or regulation:

> If any person subject to this Code becomes aware of the violation of any law, rule or regulation by the Company, whether by its officers, employees, directors, or any third party doing business on behalf of the Company, it is such person's responsibility to follow the guidelines described in the Reporting and Compliance Procedures section below to promptly report the matter to such person's supervisor or the General Counsel or, if you are an executive officer or director, to the Chair of the Nominating and Governance Committee of the Board of Directors of Zillow.

49.     The Code of Conduct also details a requirement to maintain accurate books and records:

> All Company books, records and accounts shall be maintained in accordance with all applicable regulations and binding standards and accurately reflect the true nature of the transactions they record.
>
> ***
>
> No false or misleading entries shall be made in the Company's books or records for any reason. . . .

50.     The Code of Conduct requires that "[a]ll information provided in the Company's public reports and communications must be complete, fair, accurate, timely and understandable, and must also comply with applicable laws, rules and regulations."

---

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 13

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

51.     The Code of Conduct further provides that "all [e]mployees, officers and directors who are asked to provide information for the Company's public disclosures must use all reasonable efforts to provide complete, fair, accurate, timely and understandable information."

52.     The Code of Conduct stresses the requirement to report all violations, deficiencies, and material defects related to the Company's financial reports, disclosures, and internal controls:

> If any person subject to this Code becomes aware of any information concerning (a) material defects in the disclosures made by the Company in its public filings; (b) significant deficiencies in the design or operation of internal controls; (c) any violation of this Code that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls; or (d) any material violation of the law or this Code, you should follow the guidelines described in the Reporting and Compliance Procedures section.

53.     The Code of Conduct details the following reporting and compliance procedures:

> Every person subject to this Code has the responsibility to ask questions, seek guidance, report suspected violations and express concerns regarding compliance with this Code. Any person subject to this Code who knows or believes that any other employee or representative of the Company has engaged or is engaging in Company-related conduct that violates applicable law or this Code should report such violation to at least one of the following contacts:

- Human Resources

- General Counsel

- Chief Executive Officer

- Chief Financial Officer

- Nominating and Governance Committee Chairman

- Audit Committee Chairman

*** 

---

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 14

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

While it is the Company's desire to address matters internally, nothing in this Code should discourage anyone from reporting any illegal activity, including any violation of the securities laws, antitrust laws or any other federal, state or foreign law, rule or regulation, to the appropriate regulatory authority.

**B.      Additional Duties Under The Code Of Ethics**

54.     Defendant Barton, as CEO of the Company, is subject to additional duties under the Company's Code of Ethics.

55.     Under the Code of Ethics, Defendant Barton was and is obligated to adhere to, advocate, and promote the following principles:

- Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- Full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the "SEC") and other public communications made by the Company; and

- Compliance with governmental laws, rules and regulations applicable to the Company.

**C.      Additional Duties Under The Audit Committee Charter**

56.     The Audit Committee Charter places additional duties on the members of the Audit Committee, including requirements that its members:

- Regularly review with the independent auditor any audit problems or difficulties and management's response, including any restriction on the scope of activities, access to required information, *the adequacy of internal controls*,[6] adjustments noted or proposed by the independent auditor but not taken (as immaterial or otherwise) by management, communications between the audit team and the

---

[6]      All emphasis herein has been added unless otherwise specified.

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 15

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

national office concerning auditing or accounting issues, and any management or internal control letters issued or proposed to be issued by the auditor.

- Review at least annually. . . major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, ***and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies***. . . .

- Review and discuss with management from time to time the effectiveness of, or any deficiencies in, the design or operation of disclosure controls and procedures or internal controls and any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls. Review any report issued by the Company's independent auditor regarding management's assessment of the Company's internal controls.

- Discuss policies with respect to risk assessment and risk management, including the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

- Establish and oversee a code of ethics for senior financial officers pursuant to and to the extent required by laws, rules and regulations applicable to the Company from time to time and assist the Board in the oversight of such code of ethics.

- In conjunction with the Nominating and Governance Committee, develop and monitor compliance with a code of conduct applicable to the Company's directors, officers and employees pursuant to and to the extent required by laws, rules and regulations applicable to the Company from time to time.

**D.   Additional Duties Under The Nominating And Corporate Governance Charter**

57.   The Nominating and Corporate Governance Charter places additional duties on the members of the Nominating and Corporate Governance Committee, including requirements that its members:

- Develop, review and recommend to the Board, as appropriate, principles and policies relating to corporate governance, and monitor compliance with and the effectiveness of such principles and policies, as appropriate.

---

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 16

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

- In consultation with the Audit Committee, develop and monitor compliance with the code of conduct applicable to the Company's directors, officers and employees pursuant to and to the extent required by laws, rules and regulations applicable to the Company from time to time.

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Zillow Launches Zillow Offers

58.     Zillow is an online real estate marketing company whose mission is to offer customers buying, selling, renting or financing real estate the ability to "get into their next home with speed, certainty and ease."[7]

59.     In 2017, Zillow launched a new division, Zillow Offers,[8] that buys homes for cash, handles any needed repairs, and then sells the properties.  The division began with an initial pilot program and expanded rapidly.  The Company announced its debut in a press release on May 22, 2017:

> Zillow, the leading real estate and home-related information marketplace, today announced it will begin testing the Zillow Instant Offers™ marketplace, a way for homeowners to sell their homes quickly by providing them with offers from investors and a comparative market analysis (CMA) from a local real estate agent, as an estimate for what the home might fetch on the open market. In addition to investors being required to use an agent, should a homeowner select an investor's offer, Zillow will also offer to connect them with a local agent to represent them throughout the transaction.

60.     The platform purports to use technology, data, market research, and on-site

---

[7]     Zillow Group Press Release, *Zillow Offers Will Expand Services in 2021 to Simplify Customer Transactions*, Sept. 23, 2020, https://www.zillowgroup.com/news/press/zillow-offers-will-expand-services-in-2021-to-simplify-customer-transactions/.

[8]     Barbara Marquand, *Zillow Offers: What to Know, Nerdwallet*, Nov. 2, 2021, https://www.nerdwallet.com/article/mortgages/zillow-offers-review.

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 17

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

evaluations to streamline the buying and selling process.[9]   The opening of the Zillow Offers

division was a dramatic change for the Company, which was largely a digital platform until that

point, staying away from the actual buying and selling of homes.   Barton and Zillow dubbed this

dramatic change, Zillow 2.0, and hoped to "create a radically simpler real estate transaction

through technology, service, and integration."[10]

61.     Barton set lofty goals for Zillow Offers projecting that in three to five years, Zillow

Offers would buy and sell about 5,000 houses per month and the Company would make $20 billion

per year in revenue from Zillow Offers alone.[11]

62.     Analysts were wary of the dramatic shift in Zillow's business model and real estate

experts were concerned about the tight margins.[12]   An RBC Capital Markets lead internet analyst

commented that "[i]t's pretty unusual to have this kind of business model change for a public

---

[9]     *Id.*

[10]    Zillow Group, Zillow Investors Relations Presentation, May 2020,
https://s24.q4cdn.com/723050407-files/doc_presentations/2020/05/(05.22.20)-ZG-Investor-Deck-IR-Blog-v2-(ZG-Legal-updates-5.22.20).pdf, pp. 6-11.

[11]    Aimee Rawlins, *Zillow is Losing Millions on Selling Homes;* Stephen Gandel, *Zillow Facing Big Losses, Quits Flipping Houses and Will Lay off a Quarter of Its Staff,  N.Y. Times,* Nov. 2, 2021, https://www.nytimes.com/2021/11/02/business/zillow-q3-earnings-home-flipping-ibuying.html.

[12]    MyWallst Staff, *Potential Risks and Rewards to Zillow's New Home-Flipping Business, The Motley Fool,* August 19, 2019, https://www.fool.com/investing/2019/08/19/potential-risks-and-rewards-to-zillows-new-home-fl.aspx.

---

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 18

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

company — *it's such a risky move*"[13] and that it would be years until investors would see if "one

could consistently generate material profits in this sector."

63.   Morgan Stanley downgraded Zillow from Overweight to Equal-weight on April 18,

2018,  lowering their pricing target from $55 to $50, citing the fact that the home-flipping business

comes with many "unanswered questions" that could impact expectations for the Company.[14]

64.   A *Real Money* article noted the costs and risks associated with the iBuying business:

> For all intents and purposes, Zillow is just an advertising company. They're the
> same as every other online business. ***Now that they're jumping into more complex
> businesses like mortgage lending, and buying/selling houses, we're looking at a
> big boost in costs and risk.*** Bank of America Merrill Lynch has noted the higher
> risks for next year, and has downgraded the stock to a hold.

> The combination of a changing business model, overvalued stock price, and rising
> debt levels is a cocktail for headaches. It's clear that Wall Street is finally starting
> to acknowledge that. Until earnings start moving, and the company demonstrates
> that it can handle the much heavier workload associated with buying/selling real
> estate itself, I see Zillow falling more rather than going up.

**B.    The Individual Defendants Knew Of The Substantial Risks Associated With
The Zillow Offers' Business Model And The Need To Properly Manage Them**

65.   The Individual Defendants knew of the substantial risks associated with the Zillow

Offers' business model and the importance of managing those risks because they acknowledged

the potential risks in the Company's public filings, including in the Company's latest Form 10-K

for fiscal year 2020.

---

[13]      Aimee Rawlins, *Zillow is Losing Millions on Selling Homes.*

[14]      Jayson Derrick, *Morgan Stanley's New Valuation of Zillow Prompts Downgrade*,
*Benzinga,* April 18, 2018, https://www.benzinga.com/analyst-ratings/analyst-
color/18/04/11536142/morgan-stanleys-new-valuation-of-zillow-prompts-downgra.

---

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

66.     On February 12, 2021, the Company filed with the SEC its Annual Report on Form 10-K for the period ended December 31, 2020 (the "2020 10-K").  The 2020 10-K was signed by all of the Individual Defendants.  Pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), Defendant Barton certified that the 2020 10-K fully complied with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in the 2020 10-K fairly presented, in all material respects, the financial condition and results of operations of the Company.

67.     In the 2020 10-K, the Individual Defendants acknowledged the material risk posed to the Company by the failure to properly utilize and analyze the trove of real estate data it collects and to maintain proper inventory levels in the Zillow Offers division:

*Our Zillow Offers Business Depends on Our Ability to Accurately Value Homes and Manage Inventory and a Failure to Do So May Have an Adverse Effect on Our Business and Financial Results.*[15]

The success of Zillow Offers depends in part on our ability to efficiently acquire, renovate and sell properties. We underwrite and price the homes we buy and sell through Zillow Offers using in-person evaluations and data science and proprietary algorithms based on a number of factors, including our knowledge of the real estate markets in which Zillow Offers operates. These assessments include the estimated time from purchase to sale, the cost of updating a home, market conditions and potential resale proceeds, closing costs and holding costs. These assessments may be inaccurate. Our pricing model may not account for submarket nuances – for example, the location of a home on a hill or in a building – which could have a significant impact on price. If valuations are too low and/or fees are too high, conversion rates and customer satisfaction may be adversely impacted, as our offers may not be competitive. In addition, we may not discover latent home construction defects or environmental hazards or other conditions requiring remediation or impacting the value of the home in a timely manner, or at all, which may require us to write down the inventory value of those homes or prevent us from reselling them for the price we anticipated or at all. We may be unable to acquire or sell inventory

_____

[15]     Emphasis in original.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT - 20

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

at attractive prices, in a timely manner, or at all. We may also be unable to finance and manage inventory effectively. As a result, our revenue, gross profit and results of operations may be affected, which could have an adverse effect on our business, results of operations, and financial condition.

***

***Our Zillow Offers Business is Dependent Upon Our Ability to Expeditiously Sell Inventory. Failure to Expeditiously Sell Our Inventory Could Have an Adverse Effect on Our Business and Financial Results. Holding Homes in Inventory Exposes Us to Risks, Such as Increased Holding Costs.***[16]

Our purchases of homes through our Zillow Offers business are based in large part on our estimates of projected demand. If actual sales are materially less than our forecasts, we could experience an over-supply of inventory, which may cause downward pressure on our sales prices and profitability and increase our average days to sale. Our inventory of homes purchased has at times represented a significant portion of our total assets and holding those assets in the form of non-income producing homes inventory for an extended period of time subjects us to significant holding costs, including financing costs, maintenance and upkeep expenses, insurance expenses, property tax expenses, homeowners association fees, other expenses that accompany the ownership of residential real property, and increased risk of depreciation of value. If we have excess inventory or our average days to sale increases, the results of our operations may be adversely affected because we may be unable to liquidate such inventory at prices that allow us to meet profitability targets or to recover our costs.

### C.   The Company Emphasizes The Strengths Of Zillow Offers And Certifies That The Company's Internal Controls Are Effective

68.     In its 2020 10-K, the Company described the financial results from its Zillow Offers division in glowing terms:

*For Sellers* – We launched Zillow Offers in April 2018 to provide homeowners with the ability to receive cash offers to purchase their home, giving sellers peace of mind, control and convenience in one of the most stressful transactions of their lives. We have the potential to connect sellers who do not qualify for or accept an offer from Zillow with a trusted local Premier Agent partner. When we buy a home

---

[16]     Emphasis in original.

WEISSLAW LLP
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

from a seller, our title and escrow business, Zillow Closing Services, performs their due diligence for a clean title and a seamless close of the home transaction. Then, our renovation teams perform light, make-ready repairs to swiftly list the home. *As of December 31, 2020, Zillow Offers was available in 25 markets and accounted for $1.7 billion of our revenue for the year, up from $1.4 billion in revenue for the year ended December 31, 2019. This reflects less than 0.1% of the estimated annual U.S. real estate transaction value. For the year ended December 31, 2020, we purchased 4,162 homes from sellers.*

*For Buyers* – When a buyer is ready to meet with a local real estate professional after searching for a home on our mobile applications and websites, we typically connect them with a Premier Agent partner. For customers who are focused on buying new construction homes, we connect them with our home builder partners. Home buyers are also able to purchase homes that are listed for resale through Zillow Offers. *For the year ended December 31, 2020, home buyers purchased 5,337 homes through Zillow Offers.*

69. In the 2020 10-K, the Company also focused on the competitive advantages of Zillow Offers, including superior data science and technology:

*Inimitable living database of homes and superior data science and technology advantages.*[17] Our living database of more than 135 million U.S. homes is the result of more than 15 years of substantial investment, sophisticated economic and statistical analysis and complex data aggregation of multiple sources of property, transaction and listing data, including user updates to more than 34 million property records. This data is the foundation of our proprietary Zestimate, Rent Zestimate, Zestimate Forecast and Zillow Home Value Index. In 2019, we released a new, more accurate Zestimate, incorporating key learnings from the two-year, global Zillow Prize competition. The improved Zestimate currently has a median absolute percent error of 1.8% for homes listed for sale and 7.4% for off-market homes. *These data and models also provide the foundation for our pricing algorithms for Zillow Offers, although substantially more home-specific information is incorporated to further refine the valuation for this application.*

---

[17]    Emphasis in original.

WEISSLAW LLP
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

70.     In an analyst conference call regarding the 2020 earnings, Defendant Barton praised the durability of Zillow Offers despite the pandemic remarking that the Company's "burgeoning sell-side business, Zillow Offers, proved durable through some bad weather."  Chief Financial Officer Allen Parker represented on the call that Zillow benefited from "operational improvements."

71.     Barton stressed the impact that Zillow Offers had on the Company's revenue in 2020, due to the division's growing customer base:

> [A] vast majority of our customers are now choosing to close with us when purchasing a home from Zillow Offers. This execution resulted in total revenue growth of 22%, which when combined with a disciplined approach to managing costs, resulted in more than $300 million in incremental EBITDA profit generation across the company as compared to 2019.

72.     On February 25, 2021, Zillow began using its Zestimate to make an initial cash offer to purchase homes, representing that it was a reliable tool for home evaluation:

> The Zestimate is now an initial cash offer for eligible homes in more than 20 cities nationwide. This ushers in a new era for the Zestimate, the company's proprietary home value estimation tool, which celebrates its 15th anniversary this month.
>
> ***
>
> Today's announcement highlights the growth in the reliability of the Zestimate with Zillow standing behind its valuations to provide an initial cash offer on qualifying homes through its Zillow Offers service.[18]

---

[18]     Zillow Group Press Release, February 25, 2021, http://zillow.mediaroom.com/2021-02-25-Zillow-Starts-Making-Cash-Offers-For-the-Zestimate.

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 23

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

73.     On May 4, 2021, the Company filed with the SEC its Quarterly Report on Form 10-Q for the period ended March 31, 2021 (the "1Q21 10-Q").[19]  In the 1Q21 10-Q, the Company attributed any slowing of growth in Zillow Offers to low inventory buildup due to the pandemic and represented that the division would have an increase in revenue in future periods:

> Homes segment revenue decreased 9% to $704.2 million, primarily due to a decrease of $68.1 million, or 9%, in Zillow Offers revenue. Zillow Offers revenue declined to $701.0 million due to the sale of 1,965 homes at an average selling price of $356.7 thousand per home, as compared to the sale of 2,394 homes at an average selling price of $321.3 thousand per home in the comparable prior year period. ***While we have resumed home buying in all Zillow Offers markets following our temporary pause in the first half of 2020, we are continuing to rebuild our inventory available for resale. We expect Zillow Offers revenue to increase in future periods as we expect to continue to increase our home buying and home selling activities across all markets.***

74.     In the 1Q21 10-Q, Zillow assured that the Company's governance practices procedures and internal controls regarding public disclosure were effective, stating:

> ***Evaluation of Disclosure Controls and Procedures*[20]**
>
> The Company maintains disclosure controls and procedures (as defined under Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended). Management, under the supervision and with the participation of our Chief Executive Officer and our Chief Financial Officer, evaluated the effectiveness of the Company's disclosure controls and procedures pursuant to Exchange Act Rule 13a-15(b) as of March 31, 2021. Based on that evaluation, the

---

[19]     Pursuant to SOX, Defendant Barton certified that the 1Q21 10-Q fully complied with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in the 1Q21 10-Q fairly presented, in all material respects, the financial condition and results of operations of the Company.

[20]     Emphasis in original.

---

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 24

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

Chief Executive Officer and the Chief Financial Officer concluded that these disclosure controls and procedures were effective as of March 31, 2021.

75.    In an analyst conference call regarding the first quarter results, Defendant Barton reiterated that any slowing of growth in Zillow Offers was due to the pandemic:

Our nascent sell-side business Zillow Offers continued to accelerate out of the pause we instituted in the pandemic generating over 700 million in revenue and surpassing our internal expectations on revenue, EBITDA and unit level economics.

76.    Barton asserted that "Zillow 2.0" was enthusiastically received by customers:

Every signal we see based on data and customer feedback is that customers expect and demand a more seamless experience. This is Zillow 2.0. A great example of our customers enthusiasm for ease is the reaction to our recent announcement that many homeowners in Zillow Offers markets now can see that zestimate is a live initial offer from Zillow. The announcement price alone drove record breaking interest in the service with requests coming in at levels we've never seen before. We believe we are onto something with this Zestimate offer. The continuing challenge and opportunity going forward will be to translate customer interest into transactions.

77.    On August 5, 2021, Zillow filed with the SEC its Quarterly Report on Form 10-Q for the period ended June 30, 2021 (the "2Q21 10-Q").[21]    In the 2Q21 10-Q, the Company reported that revenue from Zillow Offers had increased:

Zillow Offers revenue increased by $318.2 million to $772.0 million for the three months ended June 30, 2021 due to the sale of 2,086 homes at an average selling price of $370.1 thousand per home. For the three months ended June 30, 2020,

---

[21]    Pursuant to SOX, Defendant Barton certified that the 2Q21 10-Q fully complied with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in the 2Q21 10-Q fairly presented, in all material respects, the financial condition and results of operations of the Company.

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 25

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

Zillow Offers revenue was $453.8 million due to the sale of 1,437 homes at an average selling price of $315.8 thousand per home.

78.     In the 2Q21 10-Q, Zillow assured that the Company's governance practices procedures and internal controls regarding public disclosure were effective, stating:

**Evaluation of Disclosure Controls and Procedures[22]**

The Company maintains disclosure controls and procedures (as defined under Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended). Management, under the supervision and with the participation of our Chief Executive Officer and our Chief Financial Officer, evaluated the effectiveness of the Company's disclosure controls and procedures pursuant to Exchange Act Rule 13a-15(b) as of June 30, 2021. Based on that evaluation, the Chief Executive Officer and the Chief Financial Officer concluded that these disclosure controls and procedures were effective as of June 30, 2021.

79.     In an analyst conference call the next day discussing the second quarter earnings, Defendant Barton detailed the success of Zillow Offers:

On the sell side, Zillow Offers continued to accelerate in Q2 with a record 3,805 homes purchased. We sold 2,086 homes generating a record $777 million in revenue on our Home segment, ***surpassing our internal expectations for both revenue and EBITDA.***

***Importantly, the Zillow Offers value proposition of a fast, fair, flexible and convenient close has proved more than durable, even in this sizzling hot sellers market.*** . . . In our surveys of homeowners who want and need to move, when we present the Zillow Offers concept, the largest objection is there must be a catch. I'm pretty happy to market to that objection.

\*\*\*

***As the Zillow Offers business continues to accelerate,*** we are seeing lift to our Zillow Home Loans with approximately 40% of purchase originations in Q2 sourced from Zillow Offers.

---

[22]     Emphasis in original.

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 26

Case No. 2:22-cv-288

WEISSLAW LLP
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

80.     In response to questions from an analyst from Jeffries Group LLC about the Company's financial goals regarding Zillow Offers, Barton responded confidently that "Zillow Offers is back on track which is nice."  Barton also reiterated his confidence on Zillow Offers' ability to capture a large segment of the available market, stating:

> I confess to being quite excited by how well Zillow Offers is doing in such a hot sellers market, which has me for one kind of probing at the perimeter of my kind of penetration and TAM[23] expectations here. And thinking about, just how – we don't know of course, but just how much of the market will end up moving towards iBuying and Zillow Offers solution, I don't know, ***but comparatively more confident now than I was even a quarter ago*** – so even a quarter ago. ***So it feels good to me.***

### D.     Zillow Announces That Zillow Offers Will Be Wound Down Due To Substantial Losses

81.     On October 18, 2021, the Company issued a press release announcing that it was suspending the signing of any new contracts for the remainder of the year to focus on its current inventory:

> Due to a backlog in renovations and operational capacity constraints, Zillow announced its Zillow Offers business will not sign any new, additional contracts to buy homes through the end of the year. Pausing on new contracts will enable Zillow Offers to focus operations on purchasing homes with already-signed contracts, but have yet to close, and reducing the renovation pipeline. Zillow will continue to market and sell homes through Zillow Offers during this period.

82.     In the press release, the Company's COO, Jeremy Wacksman ("Wacksman") explained that the cessation of new contracts was based on "operating within a labor- and supply-

---

[23]     Total Addressable Market (TAM) - represents revenue opportunity at 100% market share, as if no competition exists.  *Techtarget*, https://searchcustomerexperience.techtarget.com-definition/TAM-SAM-SOM (last visited January 14, 2022).

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

constrained economy inside a competitive real estate market, especially in the construction, renovation and closing spaces."

83.     Based on this news, Zillow's Class A share price fell $8.84, or 9.4%, to close at $85.46 per share on October 18, 2021, and Zillow's Class C share price fell $8.97, or 9.4%, to close at $86.00 per share on October 18, 2021, on unusually heavy trading volume.

84.     A Wedbush analyst downgraded Zillow shares from outperform to neutral, reducing his pricing target to $86 from $158.

85.     Mike DelPrete ("DelPrete"), an independent real estate technology strategist, was surprised by the sudden halt of new purchases by Zillow, stressing that Zillow failed to leverage the tremendous amount of data it possesses:[24]

> iBuyers have access to a tremendous amount of data, they can see months into the future and plan their inventory. So, the fact that Zillow didn't see this coming and wasn't able to make adjustments before it had to resort to an iBuying lockdown is pretty surprising.
>
> ***
>
> If you're trying to be number one in the market, slamming on the brakes is one of the worst things you can do.

86.     On November 2, 2021, the Company filed with the SEC its Quarterly Report on Form 10-Q for the period ended September 30, 2021 (the "3Q21 10-Q").  Pursuant to SOX, Defendant Barton certified that the 3Q21 10-Q fully complied with the requirements of section

---

[24]     Anna Bahney, *Zillow Slams the Brakes on Home Buying as it Struggles to Manage Its Backlog of Inventory, CNN Business*, Oct. 19, 2021, https://www.cnn.com/2021/10/18-homes/zillow-halting-home-buying/index.html.

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 28

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in the 3Q21 10-Q fairly presented, in all material respects, the financial condition and results of operations of the Company.

87.     In the 3Q21 10-Q and in an accompanying press release, Zillow disclosed dismal financial results for the third quarter.  Zillow lost $169 million driven by an EBITDA loss of almost $381 million in the Zillow Offers division.  As a result, the Company announced its plan to "wind down Zillow Offers."  However, the Company disclosed that it would continue to sustain losses, expecting "an additional $240 million to $265 million of losses to be recognized in Q4 primarily on homes it expects to purchase in Q4."

88.     In the 3Q21 10-Q, the Company disclosed further details relating to the closing of the Zillow Offers division:

> ***Wind Down of Zillow Offers Operations***
>
> On November 2, 2021, the Board of Directors of the Company made the determination to wind down Zillow Offers operations. This decision was made in light of home pricing unpredictability, capacity constraints and other operational challenges faced by Zillow Offers that were exacerbated by an unprecedented housing market, a global pandemic and a difficult labor and supply chain environment. ***The wind down is expected to take several quarters and result in approximately a 25% reduction of the Company's workforce.*** During the wind down period, the Company expects to continue to complete the purchase of homes currently under contract and renovate and sell properties currently in inventory. As a result of the decision to wind down Zillow Offers operations, the Company plans to report Zillow Offers as a discontinued operation beginning with the period during which disposition of the business is complete. ***In connection with the preparation of financial statements for the three months ended September 30, 2021, the Company recorded a $304.4 million write-down of inventory associated with Zillow Offers as a result of purchasing homes during the third quarter at higher prices than the Company's current estimates of the future selling prices after selling costs.***

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

89.     In an earnings call to discuss the third quarter earnings, Barton told investors that "further scaling up Zillow Offers is too risky, too volatile to our earnings and operations, too low of a return on equity opportunity and too narrow in its ability to serve our customers."

90.     Barton admitted to CNBC's "Closing Bell," that Zillow's ultimate failure was its inability to properly analyze and use its extensive data to accurately assess the value of the homes it was buying and selling and stated that "the unpredictability in forecasting home prices *far exceeds what we anticipated*."[25]  Barton acknowledged that the Company was not positioned to accurately evaluate where home prices will be in six months "within a narrow margin of error."[26]

91.     Lastly, Barton disclosed, that despite previous representations to the contrary, Zillow Offers had failed to significantly penetrate the Company's potential market of homebuyers and sellers across the country.[27]  Barton warned that iBuying had turned Zillow into a "leveraged housing trader" which if continued could put "the whole company at risk."[28]

---

[25]     Ari Levy, *Zillow Says it's Closing Homebuying Business, Cutting 25% of Workforce; Earnings Miss Estimates, CNBC*, Nov. 2, 2021, https://www.cnbc.com/2021/11/02/zillow-shares-plunge-after-announcing-it-will-close-home-buying-business.html.

[26]     *Id.*

[27]     *Id.*

[28]     Kim Velsey, *Why Did So Many Homeowners Sell to Zillow? Because It Overpaid*, *Curbed*, Nov. 4. 2021, https://www.curbed.com/2021/11/zillows-i-buying-algorithm-house-flipping.html.

---

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 30

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

92.     Bloomberg reported that Zillow was looking to sell off its entire remaining portfolio of 7,000 homes for $2.8 billion to institutional investors, with many of the homes selling for below asking price.[29]

93.     In a *Wall Street Journal* article[30] entitled, "*Zillow Quits Home-Flipping Business, Cites Inability to Forecast Prices*," Benjamin Keys, a professor of real estate at the Wharton School of the University of Pennsylvania, wondered how Zillow had managed to lose money in "a time frame where prices have gone up in a lot of places, dramatically."

94.     Matthew Frankel, a contributor, and analyst for *The Motley Fool*,[31] commented on Zillow's business failure despite having "the most real estate data of any of their peers":

> The fact that the company with **the most real estate data of any of their peers** that has been developing away to algorithmically priced homes for over a decade in the form of the Zestimate couldn't do a better job with iBuying than the other peers . . . **just screams failure of management to me.**

95.     On the heels of the announcement that Zillow was winding down its Zillow Offers operations, Zillow's Class A share price tumbled to $19.62, or 23%, to close at $65.86 per share

---

[29]     An analysis by KeyBanc Capital Markets of 650 homes owned by Zillow showed that two-thirds were priced for less than what the Company paid for them.

[30]     Will Parker et al., *Zillow Quits Home-Flipping Business, Cites Inability to Forecast Prices*, *The Wall Street Journal*, Nov. 2, 2021, https://www.wsj.com/articles/zillow-quits-home-flipping-business-cites-inability-to-forecast-prices-11635883500.

[31]     Matthew Frankel et al, *2 Major Red Flags With Zillow's iBuying Failure*, *The Motley Fool*, Nov. 19, 2021, https://www.fool.com/investing/2021/11/19/2-major-red-flags-with-zillows-ibuying-failure/ and accompanying video.

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 31

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

on November 3, 2021.  On the same day, Zillow's Class C share price fell $21.73, or 25%, to close at $65.47 per share.

96.     A *Bloomberg Businessweek* article pinned Zillow Offers' failure on the inadequate utilization and analysis of its collected real estate data.[32]

97.     The losses incurred by the Zillow Offers division could not be ascribed to market uncertainties.  Notably, other iBuying firms, such as Zillow's competitors Redfin and Opendoor, had far better results in the same market.[33]

98.     Indeed, real estate strategists, such as DelPrete, point out that Zillow's chief competitor in the iBuying space, Opendoor, did a superior job of utilizing its collected real estate data and emerged relatively unscathed despite all of the market fluctuations:

> A comparison of Zillow Offers and Opendoor highlights the critical importance of pricing in iBuying. There's an understated elegance in the detail; it's not just buying low and selling high. A successful pricing *operation* -- not just an algorithm, but people! -- needs to work at scale, needs to improve over time, and needs to be more nuanced than a brute-force bell curve.[34]

99.     On February 10, 2022, the Company filed with the SEC its Annual Report on Form 10-K for the period ended December 31, 2022 (the "2021 10-K").  In the 2021 10-K, the Company reported a more than $880 million loss in its Zillow Offers division for fiscal year 2021.

---

[32]     Patrick Clark, *Zillow's Algorithm-Fueled Buying Spree Doomed Its Home-Flipping Experiment*, *Bloomberg Businessweek*, Nov. 8, 2021, https://www.bloomberg.com/news/articles/2021-11-08/zillow-z-home-flipping-experiment-doomed-by-tech-algorithms.

[33]     *Id.*

[34]     Mike DelPrete, *Opendoor vs. Zillow: A Tale of Two Pricing Models*, Dec. 16, 2021, https://www.mikedp.com/articles/2021/12/16/opendoor-vs-zillow-a-tale-of-two-pricing-models.

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 32

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

**E.      Zillow Is Named As A Defendant In The Securities Class Action**

100.    On November 16, 2021, a securities class action lawsuit, was filed in the United States District Court for the Western District of Washington against the Company, Defendant Barton, Wacksman, and Chief Financial Officer Allen Parker ("Parker") alleging violations of Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act").  The complaint seeks damages on behalf of a class who purchased Zillow shares between February 10, 2021 and November 2, 2021, inclusive.  The plaintiff asserts that the defendants made false and misleading statements regarding the Company's home price evaluation and that the Company's inability properly analyze and use the extensive data it maintained to support its business plan contributed to a backlog in inventory, which ultimately led to a wind-down of the Zillow Offers division, resulting in substantial losses.  On November 19, 2020 and January 6, 2022, securities class action lawsuits making substantially similar claims against Zillow, Barton, Wacksman, Parker, and Frink were filed.  On February 16, 2022, the Court entered an Order consolidating the securities class action lawsuits under the caption, *Barua et al. v. Zillow Group et al.*, No. C21-1551 TSZ (W.D. Wash).

**F.      The Individual Defendants Ignored Red Flags**

101.    Zillow relied heavily on its Zestimate to guide its home evaluation process for Zillow Offers.  In February 2021, the Company expanded its use, making the Zestimate an actual cash offer to buy from homeowners in certain markets.

102.    However, Zillow realized early on that the Zestimate, the core of its pricing model for Zillow Offers, did not adequately utilize and analyze the Company's data to accurately evaluate

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 33

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

home prices.  In 2016, then Zillow CEO, Spencer Rascoff, sold his Seattle home for $1.05 million, forty percent less than the Zestimate of $1.75 million shown on Zillow.[35]

103.    Duvora, a real estate publication, conducted a 2019 case study entitled "*Exactly How Bad Are Zillow "Zestimates*?"[36] where it took samples of the Zestimates for three homes per city in three major cities (Chicago, New York, and Los Angeles).  The study, which selected homes at random, exposed the Zestimate's failings.  For cities such as New York, ***all the homes*** were dramatically undervalued by the Zestimate.[37]

104.    As the author of the case study, Derek Devore ("Devore") noted, Zillow has a *Data Coverage and Accuracy Table* on their website which has data error rates based on location.  The 2019 charts stated that for most major areas, around 90% of the listing Zestimate was "[w]ithin 20% of Sale Price" of the home, and as Devore stressed **"*[t]hat's a really large margin for error."***

105.    Zillow employees routinely advised that the Zestimate was inaccurate in meetings, but their concerns were left unaddressed.[38]

---

[35]    Teke Wiggin, *Zillow CEO Spencer Rascoff Sold Home for Much Less than Zestimate*, *Inman*, May 18, 2016, https://www.inman.com/2016/05/18/zillow-ceo-spencer-rascoff-sold-home-for-much-less-than-zestimate/.

[36]    Derek Devore, *Exactly How Bad Are Zillow "Zestimates"? [Case Study]*, *Duvora*, April 1, 2019, https://blog.duvora.com/exactly-how-bad-are-zillow-zestimates-case-study/.

[37]    *Id.*

[38]    *Id.*

---

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 34

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

106.    In Zillow's public filings, the Company reported large losses in its Zillow Offers division despite reporting substantial revenues.  For example, on February 21, 2019, the Company filed with the SEC its Annual Report for the period ended December 31, 2018 (the "2018 10-K"), signed by Defendants Barton, Blachford, Bohutinsky, Frink, Hoag, Maffei, Stephenson, and Underwood.[39]  In the 2018 10-K, Zillow disclosed Zillow Offers had yet to prove profitable, reporting a $62.3 million loss on $52.3 million in revenue for the year in its Home segment.  The Company reported a cost of revenue of 49.3 million for the Homes segment, swallowing up 94.2% of the revenues recognized.

107.    On February 19, 2020, the Company filed with the SEC its Annual Report on Form 10-K for the period ended December 31, 2019 (the "2019 10-K"), signed by Defendants Barton, Blachford, Bohutinsky, Frink, Hoag, Maffei, Stephenson, and Underwood.[40]  In the 2019 10-K, Zillow disclosed further losses from the Zillow Offers division, reporting a loss of $312.1 million on $1.37 billion in revenue for the year in the Homes segment.  Zillow reported a cost of revenue of $1.31 billion for the Homes segment, swallowing up 95.6% of the revenues reported, and reflecting no operational improvements year over year.

---

[39]    Pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), Spencer Rascoff, the CEO of Zillow at the time, certified that the 2018 10-K fully complied with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in the 2018 10-K fairly presented, in all material respects, the financial condition and results of operations of the Company.

[40]    Pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), Defendant Barton certified that the 2019 10-K fully complied with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in the 2019 10-K fairly presented, in all material respects, the financial condition and results of operations of the Company.

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 35

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

108.    In an analyst conference call to discuss the 2019 fourth quarter earnings, Barton provided guidance for the first quarter of 2020 with an expected "Homes segment EBITDA" between "a loss of $95 million to a loss of $85 million."

109.    Reflecting Zillow's lack of operational improvement, in October and November 2020, Moody's downgraded Zillow from High Yield 1 to High Yield 2, reflecting an increased probability of default.

110.    In the 2020 10-K, Zillow reported a further loss of $320.2 million on a revenue of $1.71 billion for the Homes segment. The Company reported a cost of revenue of $1.62 billion for the Homes segment, swallowing up 94.7% of the revenues reported.

111.    Analysts also warned about the excessive risk that Zillow was taking on for a low-margin business and pointed to the losses in the Zillow offers division in late 2019 and early 2020 as signs that Zillow Offer's long-term prospects were bleak.  On February 25, 2020, Gradient Analytics ("Gradient") initiated coverage of Zillow with a negative outlook-based on concerns over the Zillow Offers venture:

> Gradient initiated coverage of ZG on 10/29/19 with a negative outlook based on several fundamental and earnings quality concerns. ***We were concerned that ZG shifted its business from a scalable internet advertising firm to a labor-intensive home-flipping business.*** Specifically, we've been concerned that the Homes business may not be profitable in the long term, and ZG made this pivot just as growth in its core IMT business slowed to the lowest level in the firm's history.
>
> ***
>
> After examining ZG's latest results, we are still concerned about the long-term earnings sustainability of its Homes segments as providing a means to divert

---

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 36

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

attention away from the slowing Premier Agent business. Zillow Offers is a cash-and-inventory business with a high cost of revenue.

***

*[S]ince ZG began selling homes in Q3 2018, the firm has sold a total of 4,490 homes. We assume these represent the best opportunities that ZG was able to find, but the firm is still reporting losses of $56,742 per home in Q4. This loss represents 17.9% of per-home sales.*

***

[W]e remain concerned with the long-term profitability of the Homes segment *as ZG could have overpaid for early home purchases and its inventory may get skewed towards homes with deferred-maintenance issues, causing further viability challenges. . .*Therefore, we believe that a return to profitability may be overly optimistic in the near term….

***

Interestingly, despite a sales forecast that implies that there will be a rapid growth, ZG's profitability expectations continue to get pushed further out into the future.

112.    In another report on May 14, 2020, Gradient continued to voice concern over the Zillow Offers division "as it appears that ZG is taking excessive risk for such a low-margin business."

### G.    Zillow's False And Misleading Proxy Statement

113.    On April 21, 2021, Zillow filed the 2021 Proxy Statement with the SEC, which solicited stockholders to, among other things, elect Defendants Blachford, Stephenson, and Thielke to the Board.  The 2021 Proxy Statement was issued by order of the Board and was signed by Defendants Barton and Frink.

114.    The 2021 Proxy Statement contains the following statement regarding the Board's commitment to strong corporate governance practices:

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 37

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

At Zillow Group, we believe all employees and directors have a shared responsibility to maintain a culture of integrity. We view our corporate governance practices and policies as important drivers of our culture.

115. The 2021 Proxy Statement contains the following statement regarding risk oversight by the Board:

The Board considers the assessment of Company risks and development of strategies for risk mitigation to be a responsibility of the entire Board in consultation with the appropriate Board committee in the case of risks that are under the purview of a particular committee. The Board engages in risk oversight on a broad range of matters, including challenges associated with strategic acquisitions, regulatory and other legal and compliance matters, and threats relevant to our information technology environment . . . . Each committee generally reports on its deliberations to the full Board during the committee reports portion of the next Board meeting. This enables the Board and its committees to coordinate their risk oversight roles.

116. The 2021 Proxy Statement also delineates the Compensation Committee's role in recoupment of improper compensation:

We do not have a formal compensation recovery policy, but the compensation committee reserves the discretion to require that certain compensation payable to our executive officers be subject to recoupment in the event of misconduct. We are also subject to the clawback provisions for the Chief Executive Officer and Chief Financial Officer under the Sarbanes-Oxley Act of 2002, which provide that those executives must reimburse the Company for any bonus or other incentive-based or equity-based compensation received during the 12-month period following the preparation of an accounting restatement as a result of misconduct. The Board or the compensation committee will adopt a formal clawback policy no later than when the final rules relating to such policies become effective pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act and require such a policy to be in effect. The compensation committee will continue to impose clawback provisions in individual arrangements as it determines appropriate. . . .

117. The foregoing statements in the 2021 Proxy Statement were false and misleading and omitted material information. In fact, the Board failed to implement and maintain an effective

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 38

Case No. 2:22-cv-288

WEISSLAW LLP
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

system of internal controls to oversee the material risks posed to the Company, its stockholders and customers, and take action when presented with red flags of misconduct.

## VI.    DEMAND FUTILITY ALLEGATIONS

118.    Plaintiff brings this action derivatively for the benefit of Zillow to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties, waste of corporate assets, and violation of Sections 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

119.    Zillow is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

120.    Plaintiff is and has been at all relevant times, a shareholder of Zillow.  Plaintiff adequately and fairly represents the interests of Zillow in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to prosecute this action.

121.    Demand upon the Board to institute this action against the Individual Defendants would be futile and is, therefore, excused.  The Board is neither disinterested nor independent.

### A.    Demand Upon Defendant Barton Is Excused

122.    Defendant Barton is a co-founder of Zillow, currently serves as the Company's CEO, and before that served as Executive Chairman for nine years.  Thus, as the Company admits in its Proxy filings, he is not an independent director according to Nasdaq listing rules.  The Company provides Defendant Barton with his principal occupation from which he receives substantial compensation, including $8,446,226 during fiscal year 2020 alone.  Thus, Barton could

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 39

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

not consider a demand for action that might require him to sue the directors that control his continued employment and/or fellow members of management with whom he works on a day-to-day basis.

123.    Barton signed the 2021 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

124.    Barton will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  Barton holds 7,956,125 shares of Zillow Class A and Class B common shares, giving him 30.6% of the Company's voting control.  If Barton acknowledged that he, Zillow, or others engaged in misconduct, his investment in Zillow would be substantially devalued.  Further, if Barton acknowledged that executives at Zillow had engaged in the wrongdoing alleged, he would be acknowledging that he, as the CEO of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

125.    Defendant Barton is named as a defendant in the pending securities class action.  As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

126.    Barton has long-standing business relationships with several of the other directors which preclude them from acting in an independent and disinterested manner.  For example, Frink and Barton first met at Stanford University as classmates.  In 1994, Barton was recruited by a mutual friend to join Frink at Microsoft.[41]  Barton founded Expedia in 1996 within Microsoft, with

---

[41]    Greg Scheiderer, *Ammo For The House Hunt, Stanford Magazine,* July/August 2015,

---

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 40

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

Frink's help.  According to a *Stanford Magazine* article, "Frink was one of the first team members to join Barton at Expedia, which marked the beginning of [their] collaboration and ***close friendship***."[42]   After taking Expedia public in 1999, Barton served as the company's President and CEO from 1999 until 2003.  Frink was Vice President of Expedia from 1999 until 2004.  Together, the pair founded Zillow in 2005.  While Barton worked as a venture partner at Benchmark Capital, the firm invested heavily in Grubhub. Frink has been on the board of Grubhub for the last eight years.

127.    Barton and Maffei have served on the board of Qurate for the last five years, with Maffei serving as Chairman of the Board.  Barton is a director on the board of Netflix alongside Defendant Hoag for more than ten years.  Barton sat on the board of Avvo, which was financially backed by Benchmark Capital, with Defendant Bohutinsky from 2014 through 2018.  Barton is a 50% co-owner of a condominium with Defendant Blachford since the Company's initial public offering ("IPO") in 2011.[43]

128.    Barton, as a director of Zillow, was required to, but failed to implement and maintain an effective system of internal controls to oversee the material risks posed to the Company, its stockholders and customers, and take action when presented with red flags of misconduct.

---

https://stanfordmag.org/contents/ammo-for-the-house-hunt.

[42]    *Id.*

[43]    2021 Proxy Statement p. 8. *See also* the Prospectus filed with the SEC in conjunction with the IPO on July 19, 2011.

---

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 41

Case No. 2:22-cv-288

WEISSLAW LLP
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

129.    Barton knew or should have known that Zillow Offers was incurring substantial losses.  Barton was required to investigate and take action to prevent damage to Zillow, its shareholders, and customers but failed to take timely action, ignoring all red flags pointing to deficiencies in the Company's internal controls and corporate governance procedures.  Had Barton taken timely action, the damage caused to Zillow could have been prevented or minimized.

130.    Barton is not independent and faces a substantial likelihood of liability for his breaches of fiduciary duty and violations of federal securities laws.  Any demand upon Defendant Barton is futile and, thus, excused.

**B.    Demand Upon Defendant Blachford Is Excused**

131.    Defendant Blachford has been a Zillow director for more than sixteen years. Blachford will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  Blachford holds 146,497 shares of Zillow Class A common stock and 339,535 shares of Class C capital stock.  If Blachford admitted that he, Zillow, or others engaged in misconduct, his investment in Zillow would be substantially devalued.  Further, if Blachford acknowledged that executives at Zillow had engaged in the wrongdoing alleged, he would be acknowledging that he, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

132.    Blachford authorized the 2021 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

---

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 42

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

133.    Blachford benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Zillow Board through the false and misleading statements and material omissions in the 2021 Proxy Statement.

134.    Blachford has long-standing business relationships with several of the other directors which precludes him from acting in an independent and disinterested manner.   For example, Hoag and Blachford have a long-standing business relationship as members of TCV. Hoag is TCV's Founding General Partner, while Blachford serves as its Executive Advisor.  Hoag and Blachford are also board members of Peloton.  Notably, Peloton and Zillow are portfolio companies of TCV, thus TCV holds an investment interest in both Peloton and Zillow.  In addition, Hoag is designated as a member of TCV's Zillow investment team.[44]  According to the 2021 Proxy Statement, TCV beneficially owns nearly 5.8 million class C shares and 484,337 class A shares, making TCV, Zillow's ninth largest shareholder.[45]  Bohutinsky also consults as a venture partner at TCV since 2019.

135.    Blachford is a 50% co-owner of a condominium with Defendant Barton since the Company's IPO in 2011.[46]

---

[44]      TCV, Companies, https://www.tcv.com/companies/zillow/ (last visited February 28, 2022).

[45]      2021 Proxy Statement p. 29. *See also* Ed Lin, *Zillow Stock Has Surged. A Big Investor Is Buying up More, Barron's,* June 1, 2019, https://www.barrons.com/articles/zillow-stock-investor-class-c-shares-51559244841.

[46]      2021 Proxy Statement p. 8. *See also* the Prospectus filed with the SEC in conjunction with the IPO on July 19, 2011.

---

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 43

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

136.     Blachford, as a director of Zillow, was required to, but failed to implement and maintain an effective system of internal controls to oversee the material risks posed to the Company, its stockholders and customers, and take action when presented with red flags of misconduct.

137.     Blachford knew or should have known that Zillow Offers was incurring substantial losses.  Blachford was required to investigate and take action to prevent damage to Zillow, its shareholders, and customers but failed to take timely action, ignoring all red flags pointing to deficiencies in the Company's internal controls and corporate governance procedures.  Had Blachford taken timely action, the damage caused to Zillow could have been prevented or minimized.

138.     Further, Blachford failed to uphold his additional obligations as a member of the Nominating and Corporate Governance Committee, which include, *inter alia*, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.

139.     Blachford is not independent and faces a substantial likelihood of liability for his breaches of fiduciary duty and violations of federal securities laws.  Any demand upon Defendant Blachford is futile and, thus, excused.

**C.     Demand Upon Defendant Bohutinsky Is Excused**

140.     Since 2005, Bohutinsky has served in several leadership roles, including serving as the Company's COO until January 2019.  Thus, as the Company admits in its Proxy filings, she is not an independent director.

---

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 44

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

141.    Bohutinsky will not sue those responsible for the wrongdoing pled herein because doing so would harm her and her investments.  Bohutinsky holds 31,250 shares of Zillow Class A common stock and 211,487 shares of Class C capital stock.  If Bohutinsky admitted that she, Zillow, or others engaged in misconduct, her investment in Zillow would be substantially devalued.  Further, if Bohutinsky acknowledged that executives at Zillow had engaged in the wrongdoing alleged, she would be acknowledging that she, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

142.    Bohutinsky authorized the 2021 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

143.    Bohutinsky has long-standing business relationships with several of the other directors which precludes them from acting in an independent and disinterested manner.  For example, Bohutinsky has been a venture partner at TCV for close to three years.  Hoag is TCV's Founding General Partner, while Blachford serves as its Executive Advisor.  Hoag and Blachford are also board members of Peloton.  Notably, Peloton and Zillow are portfolio companies of TCV, thus TCV holds an investment interest in both Peloton and Zillow.  In addition, Hoag is designated as a member of TCV's Zillow investment team.[47]  According to the 2021 Proxy Statement, TCV beneficially owns nearly 5.8 million class C shares and 484,337 class A shares, making TCV,

---

[47]    TCV, Companies, https://www.tcv.com/companies/zillow/ (last visited February 28, 2022).

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 45

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

Zillow's ninth largest shareholder.[48]  Bohutinsky was on the board of Avvo with Defendant Barton from 2014 until 2018.[49]

144.    Bohutinsky, as a director of Zillow, was required to, but failed to implement and maintain an effective system of internal controls to oversee the material risks posed to the Company, its stockholders and customers, and take action when presented with red flags of misconduct.

145.    Bohutinsky knew or should have known that Zillow Offers was incurring substantial losses.  Bohutinsky was required to investigate and take action to prevent damage to Zillow, its shareholders, and customers but failed to take timely action, ignoring all red flags pointing to deficiencies in the Company's internal controls and corporate governance procedures. Had Bohutinsky taken timely action, the damage caused to Zillow could have been prevented or minimized.

146.    Bohutinsky is not independent and faces a substantial likelihood of liability for her breaches of fiduciary duty and violations of federal securities laws. Any demand upon Defendant Bohutinsky is futile and, thus, excused.

---

[48]    2021 Proxy Statement p. 29. *See also* Ed Lin, *Zillow Stock Has Surged. A Big Investor Is Buying up More.*

[49]    Avvo founder Mark Britton worked with Barton at Expedia before founding Avvo in 2007. *Pearson Communications*, June 12, 2014, https://pearsoncomms.com/zillow-cmo-joins-avvo/. Barton also worked as a venture partner at Benchmark Capital, one of Avvo's financial backers from 2005 until 2018.

---

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 46

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

**D.      Demand Upon Defendant Thielke Is Excused**

147.      Defendant Thielke authorized the 2021 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

148.      Further, Thielke benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing her re-election to the Zillow Board through the false and misleading statements and material omissions in the 2021 Proxy Statement.

149.      Thielke, as a director of Zillow, was required to, but failed to implement and maintain an effective system of internal controls to oversee the material risks posed to the Company, its stockholders and customers, and take action when presented with red flags of misconduct

150.      Thielke knew or should have known that Zillow Offers was incurring substantial losses.  Thielke was required to investigate and take action to prevent damage to Zillow, its shareholders, and customers but failed to take timely action, ignoring all red flags pointing to deficiencies in the Company's internal controls and corporate governance procedures.   Had Thielke taken timely action, the damage caused to Zillow could have been prevented or minimized.

151.      Further, as a member of the Audit Committee, Thielke had an additional obligation to protect the Company from material risks through the risk assessment and risk management practices described in the Audit Committee Charter.  In complete disregard of those obligations, Thielke failed to ensure that an adequate system of internal controls was implemented and maintained, exposing the Company to substantial financial and reputational damages.

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 47

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

152.    Thielke is not independent and faces a substantial likelihood of liability for her breaches of fiduciary duty and violations of federal securities laws.  Any demand upon Defendant Thielke is futile and, thus, excused.

### E.    Demand Upon Defendant Frink Is Excused

153.    Defendant Frink is a co-founder of Zillow and currently serves as its President and as the Chairman of the Board.  Frink has been a Zillow director for more than sixteen years.  Thus, as the Company admits in its Proxy filings, Frink is not an independent director according to Nasdaq listing rules.  The Company provides Defendant Frink with his principal occupation from which he receives substantial compensation, including $6,843,116 during fiscal year 2020 alone.  Thus, Frink could not consider a demand for action that might require him to sue the directors that control his continued employment and/or fellow members of management with whom he works on a day-to-day basis.

154.    Frink signed the 2021 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

155.    Defendant Frink is named as a defendant in the pending securities class action.  As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

156.    Frink will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  Frink holds 5,658,045 shares of Zillow Class A and Class

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 48

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

B common stock, giving him 19.9% of the Company's voting control.[50]  If Frink admitted that he,

Zillow, or others engaged in misconduct, his investment in Zillow would be substantially devalued.

Further, if Frink acknowledged that executives at Zillow had engaged in the wrongdoing alleged,

he would be acknowledging that he, as President of the Company, either knew of the wrongdoing

or should have known of the wrongdoing.

157.    Frink has a long-standing business and personal relationship with Defendant Barton

which precludes them from acting in an independent and disinterested manner.  Frink and Barton

first met at Stanford University as classmates.  In 1994, Barton was recruited by a mutual friend

to join Frink at Microsoft.[51]  Defendant Barton founded Expedia in 1996, with Frink's help.

According to a *Stanford Magazine* article, "Frink was one of the first team members to join Barton

at Expedia, which marked the beginning of [their] collaboration and ***close friendship***."[52]  Frink

was Vice President of Expedia from 1999 until 2004.  After taking Expedia public in 1999, Barton

served as the company's President and CEO from 1999 until 2003.  Together, the pair founded

Zillow in 2004.  While Barton worked as a venture partner at Benchmark Capital, the firm invested

heavily in Grubhub.  Frink has been on the board of Grubhub for the last eight years.

---

[50]     Frink also beneficially owns 4,142,783 shares of the Company's Class C capital stock. However, as noted previously, Class C capital stock is non-voting.

[51]     Greg Scheiderer, *Ammo For The House Hunt, Stanford Magazine,* July/August 2015, https://stanfordmag.org/contents/ammo-for-the-house-hunt.

[52]     *Id.*

---

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 49

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

158.    Frink, as a director of Zillow, was required to, but failed to implement and maintain an effective system of internal controls to oversee the material risks posed to the Company, its stockholders and customers, and take action when presented with red flags of misconduct.

159.    Frink knew or should have known that Zillow Offers was incurring substantial losses.  Frink was required to investigate and take action to prevent damage to Zillow, its shareholders, and customers but failed to take timely action, ignoring all red flags pointing to deficiencies in the Company's internal controls and corporate governance procedures.  Had Frink taken timely action, the damage caused to Zillow could have been prevented or minimized.

160.    Frink is not independent and faces a substantial likelihood of liability for his breaches of fiduciary duty and violations of federal securities laws.  Any demand upon Defendant Frink is futile and, thus, excused.

**F.    Demand Upon Defendant Hoag Is Excused**

161.    Defendant Hoag has been a Zillow director for more than sixteen years. Hoag will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  Hoag holds 516,531 shares of Zillow Class A common stock and 5,918,975 shares of Class C capital stock.  If Hoag admitted that he, Zillow, or others engaged in misconduct, his investment in Zillow would be substantially devalued.  Further, if Hoag acknowledged that executives at Zillow had engaged in the wrongdoing alleged, he would be acknowledging that he, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 50

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

162.    Hoag authorized the 2021 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

163.    Hoag has long-standing business relationships with several of the other directors which precludes them from acting in an independent and disinterested manner.  For example, Hoag and Blachford have a long-standing business relationship as members of TCV.  Hoag is TCV's Founding General Partner, while Blachford serves as its Executive Advisor.  Hoag and Blachford are also board members of Peloton.  Notably, Peloton and Zillow are portfolio companies of TCV, thus TCV holds an investment interest in both Peloton and Zillow.  In addition, Hoag is designated as a member of TCV's Zillow investment team.[53]  According to the 2021 Proxy Statement, TCV beneficially owns nearly 5.8 million class C shares and 484,337 class A shares, making TCV, Zillow's ninth largest shareholder.[54]  Bohutinsky also consults as a venture partner at TCV since 2019.  Hoag has been a director on the board of Netflix alongside Defendant Barton for more than ten years.  Hoag also served on the board of TripAdvisor along with Defendant Maffei for close to five years.  Maffei is also the CEO, President, and Chairman of the Board of Liberty TripAdvisor Holdings, which currently holds a majority of the voting rights in TripAdvisor.[55]

---

[53]    TCV, Companies, https://www.tcv.com/companies/zillow/ (last visited February 28, 2022).

[54]    2021 Proxy Statement p. 29. *See also* Ed Lin, *Zillow Stock Has Surged. A Big Investor Is Buying up More.*

[55]    Liberty TripAdvisor Holdings holds approximately a 23% equity interest and 58% voting interest in Tripadvisor. *See* 2021 Proxy Statement p.8.

---

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 51

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

164.    Hoag, as a director of Zillow, was required to, but failed to implement and maintain an effective system of internal controls to oversee the material risks posed to the Company, its stockholders and customers, and take action when presented with red flags of misconduct.

165.    Hoag knew or should have known that Zillow Offers was incurring substantial losses.  Hoag was required to investigate and take action to prevent damage to Zillow, its shareholders, and customers but failed to take timely action, ignoring all red flags pointing to deficiencies in the Company's internal controls and corporate governance procedures.  Had Hoag taken timely action, the damage caused to Zillow could have been prevented or minimized.

166.    Hoag is not independent and faces a substantial likelihood of liability for his breaches of fiduciary duty and violations of federal securities laws.  Any demand upon Defendant Hoag is futile and, thus, excused.

**G.    Demand Upon Defendant Maffei Is Excused**

167.    Defendant Maffei has been a Zillow director for more than sixteen years.  Maffei will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  Maffei holds 318,419 shares of Zillow Class A common stock and 705,425 shares of Class C capital stock.  If Maffei admitted that he, Zillow, or others engaged in misconduct, his investment in Zillow would be substantially devalued.  Further, if Maffei acknowledged that executives at Zillow had engaged in the wrongdoing alleged, he would be acknowledging that he, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

168.   Maffei authorized the 2021 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

169.   Maffei has long-standing business relationships with several of the other directors which precludes them from acting in an independent and disinterested manner.  For example, Maffei and Barton have served on the board of Qurate for the last five years, with Maffei serving as Chairman of the Board.  Maffei has served on the board of TripAdvisor along with Defendant Hoag for close to five years.  Maffei is also the CEO, President, and Chairman of the Board of Liberty TripAdvisor Holdings, which currently holds a majority of the voting rights in TripAdvisor.[56]

170.   Maffei, as a director of Zillow, was required to, but failed to implement and maintain an effective system of internal controls to oversee the material risks posed to the Company, its stockholders and customers, and take action when presented with red flags of misconduct.

171.   Maffei knew or should have known that Zillow Offers was incurring substantial losses.  Maffei was required to investigate and take action to prevent damage to Zillow, its shareholders, and customers but failed to take timely action, ignoring all red flags pointing to deficiencies in the Company's internal controls and corporate governance procedures.  Had Maffei taken timely action, the damage caused to Zillow could have been prevented or minimized.

---

[56]   *Id.*

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 53

Case No. 2:22-cv-288

WEISSLAW LLP
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

172.     Further, as Chair of the Audit Committee, Maffei had an additional obligation to protect the Company from material risks through the risk assessment and risk management practices described in the Audit Committee Charter.  In complete disregard of those obligations, Maffei failed to ensure that an adequate system of internal controls was implemented and maintained, exposing the Company to substantial financial and reputational damages.

173.     Maffei is not independent and faces a substantial likelihood of liability for his breaches of fiduciary duty and violations of federal securities laws.  Any demand upon Defendant Maffei is futile and, thus, excused.

### H.     Demand Upon Defendant Stephenson Is Excused

174.     Defendant Stephenson has a Zillow director for more than sixteen years. Stephenson will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  Stephenson holds 41,647 shares of Zillow Class A common stock and 140,263 shares of Class C capital stock.  If Stephenson admitted that he, Zillow, or others engaged in misconduct, his investment in Zillow would be substantially devalued.  Further, if Stephenson acknowledged that executives at Zillow had engaged in the wrongdoing alleged, he would be acknowledging that he, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

175.     Stephenson authorized the 2021 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

176.     Further, Stephenson benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Zillow Board through the false and misleading

---

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 54

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

statements and material omissions in the 2021 Proxy Statement.

177.    Stephenson, as a director of Zillow, was required to, but failed to implement and maintain an effective system of internal controls to oversee the material risks posed to the Company, its stockholders and customers, and take action when presented with red flags of misconduct.

178.    Stephenson knew or should have known that Zillow Offers was incurring substantial losses.  Stephenson was required to investigate and take action to prevent damage to Zillow, its shareholders, and customers but failed to take timely action, ignoring all red flags pointing to deficiencies in the Company's internal controls and corporate governance.  Had Stephenson taken timely action, the damage caused to Zillow could have been prevented or minimized.

179.    Stephenson failed to uphold his additional obligations as Chair of the Nominating and Corporate Governance Committee, which include, *inter alia*, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.

180.    As a member of the Audit Committee, Stephenson had an additional obligation to protect the Company from material risks through the risk assessment and risk management practices described in the Audit Committee Charter.  In complete disregard of those obligations, Stephenson failed to ensure that an adequate system of internal controls was implemented and maintained, exposing the Company to substantial financial and reputational damages.

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 55

Case No. 2:22-cv-288

WEISSLAW LLP
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

181.    Stephenson is not independent and faces a substantial likelihood of liability for his breaches of fiduciary duty and violations of federal securities laws.  Any demand upon Defendant Stephenson is futile and, thus, excused.

**I.      Demand Upon Defendant Underwood Is Excused**

182.    Underwood authorized the 2021 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

183.    Underwood, as a director of Zillow, was required to, but failed to implement and maintain an effective system of internal controls to oversee the material risks posed to the Company, its stockholders and customers, and take action when presented with red flags of misconduct.

184.    Underwood knew or should have known that Zillow Offers was incurring substantial losses.  Underwood was required to investigate and take action to prevent damage to Zillow, its shareholders, and customers but failed to take timely action, ignoring all red flags pointing to deficiencies in the Company's internal controls and corporate governance procedures. Had Underwood taken timely action, the damage caused to Zillow could have been prevented or minimized.

185.    Underwood is not independent and faces a substantial likelihood of liability for her breaches of fiduciary duty and violations of federal securities laws.  Any demand upon Defendant Underwood, is futile and, thus, excused.

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 56

Case No. 2:22-cv-288

WEISSLAW LLP
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

**J.      Other Factors Demonstrating That Demand Upon The Individual Defendants Is Excused**

186.    Zillow has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board has not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

187.    The members of the Board received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

188.    Publicly traded companies, such as Zillow, typically carry director & officer liability insurance from which the Company could potentially recover some or all its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover Zillow's damages.

**VII.    CLAIMS FOR RELIEF**

**<u>COUNT I</u>**

**Against the Individual Defendants for
Violations of Section 14(a) of the Exchange Act**

189.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 57

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

190.    The Section 14(a) claim alleged herein is based solely on negligence.  It is not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claim alleged herein does not allege and does not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

191.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

192.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

193.    The 2021 Proxy Statement was false and misleading and omitted material information that it failed to disclose that the Directors each violated their fiduciary duties to Zillow and its stockholders by, among other things, failing to implement and maintain an effective system

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 58

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

of internal controls to oversee the material risks posed to the Company, its stockholders and customers, and take action when presented with red flags of misconduct.

194.     Further, the Proxy Statement contained the false and misleading statements related to risk oversight by the Board, the Company's commitment to strong corporate governance principles, and the Company's commitment to recoup illegally obtained compensation.

195.     In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2021 Proxy Statement were materially false and misleading.  These misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statement, including, but not limited to the election of directors, ratification of an independent auditor, and advisory votes to approve compensation for certain executive officers and to set a schedule for future advisory votes on compensation.

196.     The misleading information contained in the 2021 Proxy Statement was material to Zillow's shareholders in determining whether to elect Blachford, Stephenson, and Thielke to the Board.

197.     The material misstatements and omissions in the 2021 Proxy Statement damaged the Company.

198.     Plaintiff, on behalf of Zillow, seeks relief for damages inflicted upon the Company based on the misleading 2021 Proxy Statement in connection with the improper election of certain members of the Board.

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 59

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

1
2

## COUNT II
**Against the Individual Defendants for Breach of Fiduciary Duty**

3
4

199.    Plaintiff incorporates by reference and realleges each allegation contained above, as though fully set forth herein.

5
6
7
8
9
10
11

200.    The Individual Defendants owed and owe fiduciary duties to Zillow.  By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe Zillow the highest obligation of good faith and loyalty in the administration of Zillow's affairs.  The Board also had specific fiduciary duties as defined by the Company's corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have prevented the misconduct and consequential harm to Zillow alleged herein.

12
13
14

201.    The Individual Defendants ignored their obligations under state and federal law. The Individual Defendants failed to make a good faith effort to correct the problems or prevent their recurrence.

15
16
17
18
19

202.    The Individual Defendants each violated their fiduciary duties to Zillow and its stockholders by, among other things, failing to implement and maintain an effective system of internal controls to oversee the material risks posed to the Company, its stockholders and customers, and take action when presented with red flags of misconduct.

20
21
22
23
24

203.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Zillow has sustained and continues to sustain significant damages and its reputation has been irreparably damaged.

25
26
27
28

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 60

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

204.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.  Plaintiff on behalf of Zillow has no adequate remedy at law.

**COUNT III**
**Against the Individual Defendants for Waste of Corporate Assets**

205.    Plaintiff incorporates by reference and realleges each allegation contained above, as though fully set forth herein.

206.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have subjected Zillow to substantial liability, irreparably damaged the Company's reputation, and wasted corporate assets.

207.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

208.    Plaintiff on behalf of Zillow has no adequate remedy at law.

**COUNT IV**
**Against the Individual Defendants for Aiding and Abetting**

209.    Plaintiff incorporates by reference and realleges each allegation contained above, as though fully set forth herein.

210.    In committing the wrongful acts pled herein, each of the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct.  In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

211.    Because the actions described herein occurred under the Board's supervision and authority, each of the Individual Defendants played a direct, necessary, and substantial part in the

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

conspiracy, common enterprise, and/or common course of conduct complained of herein.

212.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Zillow, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Zillow;

(c)     Declaring that the Individual Defendants violated Section 14(a) of the Exchange Act;

(d)     Determining and awarding to Zillow the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(e)     Directing Zillow to take all necessary action to reform and improve its compliance, internal control systems and corporate governance practices and procedures to protect the Company and its stockholders from a repeat of the damaging events described herein;

(f)     Awarding Zillow restitution from the Individual Defendants, and ordering disgorgement of all profits, benefits and other compensation obtained by them;

(g)     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

(h)     Granting such other and further relief as the Court deems just and proper.

## IX.   JURY DEMAND

Plaintiff hereby demands a trial by jury.

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 62

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

RESPECTFULLY SUBMITTED AND DATED this 9th day of March 2022.

**YANICK LAW & DISPUTE RESOLUTION PLLC**

By:     */s/ Miles A. Yanick*
Miles A. Yanick
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
Telephone: (206) 455-5924
Email: myanick@yanicklaw.com

David C. Katz (*pro hac vice* pending)
Mark D. Smilow (*pro hac vice* pending)
Joshua M. Rubin (*pro hac vice* pending)
**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010
Email: dkatz@weisslawllp.com
         msmilow@weisslawllp.com
         jrubin@weisslawllp.com

*Counsel for Plaintiff*

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 63

Case No. 2:22-cv-288

**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

## **VERIFICATION**

I, Leah Rosenfeld IRA, hereby verify that I am a stockholder of Zillow Group Inc. ("Zillow" or the "Company") and am ready, willing, and able to pursue this stockholder derivative action on behalf of Zillow. I first acquired Zillow stock in November 2020 and have held those shares continuously since that time. As such, I was a stockholder at the time of the transactions complained of in the Verified Stockholder Derivative Complaint ("Complaint"). I have reviewed the allegations in the Complaint, and as to those allegations of which I have personal knowledge, I know those allegations to be true, accurate and complete. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation, and for that reason I believe them to be true. Having received a copy of the foregoing complaint, and having reviewed it with my counsel, I hereby authorize its filing.

_____

Leah Rosenfeld IRA