1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

9

10   LEAH ROSENFELD IRA, derivatively on
     behalf of ZILLOW GROUP, INC.,

11                          Plaintiff,                    C22-288 TSZ

12          v.

13   RICHARD N. BARTON, *et al.*,

                                                         **CONSOLIDATED VERIFIED**
14                          Defendants,                   **STOCKHOLDER DERIVATIVE**
            and                                           **COMPLAINT**

15   ZILLOW GROUP, INC.,

16                          Nominal Defendant.            **JURY DEMAND**

17   BRIAN SISSON, derivatively on behalf of
     ZILLOW GROUP, INC.,

18
                            Plaintiff,                    C22-599 TSZ
19          v.

20   RICHARD N. BARTON, *et al.*,

21                          Defendants,
            and
22
     ZILLOW GROUP, INC.,
23
                            Nominal Defendant.
24

25

26

27   | CONSOLIDATED VERIFIED STOCKHOLDER | | **WEISS LAW** |
     | DERIVATIVE COMPLAINT | | 305 Broadway, 7th Floor |
28   | | | New York, New York 10007 |
     | Case No. 2:22-cv-288 | | Telephone: (212) 682-3025 |
     | | | Facsimile: (212) 682-3010 |

1

MICHAEL BLAKE RANDOLPH,
derivatively on behalf of ZILLOW GROUP,
INC.,

2

                    Plaintiff,                    C22-1000 TSZ

3

        v.

4

RICHARD N. BARTON, *et al.*,

5

                    Defendants,

6

    and

7

ZILLOW GROUP, INC.,

8

9

                    Nominal Defendant.

10        Plaintiffs Leah Rosenfeld IRA, Brian Sisson, and Michael Blake Randolph ("Plaintiffs"),

11    by their counsel,  submit this Consolidated Verified Stockholder Derivative Complaint (the

12    "Complaint") for the benefit of nominal defendant Zillow Group, Inc. ("Zillow" or the

13    "Company"), against the Individual Defendants (defined below) to remedy their breaches of

14    fiduciary duties and other violations of law from August 7, 2020, through November 17, 2021 (the

15    "Relevant Period"). These allegations are made upon personal knowledge concerning Plaintiffs

16    and, as to all other matters, upon information and belief based on the investigation of undersigned

17    counsel, which includes, without limitation: (a) review and analysis of public filings made by

18    Zillow with the United States Securities and Exchange Commission ("SEC"); (b) review and

19    analysis of press releases and other publications disseminated by Zillow; (c) review of news

20    articles, stockholder communications, and postings on Zillow's website concerning the

21    Company's public statements; (d) pleadings, papers, and any documents filed with and publicly

22    available from the related consolidated securities fraud class action pending in this Court captioned

23    *Barua v. Zillow Group Inc., et al.*, Case No. 2:21cv1551 (the "Securities Class Action"); (e) review

24    and analysis of documents produced by Zillow, and (f) review of other publicly available

25    information concerning Zillow and the Individual Defendants. Plaintiffs believe that substantial

26

27    CONSOLIDATED VERIFIED
      STOCKHOLDER DERIVATIVE
28    COMPLAINT - 1

      Case No. 2:22-cv-288

**WEISS LAW**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

1 additional evidentiary support will exist for the allegations after a reasonable opportunity for
2 further discovery.

3 **NATURE OF THE ACTION**

4 1. This is a stockholder derivative action asserting claims for breach of fiduciary duty
5 and other violations of law against the Company's Board of Directors (the "Board") and certain
6 officers.

7 2. Zillow is a real estate services company that operates popular real estate websites
8 including Zillow and Trulia. In addition to the generation of advertising revenue from these
9 websites, Zillow earns referral fees when matching prospective buyers and sellers with real estate
10 agents and brokers.

11 3. In 2018, the Company launched its Zillow Offers program, also known as an
12 iBuying program, wherein Zillow Offers buys homes for cash, eliminating the need for sellers to
13 stage and show their homes. Zillow Offers handles any repairs and then resells the properties.

14 4. The term "iBuyer" is used because companies with this program use algorithms to
15 quickly value, buy, and sell the homes. The principle behind iBuying is simple: leveraging the
16 power of big data, tech firms estimate the price at which they think they can sell a property, which
17 then informs their offers to buy. They tend to offer lower prices than traditional buyers, but attract
18 sellers by promising faster, all-cash deals.

19 5. The Individual Defendants believed they had the secret to mastering the iBuying
20 world: the Zestimate. Launched in 2006, this algorithm was a confluence of two things: Zillow's
21 purported expertise in pricing homes, and a method of buying properties that relied on accurate
22 estimates. Properly collecting, analyzing, and utilizing real estate data to support the Company's
23 business plan and manage inventory was crucial to Zillow Offers' core operations. Failing to
24 oversee the vast trove of data maintained by the Company would result in excess or overvalued
25 inventory and decreased revenue, forcing Zillow to sell inventory at a loss.

26

27 CONSOLIDATED VERIFIED
28 STOCKHOLDER DERIVATIVE
COMPLAINT - 2

Case No. 2:22-cv-288

**WEISS LAW**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

6.      The Individual Defendants were aware of these substantial risks, having recognized them in public filings with the SEC. Indeed, the Individual Defendants repeatedly assured stockholders in the Company's Annual Report for fiscal year 2020 and its quarterly reports thereafter that these risks were being properly managed and that proper internal controls and corporate governance practices to monitor these risks had been implemented. However, the Individual Defendants were aware of red flags demonstrating that the Company was failing to properly collect, analyze, and utilize real estate data to support its business plan and manage inventory.

7.      During the Relevant Period, the Individual Defendants regularly attended Board meetings (defendants Barton, Blachford, Bohutinsky, Frink, Hoag, Maffei, Parker, Prawer, Stephenson, Thielke, Underwood, and Wacksman) and Audit Committee meetings (defendants Blachford, Maffei, and Stephenson) where the scope of the Zillow Offers program and its importance to the Company were discussed. As early as March of 2019, a Board Memo outlined that the "Board is very focused on growing the Offers business and knows it will be an expensive proposition." *See* ZILLOW-00000312. Moreover, the Board knew that the Company had "invested heavily in machine learning to build pricing accuracy into Offers." *See* ZILLOW-00000327.

8.      However, by June of 2019, the Individual Defendants were already aware of problems with the Zillow Offers program. A Board Memo from that same month stated that the "Company is aware of problem with quality of offerings, reflected in 50% drop in conversion rate." ZILLOW-00000275. The same Board Memo recognized that "Offers is behind the competition in tech, operations, and geographic reach." ZILLOW-00000287. Zillow Offers was also already suffering a cash burn due to the "huge increase in homes inventory." ZILLOW00000301.

9.      By August of 2019, the Audit Committee had realized that the valuation of homes in the Zillow Offers program was a significant audit risk. ZILLOW-00000734.

10.     Inventory and the quality of Zillow Offers' inventory continued to be ongoing problems. A September 2019 Board Memo noted "[o]ffer quality is still a problem – satisfaction

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 3

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

is well below goal. Zestimates are 4% higher than offers made, so sellers are dissatisfied." ZILLOW-00000236. The same Memo acknowledged that "risk management 'is a muscle new to Zillow'" and that "controls are still in baby stage with only basic procedures in place." ZILLOW-00000238-39. A Board Memo from December 2019 acknowledged "[i]naccurate valuation is a problem, losing money on every home sale, conversion % continuing to drop, expenses – including renovation – too high. Losers include even homes at the top of Zillow's purchase criteria." ZILLOW-00000212.

11.    The Individual Defendants continued to internally discuss these issues throughout the Relevant Period. For example, a September 2020 Board Memo noted in a summary of the Offers business that "costs are still too high, and profitability is a challenge. Accuracy of valuation is still a problem. Sellers see Offers as to expensive." ZILLOW-00000364-65.

12.    Nothing had changed at the Company in 2021. For instance, a Board Memo from March 2021 noted "'issues with Zestimate being too conservative are muddying the picture on conversion and profitability, buying fewer houses than projected, awareness of Offers is 'meager.'" ZILLOW-00000143. By June of 2021, things had only gotten worse. A Board Memo from June noted "Offers is still behind competitors in key areas including renovation costs . . . as evidenced by widening gap of acquisition volumes in key head-to-head markets." ZILLOW-0000051.

13.    The Individual Defendants failed to heed these red flags, allowed the Company to operate with inadequate internal controls and corporate governance procedures, and failed to take action to prevent the harm to the Company and its stockholders caused thereby. Nonetheless, many of the Individual Defendants sold over $116 million worth of their Zillow stock while they were in possession of material non-public information regarding the Company's true organic growth (or lack thereof) from Zillow Offers and the artificial manipulations thereto that materially affected the Company's financial results. The eventual disclosure of each issue would prove to adversely affect the Company's stock price and market capitalization.

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 4

Case No. 2:22-cv-288

**WEISS LAW**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

14.     Clandestinely going against the grain of the entire Zillow Offers business plan presented to investors, between April and May 2021, Zillow management overrode the offer prices generated by Zillow's algorithms and pricing analysts, and significantly increased the prices Zillow Offers paid for homes. Zillow management engaged in this practice to entice more home sellers to accept offers so that Zillow could achieve volume goals and remain competitive.

15.     The Individual Defendants also initiated or knew of Project Ketchup, which was the name given to this new strategy to "catch up" with the Company's internal goals and its competitors by accelerating purchases of homes. To compensate for the increased purchase prices being paid to home sellers, the Individual Defendants decreased the scope of home renovations, and the prices Zillow would pay to contractors for those renovations.

16.      The renovation cost-cutting and the squeeze on contractors came at a time when Zillow was relying on those contractors to quickly renovate a significantly higher volume of houses. Zillow's contractors, however, deprioritized or declined Zillow jobs.

17.     As a result of the foregoing, Zillow's inventory kept growing and contractors did not complete projects on time or agreed to fewer projects. This caused houses to sit in inventory longer. When houses sit in Zillow's inventory longer, the cost to Zillow rises.

18.     During the Relevant Period, the Individual Defendants, in further breach of their fiduciary duties, caused the Company to make materially false and/or misleading statements and failed to disclose material adverse facts about the Zillow Offers program. Specifically, the Individual Defendants repeatedly, falsely touted the strength and sustainability of the Company's Zillow Offers business and failed to disclose to investors that: (a) the Company knew that it did not have the ability to accurately price homes for its Zillow Offers business; (b) the Company increased its risk profile by deliberately over-paying for homes well beyond the prices set by its algorithms and analyst pricing; (c) this reduced the funds available for renovations, which caused a bottleneck and created a huge backlog of inventory in the Zillow Offers business; (d) as a result of the foregoing, the Company was reasonably likely to wind-down its Zillow Offers business,

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 5

Case No. 2:22-cv-288

1    which would have a material adverse impact on the Company's financial results; and (e) as a result,

2    the Individual Defendants' positive statements about the Company's business, operations, and

3    prospects were materially misleading and/or lacked a reasonable basis.

4    19.    The truth started to emerge on October 18, 2021, when Zillow announced a

5    moratorium on new contracts in the Zillow Offers division. The Company also announced it would

6    stop pursuing new homes for the remainder of the year as it worked through a backlog of properties

7    already in its pipeline. On November 2, 2021, Zillow released its third quarter 2021 financial

8    results reporting losses of $422 million and disclosing that it was shutting down Zillow Offers.

9    The Company further disclosed that its home valuation process was inadequate and that, as a result,

10    Zillow would be forced to unload thousands of properties at drastically reduced prices.

11    20.    On November 17, 2021, a *Wall Street Journal* article reported that in the spring of

12    2021, when it became clear that Zillow was substantially short of its annual target for the number

13    of homes it wanted to buy and was falling behind its top competitor, the Company hatched the

14    above discussed "Project Ketchup," the undisclosed strategy to buy more homes by spending more

15    money, offering prices well above what its algorithm and analysts picked as market value, which

16    was accomplished in part by manipulating the Company's algorithm to add in automatic price

17    increases—including one called the "gross pricing overlay" that added as much as 7%—and

18    routinely overruling analysts' objections to the increased pricing. This overstretched Zillow's

19    personnel responsible for closings and renovations and reduced the budget available for

20    renovations amid a broader labor and supply shortage. It also resulted in houses sitting unsold for

21    longer periods of time, added to insurance and debt bills, and pushed forward the sale of purchased

22    homes to the winter, when the housing market is historically weaker. In February 2022, the

23    Company reported additional losses amounting to more than $880 million in the Zillow Offers

24    division.

25    21.    In the wake of the substantial losses incurred by the Company and its downward

26    spiraling stock price caused thereby, three securities fraud class action lawsuits were filed against

27    CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
28    COMPLAINT - 6

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

1    the Company that were consolidated into the Securities Class Action. The Securities Class Action

2    alleges that the Company and several of its officers and directors made materially false and/or

3    misleading statements and omissions about the Company's ability to accurately assess the value

4    of homes it was buying and selling and to adequately manage its inventory. On December 7, 2022,

5    the motion to dismiss was denied in part in the Securities Class Action. As such, the Company is

6    now subject to substantial liability and will be forced to expend substantial sums to defend itself

7    and its officers.

8         22.    Through this action, Plaintiffs seek to recover for Zillow its damages caused by the

9    Individual Defendants' breaches of fiduciary duty and violations of the federal securities laws.

10   Demand to bring this action is excused because the Individual Defendants are neither disinterested

11   nor independent, making any such demand futile.

12                              **JURISDICTION AND VENUE**

13        23.    This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331

14   because Plaintiffs allege claims arising under the laws of the United States. The Court has

15   supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a)

16   because they are related to the claims arising under this Court's original jurisdiction and part of

17   the same case or controversy. This action is not a collusive action designed to confer jurisdiction

18   on a court of the United States that it would not otherwise have.

19        24.    This Court also has diversity jurisdiction over this action pursuant to 28 U.S.C.

20   §1332. At the time that Plaintiffs Leah Rosenfeld IRA and Brian Sisson filed their respective

21   actions, each of them was completely diverse from all of the defendants named therein. The

22   amount in controversy exceeds $75,000. This Court has personal jurisdiction over each of the

23   Defendants because each is either present in this District for jurisdictional purposes or has

24   sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this

25   Court permissible under traditional notions of fair play and substantial justice.

26

27   CONSOLIDATED VERIFIED
     STOCKHOLDER DERIVATIVE                                    **WEISS LAW**
28   COMPLAINT - 7                                             305 Broadway, 7th Floor
                                                              New York, New York 10007
     Case No. 2:22-cv-288                                     Telephone: (212) 682-3025
                                                              Facsimile: (212) 682-3010

25.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because (a) Zillow maintains its principal executive offices in this District; (b) a substantial portion of the transactions and wrongs complained of herein occurred in the District; and (c) Defendants have received substantial compensation and other transfers of money in the District by doing business and engaging in activities having an effect in the District.

## PARTIES

### A.     Plaintiffs

26.     Plaintiff Leah Rosenfeld IRA has been a stockholder of Zillow since November 2020, was a stockholder of Zillow at the time of the wrongdoing alleged herein and has been a stockholder of Zillow continuously since that time. Leah Rosenfeld IRA is a citizen of New York.

27.     Plaintiff Brian Sisson has been a stockholder of Zillow since November 2020, was a stockholder of Zillow at the time of the wrongdoing alleged herein and has been a stockholder of Zillow continuously since that time. Brian Sisson is a citizen of Michigan.

28.     Plaintiff Michael Blake Randolph has been a stockholder of Zillow since December 2020, was a stockholder of Zillow at the time of the wrongdoing alleged herein and has been a stockholder of Zillow continuously since that time. Michael Blake Randolph is a citizen of Texas.[1]

29.     Plaintiff Bruce Taylor has been a stockholder of Zillow since at least February 2021, was a stockholder of Zillow at the time of the wrongdoing alleged herein and has been a stockholder of Zillow continuously since that time. Bruce Taylor is a citizen of Arizona.

---

[1] Mr. Randolph is named as a plaintiff solely because he is the named plaintiff in the *Randolph* action that was consolidated with and into this consolidated action. Plaintiff Bruce Taylor intends to intervene in the *Randolph* action for purposes of substituting for Mr. Randolph shortly after this Consolidated Verified Stockholder Complaint is filed.

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 8

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

1    B.    **Defendants**

2        1.    **Nominal Defendant Zillow Group, Inc.**

3        30.    Zillow, incorporated under Washington law and headquartered at 1301 Second

4    Avenue, Seattle, WA 98101, is a digital real estate company, operating real estate brands on mobile

5    applications and websites in the United States. Its common stock trades on the Nasdaq Stock

6    Market under the ticker symbol "ZG." The Company operates through three segments: Homes;

7    Internet, Media & Technology ("IMT"); and Mortgages. The Homes segment is involved in resale

8    of homes and title and escrow services to home buyers and sellers, including title search procedures

9    for title insurance policies, escrow, and other closing services. The IMT segment offers premier

10    agent, rentals, and new construction marketplaces, as well as dotloop, display, and other

11    advertising, as well as business software solutions. The Mortgage segment provides home loans;

12    and marketing products including custom quote and connect services.

13        2.    **Defendant Richard N. Barton**

14        31.    Defendant Richard N. Barton ("Barton") is a director of Zillow since 2005 and

15    serves as its Chief Executive Officer ("CEO"). Barton co-founded Zillow in 2005 and served as

16    CEO until 2010, when he became the Company's executive chairman. He returned as CEO in early

17    2019. For fiscal year 2020, Barton worked as a venture partner at Benchmark Capital, a venture

18    capital fund. Barton also sits on the boards of Netflix, Inc. ("Netflix"), and Qurate Retail Inc.

19    ("Qurate"), and he sat on the board of Avvo Inc. ("Avvo") from 2014 until 2018, until it was

20    acquired by Internet Brands Inc. Before Zillow, Barton founded Expedia Group, Inc. ("Expedia")

21    within the Microsoft Corporation in 1996, where he was president and CEO from 1999 until 2003,

22    and he successfully spun Expedia out as a public company in 1999. According to the Company's

23    proxy statement filed with the SEC on April 26, 2023 (the "2023 Proxy"), Barton received total

24    compensation of $8,446,226 in 2020, $20,955,934 in 2021, and 11,503,768 in 2022.

25        32.    As of April 26, 2023, Barton owned 4,192,400 Class A common stock; 3,763,725

26    Class B common stock; 8,225,199 Class C common stock and held 31.7 % total voting power.

27    CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
28    COMPLAINT - 9

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

Barton is a citizen of Washington. During the Relevant Period, Barton made the following sales of stock:

| Date | Class | Shares | Price (Average) | Proceeds |
|------|-------|--------|-----------------|----------|
| 3/1/2021 | A | 43,750 | $175.61 | $7,669,929.04 |
| 3/1/2021 | C | 87,500 | $167.38 | $14,624,790.28 |
| 3/8/2021 | C | 94,046 | $130.78 | $12,036,849.91 |
| 3/16/2021 | C | 343,940 | $149.69 | $51,218,779.33 |
| **Total Proceeds:** | | | | **$85,550,348.56** |

33.     Barton's most recent sale of stock prior to March 1, 2021 was on August 7, 2020—almost seven months before. He has sold no stock from March 16, 2021 through the date of this Complaint.

### 3.     Defendant David Beitel

34.     Defendant David Beitel ("Beitel") has served as Chief Technology Officer since February 2005. During the Relevant Period, he made the following sales of stock:

| Date | Class | Shares | Price | Proceeds |
|------|-------|--------|-------|----------|
| 3/2/2021 | C | 214 | $168.85 | $36,134.50 |
| 3/2/2021 | C | 1,155 | $168.02 | $194,060.79 |
| 3/2/2021 | C | 3,206 | $166.79 | $534,739.32 |
| 3/2/2021 | C | 4,775 | $165.97 | $792,513.91 |
| 4/1/2021 | C | 156 | $136.64 | $21,315.06 |
| 4/1/2021 | C | 520 | $134.38 | $69,878.69 |
| 4/1/2021 | C | 792 | $135.65 | $107,436.78 |
| 4/1/2021 | C | 1,542 | $132.64 | $204,531.81 |
| 4/1/2021 | C | 1,990 | $133.57 | $265,794.55 |
| 5/3/2021 | C | 250 | $127.33 | $31,833.00 |
| 5/3/2021 | C | 300 | $130.69 | $39,207.63 |
| 5/3/2021 | C | 300 | $129.69 | $38,908.02 |
| 5/3/2021 | C | 650 | $128.80 | $83,719.74 |
| 5/3/2021 | C | 950 | $126.29 | $119,978.35 |
| 5/3/2021 | C | 1,150 | $124.35 | $143,002.50 |
| 5/3/2021 | C | 1,400 | $125.17 | $175,244.16 |
| 6/1/2021 | C | 3,149 | $113.77 | $358,257.95 |
| 6/1/2021 | C | 1,000 | $114.44 | $114,439.30 |
| 6/1/2021 | C | 400 | $115.76 | $46,304.00 |
| 6/1/2021 | C | 200 | $117.01 | $23,402.50 |
| 6/1/2021 | C | 200 | $118.05 | $23,609.50 |

| Date | Class | Shares | Price | Proceeds |
|------|-------|--------|-------|----------|
| 6/1/2021 | C | 51 | $118.74 | $6,055.89 |
| 7/1/2021 | C | 3,668 | $120.98 | $443,746.57 |
| 7/1/2021 | C | 388 | $122.35 | $47,471.30 |
| 7/1/2021 | C | 843 | $123.42 | $104,044.66 |
| 7/1/2021 | C | 101 | $124.10 | $12,533.60 |
| 8/5/2021 | C | 3,670 | $110.35 | $404,992.21 |
| 8/5/2021 | C | 1,330 | $111.13 | $147,805.29 |
| **Total Proceeds:** | | | | **$4,590,961.57** |

### 4. Defendant Erik Blachford

35.     Defendant Erik Blachford ("Blachford") is a Zillow director since 2005, a member of its Nominating and Corporate Governance Committee, and a member of its Audit Committee during the Relevant Period. He is a venture partner at Technology Crossover Ventures ("TCV") since March 2011. Zillow is a TCV portfolio company. Blachford also sits on the board of Peloton Interactive, Inc. ("Peloton"), another TCV portfolio company.

36.     As of April 26, 2023, Blachford beneficially owned 49,019 Zillow Class A shares and 119,787 Zillow Class C shares. Defendant Blachford received compensation of $250,000 as a director in 2020, 2021, and 2022. He is a citizen of the United Kingdom. During the Relevant Period, Blachford made the following sales of stock:

| Date | Class | Shares | Price | Proceeds |
|------|-------|--------|-------|----------|
| 2/24/2021 | A | 4,602 | $174.87 | $804,766.01 |
| 2/24/2021 | C | 9,204 | $167.25 | $1,539,402.13 |
| **Total Proceeds:** | | | | **$2,344,168.14** |

37.     Blachford's most recent sale of stock prior to February 24, 2021, was on November 30, 2020—almost three months before. He did not sell stock after February 24, 2021, until that September 1—over six months later.

### 5. Defendant Amy C. Bohutinsky

38.     Defendant Amy C. Bohutinsky ("Bohutinsky") is a Zillow director since 2018, a member of its Compensation Committee, and a member of its Nominating and Corporate Governance Committee. She has served in several leadership roles at Zillow since 2005, including Chief Marketing Officer and Chief Operating Officer ("COO"). She is a venture partner at TCV and sat on the board of Avvo from 2014 until 2018. As of April 26, 2023, she beneficially owned

31,250 Zillow Class A shares and 222,064 Zillow Class C shares. She received compensation of $250,000 as a director in 2020, 2021, and 2022. Bohutinsky is a citizen of Washington.

### 6. Defendant Susan Daimler

39.    Defendant Susan Daimler ("Daimler") has served as President of Zillow since February 2021. On September 8, 2021, Daimler's husband, Matthew, sold 23,309 shares of Class C capital stock for total proceeds of $2.219 million. This was his first sale of Zillow stock, and he did not sell any more stock until May 18, 2022 – over nine months later. He then sold Zillow stock another seven times through May 22, 2023. He sold a total of 23,082 shares of Zillow stock in 8 sales after September 8, 2021 – collectively less than he sold on that single day.

### 7. Defendant Lloyd Frink

40.    Defendant Lloyd Frink ("Frink") is a co-founder of Zillow, Chairman of the Board and President since 2019, and a director since 2005. Since founding the Company, he has served in many leadership roles, including Treasurer and Chief Strategy Officer. Frink also has sat on the board of Grubhub Inc. ("Grubhub") since 2013. From 1999 until 2004, he was a Senior Vice President at Expedia, a company he helped Barton create. As of April 26, 2023, Frink owned 3,206,188 Class A common stock; 2,453,722 Class B common stock; 4,759,562 Class C common stock, and held 20.6% total voting power. Frank received $6,843,116 in total executive compensation for 2020, and $$16,936,143 in 2021. Frink is a citizen of Washington.

### 8. Defendant Jay Hoag

41.    Defendant Jay Hoag ("Hoag") is a Zillow director since 2005 and Chair of the Compensation Committee. Hoag co-founded TCV in 1995 and continues to serve as a Founding General Partner. Hoag also sits on the boards of Netflix, TripAdvisor, Inc. ("TripAdvisor"), and Peloton. Hoag received compensation of $250,000 in 2020, 2021, and 2022. As of April 6, 2023, Hoag beneficially owned 516,531 Zillow Class A shares and 5,923,366 Zillow Class C shares. Hoag is a citizen of California.

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 12

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

1

### 9. Defendant Aimee Johnson

2       42.    Defendant Aimee Johnson ("Johnson") has served as the Company's Chief

3   Marketing Officer since 2018, according to her LinkedIn profile.

4

### 10. Defendant Gregory Maffei

5       43.    Defendant Gregory Maffei ("Maffei") has served as a Zillow director since 2005

6   and was the chair of its Audit Committee during the Relevant Period. He serves as Chairman of

7   the Board of Qurate and as a director of TripAdvisor. He is also the CEO and Chairman of the

8   Board of Liberty TripAdvisor Holdings, which holds a majority of the voting rights of

9   TripAdvisor. He received compensation of $250,000 for fiscal years 2020, 2021, and 2022. As of

10  April 26, 2023, he beneficially owned 316,485 Zillow Class A shares and 711, 548 Zillow Class

11  C shares. He is a citizen of Colorado or Idaho. On March 2, 2021, Maffei sold 2,296 shares of

12  Class C capital stock for total proceeds of $380,864. His most recent prior sale was on February 28,

13  2020—over a year before. He did not sell any Zillow stock again until February 25, 2022—almost

14  a year later.

15

### 11. Defendant Allen W. Parker

16      44.    Defendant Allen W. Parker ("Parker") has served as the Company's Chief Financial

17  Officer from 2018 to 2023. Parker received $5,283,623 in total executive compensation for fiscal

18  year 2020, $14,019,442 in 2021, and $10,206,860 in 2022. As of April 26, 2023, he beneficially

19  owned 1,037,629 Zillow Class C shares. He is a citizen of Washington.

20

### 12. Defendant Arik Prawer

21      45.    Defendant Arik Prawer ("Prawer") has served as President of Zillow's Homes

22  Division since December 2019. Prawer previously served as President, Homes Division and

23  Co-Head of Zillow Offers from June 2018 to December 2019, and Chief Business Development

24  Officer from February 2018 to June 2018.

25

26

27  CONSOLIDATED VERIFIED
    STOCKHOLDER DERIVATIVE

28  COMPLAINT - 13

    Case No. 2:22-cv-288

**WEISS LAW**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

1

**13.    Defendant Dan Spaulding**

2    46.    Defendant Dan Spaulding ("Spaulding") has served as Chief People Officer since

3    April 2016.

4

**14.    Defendant Gordon Stephenson**

5    47.    Defendant Gordon Stephenson ("Stephenson") has served as a Zillow director since

6    2005, Chair of its Nominating and Corporate Governance Committee, and was a member of its

7    Audit Committee during the Relevant Period. As of April 6, 2023, Stephenson beneficially owned

8    41,647 Zillow Class A shares and 150,840 Zillow Class C shares. Stephenson received

9    compensation of $250,000 in fiscal years 2020, 2021 and 2022. He is a citizen of Washington. On

10    February 18, 2021, Stephenson sold 11,004 shares of Class C capital stock for total proceeds of

11    $1.989 million. His most recent prior sale of Zillow stock was over three months earlier on

12    November 6, 2020, and he sold no shares of Zillow stock from February 18, 2021 until January

13    12, 2022.

14

**15.    Defendant Claire Cormier Thielke**

15    48.    Defendant Claire Cormier Thielke ("Thielke") is a Zillow director since 2020 and

16    a member of its Audit Committee. As of April 6, 2023, Thielke beneficially owned 14,135 Zillow

17    Class C shares. Thielke received compensation of $125,100 as a director in 2020, and $250,000 in

18    2021 and 2022. Thielke is a citizen of Texas.

19

**16.    Defendant April Underwood**

20    49.    Defendant April Underwood ("Underwood") has served as a Zillow director since

21    2017 and is a member of its Compensation Committee. As of April 6, 2023, Underwood

22    beneficially owned 54,342 Zillow Class C shares. Underwood received compensation of $250,000

23    in fiscal years 2020, 2021, and 2022. She is a citizen of California.

24

**17.    Defendant Jeremy Wacksman**

25    50.    Defendant Jeremy Wacksman ("Wacksman") has served as the Company's COO

26    since February 2021. Since joining the Company in 2009, Wacksman has held a number of

27    CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
28    COMPLAINT - 14

Case No. 2:22-cv-288

1  leadership positions including President of Zillow from December 2019 to February 2021,

2  President, Zillow Brand, and Co-Head of Zillow Offers from June 2018 to December 2019, Chief

3  Marketing Officer from July 2016 to June 2018, Chief Marketing Officer of Zillow from August

4  2015 to July 2016, and Vice President of Marketing and Product Management from 2009 to August

5  2015. As of April 6, 2023, Wacksman beneficially owned 3,089 Zillow Class A shares and

6  1,037,629 Zillow Class C shares. Wacksman received $6,843,784 in executive compensation in

7  fiscal year 2020, $16,725,163 in 2021, and $14,267,096 in 2022. Upon information and belief,

8  Wacksman is a citizen of Washington.

9      51.    Collectively, Individual Defendants Barton, Beitel, Blachford, Bohutinsky,

10  Daimler, Frink, Hoag, Johnson, Maffei, Parker, Prawer, Spaulding, Stephenson, Thielke

11  Underwood, and Wacksman are referred to herein as the "Individual Defendants," and together

12  with Zillow, as the "Defendants."

13                    **DUTIES OF THE INDIVIDUAL DEFENDANTS**

14      52.    By reason of their positions as officers and/or directors of the Company and because

15  of their ability to control the business and corporate affairs of the Company, the Individual

16  Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty,

17  and candor and were and are required to use their utmost ability to control and manage the

18  Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are

19  required to act in furtherance of the best interests of the Company and its stockholders so as to

20  benefit all stockholders equally and not in furtherance of their personal interest or benefit. Each

21  director and officer of the Company owes to the Company and its stockholders the fiduciary duty

22  to exercise good faith and diligence in the administration of the affairs of the Company and in the

23  use and preservation of its property and assets, and the highest obligations of fair dealing.

24      53.    The Individual Defendants, because of their positions of control and authority as

25  directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise

26  control over the wrongful acts complained of herein.

27  CONSOLIDATED VERIFIED
    STOCKHOLDER DERIVATIVE                    **WEISS LAW**
                                              305 Broadway, 7th Floor
28  COMPLAINT - 15                            New York, New York 10007
                                              Telephone: (212) 682-3025
    Case No. 2:22-cv-288                      Facsimile: (212) 682-3010

54.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial and corporate affairs and assets of the Company. By virtue of such duties, the officers and directors of Zillow were required to, among other things:

   a.  ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

   b.  conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

   c.  properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

   d.  remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

   e.  ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

55.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a conscious disregard for their duties to the Company and its stockholders that Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 16

Case No. 2:22-cv-288

**WEISS LAW**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

**A.    Additional Duties Under The Code Of Business Conduct**

56.    The Company's Code of Business Conduct (the "Code" or "Code of Conduct") applies to all employees, including officers and members of the Board.

57.    The Code provides that Zillow "is committed to promoting high standards of honest and ethical business conduct and compliance with applicable laws, rules and regulations." It states:

> Honest and Ethical Conduct and Fair Dealing
>
> Every person subject to this Code should endeavor to deal honestly, ethically, and fairly with the Company's consumers, customers, suppliers, competitors and employees. Statements regarding the Company's products and services must not be false, misleading, deceptive or fraudulent. No person subject to this Code may take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice.

58.    The Code of Conduct also states that "the Company requires that all persons subject to this Code comply with all laws, rules and regulations applicable to the Company wherever it does business."

59.    The Code of Conduct delineates the obligation to report violations of any law, rule, or regulation:

> If any person subject to this Code becomes aware of the violation of any law, rule or regulation by the Company, whether by its officers, employees, directors, or any third party doing business on behalf of the Company, it is such person's responsibility to follow the guidelines described in the Reporting and Compliance Procedures section below to promptly report the matter to such person's supervisor or the General Counsel or, if you are an executive officer or director, to the Chair of the Nominating and Governance Committee of the Board of Directors of Zillow.

60.    The Code of Conduct also details a requirement to maintain accurate books and records:

> All Company books, records and accounts shall be maintained in accordance with all applicable regulations and binding standards and accurately reflect the true nature of the transactions they record.
>
> ***
>
> No false or misleading entries shall be made in the Company's books or records for any reason . . . .

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 17

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

61.     The Code of Conduct requires that "[a]ll information provided in the Company's public reports and communications must be complete, fair, accurate, timely and understandable, and must also comply with applicable laws, rules and regulations."

62.     The Code of Conduct further provides that "all [e]mployees, officers and directors who are asked to provide information for the Company's public disclosures must use all reasonable efforts to provide complete, fair, accurate, timely and understandable information."

63.     The Code of Conduct stresses the requirement to report all violations, deficiencies, and material defects related to the Company's financial reports, disclosures, and internal controls:

> If any person subject to this Code becomes aware of any information concerning (a) material defects in the disclosures made by the Company in its public filings; (b) significant deficiencies in the design or operation of internal controls; (c) any violation of this Code that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls; or (d) any material violation of the law or this Code, you should follow the guidelines described in the Reporting and Compliance Procedures section.

64.     In The Code of Conduct details the following reporting and compliance procedures:

> Every person subject to this Code has the responsibility to ask questions, seek guidance, report suspected violations and express concerns regarding compliance with this Code. Any person subject to this Code who knows or believes that any other employee or representative of the Company has engaged or is engaging in Company-related conduct that violates applicable law or this Code should report such violation to at least one of the following contacts:

- Human Resources

- General Counsel

- Chief Executive Officer

- Chief Financial Officer

- Nominating and Governance Committee Chairman

- Audit Committee Chairman

***

> While it is the Company's desire to address matters internally, nothing in this Code should discourage anyone from reporting any illegal activity, including any violation of the securities laws, antitrust laws or any other federal, state, or foreign law, rule or regulation, to the appropriate regulatory authority.

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 18

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

**B.    Additional Duties Under The Code Of Ethics**

65.    Defendant Barton, as CEO of the Company, is subject to additional duties under the Company's Code of Ethics.

66.    Under the Code of Ethics, Defendant Barton was and is obligated to adhere to, advocate, and promote the following principles:

- Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- Full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the "SEC") and other public communications made by the Company; and

- Compliance with governmental laws, rules and regulations applicable to the Company.

**C.    Additional Duties Under The Audit Committee Charter**

67.    The Audit Committee Charter places additional duties on the members of the Audit Committee, including requirements that its members:

- Regularly review with the independent auditor any audit problems or difficulties and management's response, including any restriction on the scope of activities, access to required information, ***the adequacy of internal controls***,[2] adjustments noted or proposed by the independent auditor but not taken (as immaterial or otherwise) by management, communications between the audit team and the national office concerning auditing or accounting issues, and any management or internal control letters issued or proposed to be issued by the auditor.

- Review at least annually. . . major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, ***and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies***. . . .

- Review and discuss with management from time to time the effectiveness of, or any deficiencies in, the design or operation of disclosure controls and procedures or internal controls and any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls. Review any report issued by the Company's

---

[2] All emphasis herein has been added unless otherwise specified.

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 19

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

independent auditor regarding management's assessment of the Company's internal controls.

- Discuss policies with respect to risk assessment and risk management, including the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

- Establish and oversee a code of ethics for senior financial officers pursuant to and to the extent required by laws, rules and regulations applicable to the Company from time to time and assist the Board in the oversight of such code of ethics.

## SUBSTANTIVE ALLEGATIONS

### A.    The Company Launches Zillow Offers

68.    In May 2017, Zillow launched Zillow Offers, a business in the Homes segment that lets homeowners receive cash offers from "select investors" as well as a market appraisal from regional agents to see what the house would be worth on the open market. The initiative was first tested in Las Vegas and Orlando.

69.    According to a Company press release, Zillow Offers connected homeowners to offers from investors as well as a comparative market analysis ("CMA") from a local real estate agent. The process started when a homeowner was able to provide basic information about their home—number of bedrooms, square footage, remodel information, etc.—and upload several photos of the home. Select investors who buy homes in the area can present offers alongside the local agent's CMA. Zillow represented that any offers and the CMA will include an overview of fees associated with each option and that there was no obligation for the seller to accept any offers.

70.    By avoiding traditional home sale necessities such as staging and open houses, Zillow represented that sellers experience less stress, and they can gain additional control over such things as closing date and price.

71.    Indeed, Zillow pinned its future on Zillow Offers. In February 2019, Zillow doubled down on Zillow Offers with lofty projections of annual revenue of $20 billion within five years. Defendant Barton called the shift to focus on home sales the beginning of "Zillow 2.0." He said the Company is "on the threshold of becoming a brand new startup." The Company planned to

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 20

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

drastically step up the pace of purchasing homes. To get to $20 billion in revenue from the Homes segment, Zillow projected that it would purchase 5,000 homes a month.

72.     The Zillow Offers program expanded substantially and quickly became a significant driver of revenue growth. By the end of 2019, the Company was buying and selling homes directly in 22 markets and Zillow Offers "accounted for nearly $1.4 billion of revenue for the year." In fact, Zillow Offers accounted for roughly half of the Company's total revenue in 2019.

**B.     The Individual Defendants Cause the Company To Issue False And Misleading Statements During The Relevant Period**

73.     The Relevant Period begins on August 7, 2020, when the Company issued its second quarter 2020 financial results after the market closed on August 6, 2020. In connection with its quarterly results, Zillow reported that "quarterly revenue grew 28% year over year to $768 million, driven primarily by a continued increase in Zillow Offers resale volume." Critically, the Company explained that while "Zillow Offers entered Q2 with home acquisitions temporarily paused due to market uncertainty" resulting from the COVID-19 pandemic, "[d]uring the quarter, the company sold 1,437 homes and purchased 86 homes through Zillow Offers, ending Q2 with 440 homes in inventory" and "is now actively purchasing homes in all 24 markets where it previously operated."

74.     During the accompanying conference call with investors later that day, Defendant Barton, Zillow's CEO and Co-Founder, boasted of Zillow Offers program even with the ongoing COVID-19 pandemic:

> In Zillow Offers, we used enhanced selling strategies and differentiated data signals to manage our inventory. The fact that we were able to make it gracefully through the uncertainty of the past 5 months, continuing to sell inventory is a testament to the team's agility. Our combination of machines and humans is getting smarter and more experienced.

75.     In response to an analyst's questions, Barton explained he was very bullish on the post-COVID-19 Zillow Offers program:

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 21

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

So starting with your question, Robert, about how aggressive we want to be with Zillow Offers. Well, we've now, as of today, actually opened up all 24 of the markets that we had open before COVID hit. And we -- so you can tell, by the way, we've opened markets and how aggressively we've reopened markets, you can tell we feel good about it. And the supposition is that this price certainty, this time certainty and convenience and the kind of safety associated with -- if you're a seller, not having to have a bunch of people go through your house, and if you're a buyer, letting yourself into a home with a Zillow app with nobody there, those both feel like good things in the midst of a health crisis, and we're seeing that play out.

So we feel that in a way, the pandemic highlights some of the benefits of working with Zillow Offers. It is -- the reopening is early days. So we're watching. And -- carefully, but we're feeling good about kind of the post-COVID Zillow Offers.

76.    On November 5, 2020, Zillow announced its financial results for third quarter 2020. During the Company's accompanying conference call that day, Defendant Barton again touted the growing momentum behind Zillow Offers:

In our Zillow Offers business, we are ramping back up across the country after pausing acquisitions back in March, and it will take time to rebuild our inventory levels. We added Jacksonville, Florida to our list of 25 markets where people can get a fair, hassle-free cash offer for their home. This option for home sellers to be able to move without showings, without open houses on their own time line is proving its appeal. As we build back, we are focused on improving our cost structure on every line item, while simultaneously delivering more ease and convenience for our customers.

77.    Defendant Parker provided details regarding Zillow Offers and the effect of the COVID-19 pandemic at the Company's November 16, 2020 appearance at the Needham Virtual Internet Services Conference. Specifically, Parker noted:

As we come out of the pause, one of the positives that we have is that we were able to take a lot of those learnings, and again, I mentioned we kind of started up again a little more cautiously out of safety and just uncertainty.

But we are smarter about what to buy, how long it's going to take us to renovate it. We continue to get better. And so all of those things actually spread across the markets relatively quickly. But there are certain markets that are hotter than others, and we continue to work those. I wouldn't say there's one formula that says after 18 months, one market is profitable. There's still a lot to learn and a lot of tech has developed. And that learning helps in us getting smarter, and we can -- typically, we can roll that into other markets quickly, and we can ramp them up a little faster than we did initially, but we've still got a lot to learn.

78.    At Zillow's November 18, 2020 appearance at RBC Global Technology, Internet, Media and Telecommunications Conference (Virtual), Defendant Barton answered questions

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 22

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

1  regarding the future business condition of Zillow Offers, explaining, "But to answer your question

2  directly, I'm confident now that we've seen enough and we've achieved the scale and we've

3  learned enough that for Zillow, we can make the unit economics work. I am convinced of that, and

4  I think we will get better from here."

5  79.  By the time the above statements were made, the Individual Defendants were

6  already aware of a "problem with quality of offerings, reflected in 50% drop in conversion rate,"

7  (ZILLOW-00000275), Zillow Offers was "behind the competition in tech, operations, and

8  geographic reach, (ZILLOW-00000287), and that Zillow Offers was suffering a cash burn due to

9  the "huge increase in homes inventory." (ZILLOW-00000301). All of which was discussed at the

10  June 2019 Board Meeting attended by defendants Richard Barton, Lloyd Frink, Spencer Rascoff,

11  Gordon Stephenson, Erik Blachford, Jay Hoag, Greg Maffei, Amy Bohutinsky, April Underwood,

12  Jeremy Wacksman, Allen Parker, Arik Prawer, Susan Daimler, David Beitel, and Dan Spaulding.

13  80.  Moreover, Zillow Offers' inventory and the quality of its inventory continued to be

14  ongoing problems. A September 2019 Board Memo noted "[o]ffer quality is still a problem –

15  satisfaction is well below goal. Zestimates are 4% higher than offers made, so sellers are

16  dissatisfied." ZILLOW-00000236. The September 2019 Board meeting was attended by

17  Individual Defendants Barton, Beitel, Blachford, Bohutinsky, Daimler, Frink, Hoag (by phone),

18  Maffei, Parker, Prawer, Spaulding, Stephenson, Underwood, and Wacksman. The same Memo

19  acknowledged that "risk management 'is a muscle new to Zillow'" and that "controls are still in

20  baby stage with only basic procedures in place." ZILLOW-00000238-39.

21  81.  In addition, a Board Memo from December 2019 acknowledged "[i]naccurate

22  valuation is a problem, losing money on every home sale, conversion % continuing to drop,

23  expenses – including renovation – too high. Losers include even homes at the top of Zillow's

24  purchase criteria." ZILLOW-00000212. The December 2019 Board Meeting was attended by

25  Individual Defendants Barton, Beitel, Blachford (by phone), Bohutinsky, Daimler, Frink, Hoag,

26  Johnson, Maffei, Parker, Prawer, Spaulding, Stephenson, Underwood, and Wacksman.

27  CONSOLIDATED VERIFIED
    STOCKHOLDER DERIVATIVE
28  COMPLAINT - 23

    Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

82.    A subsequent Board Memo from September 2020 noted in a summary of the Offers business, "costs are still too high and profitability is a challenge. Accuracy of valuation is still a problem. Sellers see Offers as to[o] expensive." ZILLOW-00000364-65. The September 2020 Board meeting was attended by Individual Defendants Barton, Beitel, Blachford, Bohutinsky, Daimler, Frink, Hoag, Maffei, Parker, Prawer, Stephenson, Underwood, and Wacksman.

83.    The Zillow Offers program was thus a disaster from the start, which was quite clear internally, but never conveyed to the outside world.

### 1.    Zillow's False and Misleading Fourth Quarter and Full Year 2020 Financial Results

84.    On February 10, 2021, Zillow filed a Form 8-K with the SEC that published its fourth quarter and full year 2020 financial results. Among other things, the Company reported 2020 revenue from Zillow Offers of more than $1.7 billion—a 25% increase, despite the COVID-19 pandemic, over 2019 revenue of nearly $1.4 billion. Zillow Offers accounted for 51% of the Company's total 2020 revenues. That same day, during the Company's conference call, Defendant Barton stated his confidence in Zillow Offers stating, "[o]ur burgeoning sell side business, Zillow Offers, proved durable through some bad weather" and that while "[w]e paused home buying to manage risk during the early days of the pandemic" the Company "exited 2020 with our quarterly acquisitions pace returning to Q4 2019 levels." Barton further stated, in relevant part, concerning Zillow Offers:

> Our financing arm, Zillow Home Loans, nearly tripled its originations revenue in 2020 compared to 2019. We expanded Zillow Closing Services to 25 markets in less than 12 months, and a vast majority of our customers are now choosing to close with us when purchasing a home from Zillow Offers. This execution resulted in total revenue growth of 22%, which when combined with a disciplined approach to managing costs, resulted in more than $300 million in incremental EBITDA profit generation across the company as compared to 2019.

85.    Similarly, Defendant Parker reiterated his faith in Zillow Offers stating:

> During Q4, Zillow Offers benefited from operational improvements, stronger-than-expected home price appreciation across the country, a strong customer value proposition and faster sales velocity.

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 24

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

> Home segment revenue of $304 million exceeded the high end of our outlook with home purchases returning to Q4 2019 levels. Our Q4 Zillow Offers unit economics of 668 basis points before interest was above the plus or minus 200 basis point guardrail, we set for ourselves while working to scale the business. The outsized unit economic results were impacted by the stronger and faster housing market recovery than we initially assumed in addition to the expected benefit of a predominantly high mix of recently acquired homes following the first half air gap.

> Q4 unit economics also showed meaningful operational progress in improving our cost per home sold. Combined, we saw all 3 operational cost line items improved nearly 250 basis points compared to Q3. We are continuing to target our underwriting goal of plus or minus 200 basis points going forward.

86.    The same month, Zillow began using the "Zestimate," the Company's algorithm which estimated a property's market value, and represented that it was a reliable tool for evaluating a property's market value:

> The Zestimate is now an initial cash offer for eligible homes in more than 20 cities nationwide. This ushers in a new era for the Zestimate, the company's proprietary home value estimation tool, which celebrates its 15th anniversary this month.
>
> ***
>
> Today's announcement highlights the growth in the reliability of the Zestimate with Zillow standing behind its valuations to provide an initial cash offer on qualifying homes through its Zillow Offers service.

### 2.    Zillow's False And Misleading Annual Report

87.    On February 12, 2021, Zillow filed with the SEC its Annual Report on Form 10-K for the period ended December 31, 2020 (the "2020 10-K"). The 2020 10-K was signed by Barton, Blachford, Bohutinsky, Frink, Hoag, Maffei, Parker, Stephenson, Thielke, and Underwood. Pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), Defendant Barton certified that the 2020 10-K fully complied with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in the 2020 10-K fairly presented, in all material respects, the financial condition and results of operations of the Company.

88.    In the 2020 10-K, the Individual Defendants acknowledged the material risk posed to the Company by the failure to properly utilize and analyze the trove of real estate data it collects and to maintain proper inventory levels in the Zillow Offers division:

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 25

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

***Our Zillow Offers Business Depends on Our Ability to Accurately Value Homes and Manage Inventory and a Failure to Do So May Have an Adverse Effect on Our Business and Financial Results.***

The success of ***Zillow*** Offers depends in part on our ability to efficiently acquire, renovate and sell properties. We underwrite and price the homes we buy and sell through Zillow Offers using ***in***-person evaluations and data science and proprietary algorithms based on a number of factors, including our knowledge of the real estate markets in which Zillow Offers operates. These assessments include the estimated time from purchase to sale, the cost of updating a home, market conditions and potential resale proceeds, closing costs and holding costs. These assessments may be inaccurate. Our pricing model may not account for submarket nuances – for example, the location of a home on a hill or in a building – which could have a significant impact on price. If valuations are too low and/or fees are too high, conversion rates and customer satisfaction may be adversely impacted, as our offers may not be competitive. In addition, we may not discover latent home construction defects or environmental hazards or other conditions requiring remediation or impacting the value of the home in a timely manner, or at all, which may require us to write down the inventory value of those homes or prevent us from reselling them for the price we anticipated or at all. We may be unable to acquire or sell inventory at attractive prices, in a timely manner, or at all. We may also be unable to finance and manage inventory effectively. As a result, our revenue, gross profit and results of operations may be affected, which could have an adverse effect on our business, results of operations, and financial condition.

***

***Our Zillow Offers Business is Dependent Upon Our Ability to Expeditiously Sell Inventory. Failure to Expeditiously Sell Our Inventory Could Have an Adverse Effect on Our Business and Financial Results. Holding Homes in Inventory Exposes Us to Risks, Such as Increased Holding Costs.***

Our purchases of homes through our Zillow Offers business are based in large part on our estimates of projected demand. If actual sales are materially less than our forecasts, we could experience an oversupply of inventory, which may cause downward pressure on our sales prices and profitability and increase our average days to sale. Our inventory of homes purchased has at times represented a significant portion of our total assets and holding those assets in the form of non-income producing homes inventory for an extended period of time subjects us to significant holding costs, ***including*** financing costs, maintenance and upkeep expenses, insurance expenses, property tax expenses, homeowners association fees, other expenses that accompany the ownership of residential real property, and increased risk of depreciation of value. If we have excess inventory or our average days to sale increases, the results of our operations may be adversely affected because we may be unable to liquidate such inventory at prices that allow us to meet profitability targets or to recover our costs.

89.    In its 2020 10-K, the Company described the financial results from its Zillow Offers division in glowing terms:

***For Sellers*** – We launched Zillow Offers in April 2018 to provide homeowners with the ability to receive cash offers to purchase their home, giving sellers peace

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 26

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

of mind, control and convenience in one of the most stressful transactions of their lives. We have the potential to connect sellers who do not qualify for or accept an offer from Zillow with a trusted local Premier Agent partner. When we buy a home from a seller, our title and escrow business, Zillow Closing Services, performs their due diligence for a clean title and a seamless close of the home transaction. Then, our renovation teams perform light, make-ready repairs to swiftly list the home. ***As of December 31, 2020, Zillow Offers was available in 25 markets and accounted for $1.7 billion of our revenue for the year, up from $1.4 billion in revenue for the year ended December 31, 2019. This reflects less than 0.1% of the estimated annual U.S. real estate transaction value. For the year ended December 31, 2020, we purchased 4,162 homes from sellers.***

***For Buyers*** – When a buyer is ready to meet with a local real estate professional after searching for a home on our mobile applications and websites, we typically connect them with a Premier Agent partner. For customers who are focused on buying new construction homes, we connect them with our home builder partners. Home buyers are also able to purchase homes that are listed for resale through Zillow Offers. ***For the year ended December 31, 2020, home buyers purchased 5,337 homes through Zillow Offers.***

90.    In the 2020 10-K, the Company also focused on the competitive advantages of Zillow Offers, including superior data science and technology:

***Inimitable living database of homes and superior data science and technology advantages.*** Our living database of more than 135 million U.S. homes is the result of more than 15 years of substantial investment, sophisticated economic and statistical analysis and complex data aggregation of multiple sources of property, transaction and listing data, including user updates to more than 34 million property records. This data is the foundation of our proprietary Zestimate, Rent Zestimate, Zestimate Forecast and Zillow Home Value Index. In 2019, we released a new, more accurate Zestimate, incorporating key learnings from the two-year, global Zillow Prize competition. The improved Zestimate currently has a median absolute percent error of 1.8% for homes listed for sale and 7.4% for off-market homes. ***These data and models also provide the foundation for our pricing algorithms for Zillow Offers, although substantially more home-specific information is incorporated to further refine the valuation for this application.***

91.    However, the Individual Defendants already knew that Zillow Offers was experiencing numerous problems, including but not limited to bloated inventory. A December 2020 Board Memo noted the following litany of problems with Zillow Offers: "costs to customer, poor customer satisfaction, and poor tech." ZILLOW-0000017. "Renovation costs are out of control. Continued tweaks to pricing model to improve accuracy (many customers say Offers offers are too low). *Id.* The December 2020 Board meeting was attended by Individual Defendants

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 27

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

Barton, Beitel, Blachford, Bohutinsky, Frink, Hoag, Maffei, Parker, Spaulding, Stephenson, Thielke, Underwood, and Wacksman.

92.    Remarkably, in an analyst conference call regarding the 2020 earnings, Defendant Barton praised the durability of Zillow Offers despite the pandemic remarking that the Company's "burgeoning sell-side business, Zillow Offers, proved durable through some bad weather."

93.    Defendant Parker, the Company's CFO, represented on that Zillow benefited from "operational improvements." Barton stressed the impact that Zillow Offers had on the Company's revenue in 2020, due to the division's growing customer base:

> [A] vast majority of our customers are now choosing to close with us when purchasing a home from Zillow Offers. This execution resulted in total revenue growth of 22%, which when combined with a disciplined approach to managing costs, resulted in more than $300 million in incremental EBITDA profit generation across the company as compared to 2019.

94.    Even without access to the internal memos that the Individual Defendants were reading, analysts warned about the excessive risk that Zillow was taking on for a low-margin business and pointed to the losses in the Zillow offers division in late 2019 and early 2020 as signs that Zillow Offer's long-term prospects were bleak. On February 25, 2020, Gradient Analytics ("Gradient") initiated coverage of Zillow with a negative outlook-based on concerns over the Zillow Offers venture:

> Gradient initiated coverage of ZG on 10/29/19 with a negative outlook based on several fundamental and earnings quality concerns. **We were concerned** that **ZG shifted its business from a scalable internet advertising firm to a labor-intensive home-flipping business.** Specifically, we've been concerned that the Homes business may not be profitable in the long term, and ZG made this pivot just as growth in its core IMT business slowed to the lowest level in the firm's history.
>
> ***
>
> After examining ZG's latest results, we are still concerned about the long-term earnings sustainability of its Homes segments as providing a means to divert attention away from the slowing Premier Agent business. Zillow Offers is a cash-and-inventory business with a high cost of revenue.
>
> ***
>
> **[S]ince ZG** began **selling homes in Q3 2018, the firm has sold a total of 4,490 homes. We assume these represent the best opportunities that ZG was able to find,**

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 28

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

*but the firm is still reporting losses of $56,742 per home in Q4. This loss represents 17.9% of per-home sales.*

\*\*\*

[W]e remain concerned with the long-term profitability of the Homes segment *as ZG could have overpaid for early home purchases and its inventory may get skewed towards homes with deferred-maintenance issues, causing further viability challenges. . .*Therefore, we believe that a return to profitability may be overly optimistic in the near term….

\*\*\*

Interestingly, despite a sales forecast that implies that there will be a rapid growth, ZG's *profitability* expectations continue to get pushed further out into the future.

### 3.    Zillow's False and Misleading Proxy Statement

95.    On April 21, 2021, Zillow filed the 2021 Proxy, issued by the Board, soliciting stockholders votes on, among other things, the election of Defendants Blachford, Stephenson, and Thielke to the Board. The 2021 Proxy also recommended approving, on an advisory basis, the compensation of named executive officers and the frequency of future advisory votes on the compensation of named executive officers. The 2021 Proxy, signed by Defendants Barton and Frink, contained material misstatements and omissions.

96.    The 2021 Proxy emphasized the success of Zillow Offers:

[I]n September 2020, we announced that beginning in January 2021, customers in certain markets who sell homes through Zillow Offers will work directly with trusted, licensed employees of Zillow Homes, a licensed brokerage entity. Zillow-owned homes in these markets are listed for sale by licensed Zillow Homes employees. We expect to expand these services to additional Zillow Offers markets later in 2021…in 2020, Homes segment revenue grew to $1,715.4 million for the year ended December 31, 2020, due to the sale of 5,337 homes through our Zillow Offers business, which began selling homes in July of 2018. As of December 31, 2020, Zillow Offers and Zillow Closing Services were operating in 25 metropolitan areas….

97.    The 2021 Proxy Statement also stated, in relevant part, the following regarding the risks of Zillow Offers:

The audit committee provides oversight concerning our major financial risks and the steps management has taken to monitor and control such exposure, including with respect to the capital, regulatory, and other requirements of our Zillow Offers, Zillow Home Loans, and Zillow Closing Services businesses, and data privacy, cybersecurity, and other topics related to our information technology infrastructure. Each committee generally reports on its deliberations to the full Board during the committee reports portion of the next Board meeting. This enables the Board and its committees to coordinate their risk oversight roles.

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 29

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

98.     The 2021 Proxy Statement stated the following regarding Zillow's corporate governance practices:

> At Zillow Group, we believe all employees and directors have a shared responsibility to maintain a culture of integrity. We view our corporate governance practices and policies as important drivers of our culture.

99.     With respect to the Board's risk management duties, the 2021 Proxy Statement stated the following:

> The Board considers the assessment of Company risks and development of strategies for risk mitigation to be a responsibility of the entire Board in consultation with the appropriate Board committee in the case of risks that are under the purview of a particular committee. The Board engages in risk oversight on a broad range of matters, including challenges associated with strategic acquisitions, regulatory and other legal and compliance matters, and threats relevant to our information technology environment…. Each committee generally reports on its deliberations to the full Board during the committee reports portion of the next Board meeting. This enables the Board and its committees to coordinate their risk oversight roles.

100.     The 2021 Proxy Statement delineated the Compensation Committee's role in recoupment of improper compensation:

> We do not have a formal compensation recovery policy, but the compensation committee reserves the discretion to require that certain compensation payable to our executive officers be subject to recoupment in the event of misconduct. We are also subject to the clawback provisions for the Chief Executive Officer and Chief Financial Officer under [SOX], which provide that those executives must reimburse the Company for any bonus or other incentive-based or equity-based compensation received during the 12-month period following the preparation of an accounting restatement as a result of misconduct. The Board or the compensation committee will adopt a formal clawback policy no later than when the final rules relating to such policies become effective pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act and require such a policy to be in effect. The compensation committee will continue to impose clawback provisions in individual arrangements as it determines appropriate. . . .

101.     The 2021 Proxy Statement also listed the responsibilities of the Audit Committee, which at that time consisted of Defendants Blachford, Maffei, and Stephenson, as follows: "The audit committee assists our Board in oversight of (a) our accounting and financial reporting processes and the audits of our financial statements, (b) the independent auditor's qualifications, independence and performance, (c) our internal audit function, if any, and the performance of our

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 30

Case No. 2:22-cv-288

**WEISS LAW**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

1  internal accounting and financial controls, and (d) our compliance with legal and regulatory

2  requirements."

3        102.    Additionally, the 2021 Proxy contained an Audit Committee Report which stated

4  the following, in relevant part:

   (i)   The audit committee has reviewed and discussed the audited financial statements for
         fiscal year 2020 with Zillow Group's management.

   (ii)  The audit committee has discussed with Deloitte, the Company's independent
         registered public accounting firm, the matters required to be discussed by the statement
         on Auditing Standard No. 1301, and Rule 2-07 of Regulation S-X, Communications
         with Audit Committees.

   (iii) The audit committee has received the written disclosures and the letter from Deloitte,
         the Company's independent registered public accounting firm, required by applicable
         requirements of the Public Company Accounting Oversight Board regarding the
         independent registered public accounting firm's communications with the audit
         committee concerning independence, and has discussed with the independent
         registered public accounting firm the independent registered public accounting firm's
         independence.

   (iv)  Based on the review and discussion referred to in paragraphs (i) through (iii) above,
         the audit committee recommended to Zillow Group's Board of Directors that the
         audited financial statements be included in Zillow Group's Annual Report on Form
         10-K for the year ended December 31, 2020, for filing with the SEC.

        103.    The foregoing statements in the 2021 Proxy Statement were false and misleading

   and omitted material information. In fact, the Board failed to implement and maintain an effective

   system of internal controls to oversee the material risks posed to the Company, its stockholders

   and customers, and take action when presented with red flags of misconduct.

        104.    In addition to the failings of the Zillow Offers program set forth above, the March

   2021 Board Memo stated in its summary of the Offers business that "issues with Zestimates being

   too conservative are muddying the picture on conversion and profitability," buying fewer houses

   than projected, awareness of Offers is "meager." ZILLOW-00000143.[3] None of these known

   shortcomings was shared with Zillow's shareholders prior to their voting in connection with the

   2021 Proxy Statement.

   _____
   [3] Plaintiffs do not know the attendees of the March 2021 Board meeting because the accompanying
   minutes were omitted from the Company's books and records produced to the Plaintiffs.

   CONSOLIDATED VERIFIED                          **WEISS LAW**
   STOCKHOLDER DERIVATIVE                         305 Broadway, 7th Floor
   COMPLAINT - 31                                 New York, New York 10007
                                                  Telephone: (212) 682-3025
   Case No. 2:22-cv-288                           Facsimile: (212) 682-3010

1

### 4.    Zillow's False and Misleading Quarterly Reports

2      105.    On May 4, 2021, Zillow filed with the SEC its Form 8-K and its Quarterly Report

3  on Form 10-Q for the period ended March 31, 2021 (the "1Q21 10-Q"), reporting Zillow's first

4  quarter 2021 financial results. Appended thereto was a signed certification pursuant to SOX by

5  Barton and Parker attesting that "the information contained in the [1Q21 10-Q] fairly presents, in

6  all material respects, the financial condition and results of operations of the Company."

7      106.    In discussing the results, Defendant Barton noted that they "exceeded expectations

8  and showed our momentum toward delivering a seamless, end-to-end real estate transaction." In

9  the 1Q21 10-Q, the Company attributed any slowing of growth in Zillow Offers to low inventory

10  buildup due to the pandemic and represented that the division would have an increase in revenue

11  in future periods:

12       Homes segment revenue decreased 9% to $704.2 million, primarily due to a
         decrease of $68.1 million, or 9%, in Zillow Offers revenue. Zillow Offers revenue
13       declined to $701.0 million due to the sale of 1,965 homes at an average selling price
         of $356.7 thousand per home, as compared to the sale of 2,394 homes at an average
14       selling price of $321.3 thousand per home in the comparable prior year period.
         ***While we have resumed home buying in all Zillow Offers markets following our***
15       ***temporary pause in the first half of 2020, we are continuing to rebuild our***
         ***inventory available for resale. We expect Zillow Offers revenue to increase in***
16       ***future periods as we expect to continue to increase our home buying and home***
         ***selling activities across all markets.***
17
         107.    In the 1Q21 10-Q, Zillow assured that the Company's governance practices
18
  procedures and internal controls regarding public disclosure were effective, stating:
19
         ***Evaluation of Disclosure Controls and Procedures***
20
         The Company maintains disclosure controls and procedures (as defined under
21       Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as
         amended). Management, under the supervision and with the participation of our
22       Chief Executive Officer and our Chief Financial Officer, evaluated the
         effectiveness of the Company's disclosure controls and procedures pursuant to
23       Exchange Act Rule 13a-15(b) as of March 31, 2021. Based on that evaluation, the
         Chief Executive Officer and the Chief Financial Officer concluded that these
24       disclosure controls and procedures were effective as of March 31, 2021.

25       108.    On May 4, 2021, Defendants Barton and Parker, among others, attended an

26  earnings call to discuss the Company's first quarter 2021 results. During the call, Barton explained

27  CONSOLIDATED VERIFIED                          **WEISS LAW**
   STOCKHOLDER DERIVATIVE                          305 Broadway, 7th Floor
28  COMPLAINT - 32                                  New York, New York 10007
                                                    Telephone: (212) 682-3025
   Case No. 2:22-cv-288                            Facsimile: (212) 682-3010

1   that Zillow was "now beginning to register the benefits of the investments we have made across

2   our product innovations" and that "[t]his increased profit generation after such a meaningful

3   investment period gives us confidence that the bets we are making across the business are

4   accretive, and we are allocating our time, our people and our capital appropriately for the long

5   term." He reiterated that any slowing of growth in Zillow Offers was due to the pandemic:

> Our top-of-funnel engagement with our customers translated into excellent results across Zillow suite of products and services. Our flagship buy side business, Zillow Premier Agent, once again generated the strongest results we've ever seen, reporting 38% revenue growth year-over-year in Q1. Our nascent sell-side business Zillow Offers continued to accelerate out of the pause we instituted in the pandemic generating over 700 million in revenue and surpassing our internal expectations on revenue, EBITDA and unit level economics.

109.   Barton asserted that "Zillow 2.0" was enthusiastically received by customers:

> Pursuit of these growth opportunities deserves continued appropriate reinvestment of profits. As part of that journey, we recently launched a new advertising campaign with the tagline To Move is to Grow. We think it wonderfully captures the essence of why moving is both exciting and daunting, and how we at Zillow are increasingly able to help our customers navigate this crossing. The campaign supports the expedition we are on as a company as well. Just as we've been reorienting our employees and mission around transactions, we have the exciting task of reeducating our customers on who the new Zillow is and what we can do for them. Every signal we see based on data and customer feedback is that customers expect and demand a more seamless experience. This is Zillow 2.0.

> A great example of our customers' enthusiasm for ease is the reaction to our recent announcement that many homeowners in Zillow Offers markets now can see that zestimate is a live initial offer from Zillow. The announcement price alone drove record-breaking interest in the service with requests coming in at levels we've never seen before. We believe we are onto something with this Zestimate offer. The continuing challenge and opportunity going forward will be to translate customer interest into transactions.

110.   Defendant Parker once again reassured investors regarding the durable condition

of Zillow Offers stating:

> Growth in Zillow Offers continue to reaccelerate in Q1. We reported Homes segment revenue of $704 million, which exceeded the high end of our outlook with 1,965 home sales. Resale velocity was above our expectations. In Q1, we sold 128% of the beginning inventory of 1,531 homes, which contributed to inventory declining at the end of Q1 to 1,422 homes. Purchases increased to 1,856 homes in the quarter from 1,789 homes purchased in Q4, but not quite at the pace we planned as we continue to work on refining our models to catch up with the rapid acceleration in home price appreciation.

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 33

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

> During Q1, we continued to focus on unit costs, automation, adding capacity and sharpening pricing models to improve offer strength as we continue to scale. Our Q1 Zillow Offers unit economics of 549 basis points return before interest expense was above the plus or minus 200 basis point guardrails we've set for ourselves while working to scale the business. The outsized unit economic results were impacted by the ongoing strong housing market, which is temporal in nature. We made progress during the quarter on improving offer strength and sharpened pricing that tightened our unit economics by approximately 120 basis points from that of Q4. The durable operational improvements in overall cost per home contributed 280 basis points improvement from Q1 2020.

111.   Defendant Barton further explained that the confidence Zillow had in Zillow Offers:

> But on [Zillow Offers], in particular, Ron, we're leaning in, like -- we're leaning in. We're expanding in the 25 markets. We're heavily staffing, as I think we made an announcement, maybe Allen just talked about it, too. We are planning as a company. I'm hiring a net 2,000 people in 2021, and a lot of that will be for Zillow Offers. And we're making other investments in [Zillow Offers] as well.
>
> So we are comfortable with that increased investment because of what we're seeing top of funnel because what we know about the consumer value proposition. And also, we're leaning in because most consumers don't even know what Zillow Offers is yet. They don't even know -- we've got to take Zillow 2.0 out of the kind of quarterly conference call realm and into the consumer awareness realm. And so we've got a lot of work to do there, and we're basis points penetrated in the business overall. So long answer, but we're feeling -- we're leaning in and feeling good.

112.   The Individual Defendants knew none of this was true. Once again, in June 2021, the Board Memo told the true story of Zillow Offers, the one being kept from the public. The Board Memo laid out how the "[y]ear started off choppy" for Offers, which is "a ways off behind competitors," who are "getting better and stronger." ZILLOW-0000050. The June 2021 Board Meeting was attended by Defendants Barton, Beitel, Blachford, Bohutinsky, Frink, Hoag, Johnson, Maffei, Parker, Stephenson, Thielke, Underwood, and Wacksman.

113.   The June 2021 Board Memo further stated that Zillow "Offers is still behind in key areas including renovation costs . . . as evidenced by widening gap of acquisition volumes in key head-to-head markets." ZILLOW-0000051. "All eyes have been on Project Ketchup, which is our effort to catch up to our annual goals and the competition." *Id*. Thus, not only was Zillow Offers floundering, but it was preforming so poorly that a new program had been put in place to try and fix it.

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 34

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

114.    Regardless, the Individual Defendants' false reassurances continued on August 5, 2021, when the Company filed its Forms 8-K and 10-Q with the SEC for the period ended June 30, 2021 (the "2Q21 10-Q"), reporting its second quarter 2021 financial results, including Zillow Offers revenue of $772 million (accounting for nearly 60% of total Company revenue). In the Company's earnings release, Defendant Barton mentioned Zillow Offers stating "[o]f particular note, our iBuying business, Zillow Offers, continues to accelerate as we offer more customers a fast, fair, flexible and convenient way to move. Zillow Offers is proving attractive to sellers even in this sizzling-hot seller's market. Finally, we expect millennial-buyers, low interest rates, and the increasing adoption of location-flexible work policies, to fuel interest in moving for many years to come. And these movers will increasingly demand e-commerce-like solutions where Zillow excels." The Company's August 5, 2021 shareholder letter gave an outlook of total revenue of $1,927 million to $2,047 million and Homes segment revenue of $1,400 million to $1,500 million for the three months ended September 30, 2021.

115.    The shareholder letter also included a segment regarding Homes Segment:

As we previously discussed, the strong customer demand for Zillow Offers at the start of the quarter continued to accelerate in Q2, resulting in the purchase of 3,805 homes and sale of 2,086 homes. The record number of homes purchased was more than double that of Q1 2021 and is a direct reflection of the customer value proposition, the progress we have made in strengthening our pricing models and automation when providing offers to customers. These drivers resulted in rapid gains in our customer conversion rate from requested offers to signed agreements, which drove inventory to more than double from the end of Q1, with 3,142 homes in inventory at the end of Q2.

\*\*\*

We expect homes that we purchase to have tighter pricing assumptions closer to our self-imposed guardrails of +/1 200 basis points before interest expense over the course of the second half of the year.

116.    In the 2Q21 10-Q, Zillow assured that the Company's governance practices procedures and internal controls regarding public disclosure were effective, stating:

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 35

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

***Evaluation of Disclosure Controls and Procedures***

The Company maintains disclosure controls and procedures (as defined under Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended). Management, under the supervision and with the participation of our Chief Executive Officer and our Chief Financial Officer, evaluated the effectiveness of the Company's disclosure controls and procedures pursuant to Exchange Act Rule 13a-15(b) as of June 30, 2021. Based on that evaluation, the Chief Executive Officer and the Chief Financial Officer concluded that these disclosure controls and procedures were effective as of June 30, 2021.

117.    In the accompanying conference call with investors the next day discussing the second quarter earnings, Defendant Barton further stated:

On the sell side, Zillow Offers continued to accelerate in Q2 with a record 3,805 homes purchased. We sold 2,086 homes, generating a record $777 million in revenue in our Home segment, surpassing our internal expectations for both revenue and EBITDA.

Importantly, the Zillow Offers value proposition of a fast, fair, flexible and convenient close has proved more than durable even in the sizzling hot sellers' market. It's a nod to just how dreadful and dreaded the prospect of selling, buying and moving is to people. Likely, this is not a surprise to any of you. In our surveys of homeowners who want and need to move, when we present the Zillow Offers concept, the largest objection is there must be a catch. I'm pretty happy to market to that objection.

As we discussed on our last call, we entered Q2 with strong customer interest in [Zillow Offers], which accelerated throughout the quarter and into Q3. Allen will get into more details. But as we said on our Q1 call, we saw significant customer demand at the beginning of Q2 that we expected would drive revenue growth on a lagged basis in Q3, which is now leading to our strong Q3 outlook. And we continued to see strong growth in customer demand as we entered Q3 that we expect will favorably impact revenue in future quarters. With that in mind, we are focused on making progress automating key workflows in support of building a large-scale operation.

118.    Defendant Parker also spoke highly of Zillow Offers, discussing its continued growth stating:

Growth in Zillow Offers continued to accelerate in Q2 and exceeded our expectations, with 2,086 homes sold, driving $777 million in Home segment revenue. We made progress this quarter in improving our pricing models, including launching the neural Zestimate, which sharpened our offer strength. The neural Zestimate puts more weight on attributes of homes and allows more granularity at the asset level, placing less emphasis on repeat home sales price comparisons. In addition, we continue to make progress building automation at the top of the funnel when providing offers to customers. These improvements drove rapid gains in conversion rates in Q2 when compared to Q1, resulting in record purchases, more

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 36

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

1    than catching up to our pre-pandemic pace. We purchased 3,805 homes during the
     second quarter, more than double what we purchased in Q1.

2    119.    Defendant Parker also spoke positively regarding Zillow's third quarter 2021,

3    stating:

4        In Q3, we expect our Homes segment revenue to increase sequentially from Q2 to
         $1.45 billion at the midpoint of our outlook range. This step-up in pace
5        demonstrates our confidence in our ability to scale, resulting from the progress we
         have made in strengthening our pricing models and automating the top of the
6        funnel. Evidence of our accelerated pace can be seen in our homes under contract,
         which was $1.2 billion at the end of Q2, up 126% from $511 million at the end of
7        Q1. I will reiterate that our goal here is to become a true market maker.

8    120.    In response to questions from an analyst from Jeffries Group LLC about the

9    Company's financial goals regarding Zillow Offers, Barton responded confidently that "Zillow

10   Offers is back on track which is nice." Barton also reiterated his confidence on Zillow Offers'

11   ability to capture a large segment of the available market, stating:

12       I confess to being quite excited by how well Zillow Offers is doing in such a hot
         sellers market, which has me for one kind of probing at the perimeter of my kind
13       of penetration and TAM[4] expectations here. And thinking about, just how – we
         don't know of course, but just how much of the market will end up moving towards
14       iBuying and Zillow Offers solution, I don't know, ***but comparatively more
         confident now than I was even a quarter ago*** – so even a quarter ago. ***So it feels
15       good to me.***

16       **5.    Zillow's Additional False And Misleading Statements**

17   121.    On September 13, 2021, Defendant Wacksman participated on Zillow's behalf in

18   the Piper Sandler 2021 Virtual Global Technology Conference. Wacksman had the following

19   exchange with a Piper Sandler analyst regarding Zillow Offers' positive impact on the Company:

20       Analyst: Super. Okay. Let's switch gears and talk a little bit about the Zoffers
         business. And I think the company was able to really effectively rebuild inventory
21       in the second quarter. And this was more of a challenge in 1Q. Maybe you could
         talk a little bit about what changed in the interim and how the company is getting
22       better able to react to the current pricing environment with sharply rising prices.

23

24   [4] Total Addressable Market (TAM) - represents revenue opportunity at 100% market share, as if
     no competition exists. https://www.techtarget.com/searchcustomerexperience/definition/TAM-
25   SAM-
     SOM#:~:text=The%20acronyms%20stand%20for%20the,a%20company's%20products%20and
26   %20services (last visited January 25, 2024).

27   CONSOLIDATED VERIFIED                      **WEISS LAW**
     STOCKHOLDER DERIVATIVE                     305 Broadway, 7th Floor
28   COMPLAINT - 37                             New York, New York 10007
                                                Telephone: (212) 682-3025
     Case No. 2:22-cv-288                       Facsimile: (212) 682-3010

Wacksman: Yes. I mean you hit on it. Some of the inventory growth timing was just based on the fastest home price appreciation we -- any of us had ever seen before and much stronger than both our internal and other third-party forecast we're seeing at the beginning of the year. So keeping up with rising home price appreciation, both on our acquisition side and then finding that price in the markets we're in, that continue to be a new and unique challenge coming out of pandemic.

But I will say what we've learned is that this business, Zillow Offers, is a business that exists across all housing market cycles, right? And that's been a question that we've touched on over the past few years. Is Zillow Offers more interesting in a hot or a cold or a medium market? Zillow Offers is a really interesting opportunity for our customers in all markets.

Now what customers may value continues to shift, right? In a super hot market, it's not as hard to sell your house, yet we're still seeing record demand for Zillow Offers and services like us. And why is that? It's because customers -- those same customers are struggling to buy. And they need to fix and get the certainty of selling so they can both go -- go be a competitive buyer in a hot market, right?

Now in a cooling market, maybe that's not as much their focus, but the certainty is. And then underlying all that is the convenience factor of you have to live in this asset while you try and sell it and move. So we were really encouraged to see while we saw these incredibly hot markets, the strength and the appeal for Zillow Offers just continues to grow, and we're even more confident now that this is going to be a service really in all weather markets.

122.    The analyst then focused on the economics of Zillow Offers:

Analyst: Absolutely. So getting the economics right at the unit level is really paramount for this business to be successful and to hit the kind of the long-term margin targets that you've laid out. Kind of -- can you talk about that? How are you feeling about the ability to profitably run the business, especially on some of those line items below gross profit at the unit level?

Wacksman: Yes. It's a good question. And we talk about wanting to run the business at a plus or minus 200 basis point guardrail on the unit level. And in Q2, we saw unit economics of nearly 600 basis points, I think 576 basis points. And so yes, a good chunk of that is home price appreciation, right, in the  market. And you saw that in HPA itself, but also in kind of holding costs correlated with the velocity of sale.

But some of those unit economic improvements are durable, right? The work we're doing on more dynamic renovations, the work we're doing on selling costs as our homes brokerage improvements roll out more gradually, you're going to see us book those improvements as unit economic savings to the unit and be able to pass those back on to the customer and eventually to the bottom line.

123.    These statements also proved to be complete misrepresentations. The September

2021 Board Memo once again told the truth, namely that "accelerated product market fit [for

Zillow Offers] is creating scaling challenges that our team is feeling across our operations and in

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 38

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

our capital markets. That means a lot of late night scrambles in search of unnatural solutions . . . we have not been able to keep pace with the rapid home acquisition growth in Zillow Offers, as we've seen capacity breakdowns across our supply chain, our vendors, and our broker partners, which has resulted in our homes sold significantly lagging our internal targets." ZILLOW-00000367. The result was a Zillow Offers program "not yet running automated, integrated, or running smoothly." *Id*.  The September 2021 Board meeting was attended by Individual Defendants Barton, Beitel, Blachford, Bohutinsky, Daimler, Frink, Maffei, Parker, Prawer, Stephenson, Thielke, Underwood, and Wacksman.

124.    By September of 2021, even Project Ketchup, the program put in place to right the Zillow Offers ship, was running into problems. As noted in the same Board Memo, "Project Ketchup . . . is creating new problems in digesting inventory. ZILLOW-00000369. Increased inventory means 2x longer wait times for renovations, plus staff shortages. *Id*. Houses are also taking significantly longer to sell. *Id*. The buying spree in Project Ketchup led [the] Company to overpay for a number of houses, which will hurt profitability. *Id*. The end result of all this, which was known to the Individual Defendants, but kept from the public, was that "Q3 finances will suck in large part because of capacity constraints due in part to too much inventory. ZILLOW-00000371.

125.    At the end of the day, the pricing of assets, both the purchase price of homes and the sale price of homes, proved to be Zillow Offers undoing. ZILLOW-00000129, 131, 137, and 138. The Individual Defendants narrative of leveraging the power of big data to estimate the price at which Zillow can sell a property, which then informs the Company's offers to buy, proved to be a fantasy. Zillow Offers struggled with pricing from the outset, but instead of admitting this fatal flaw, the Individual Defendants publicly stood by the pricing model, merely saying it was being tweaked to be even better.

126.    The statements in ¶¶ 73-78, 84-90, 92-102, 105-111, and 114-122 are materially false and misleading and/or failed to disclose that: (1) the growth of and demand for Zillow Offers

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 39

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

was not organic, not based upon Zillow's frequently discussed and highlighted algorithm and pricing models, and that Zillow Offers' favorable margins were not the result of durable and sustainable operational and cost improvements; (2) Zillow management overrode the offer prices generated by Zillow's algorithms and pricing analysts, and significantly increased the prices Zillow Offers would pay for homes in order to entice more home sellers to accept offers to meet Zillow's volume goals; (3) in the April to May 2021 time frame, the Individual Defendants initiated or knew of Project Ketchup which was hastily arranged to quickly ramp up the purchases of homes; (4) the claimed operational, unit economic, or renovation "improvements" were the result of non-durable and unsustainable slashing of renovation scopes and the amounts Zillow would pay contractors; (5) in April or May 2021, the Individual Defendants began decreasing the scope of its renovations and the prices it would pay contractors for those renovations; (6) the Company's inability to properly price homes for its Zillow Offers business, in addition to labor and supply shortages, resulted in a backlog of inventory in the Zillow Offers business; (7) as a result of the foregoing, the Company was reasonably likely to wind-down its Zillow Offers business, which would have a material adverse impact of the Company's financial results; (8) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis; and (9) the Individual Defendants failed to maintain an adequate system of internal controls.

### C. The Individual Defendants Knew of the Substantial Risks Associated with the Zillow Offers' Business Model and the Need to Properly Manage Them and Ignored Red Flags

127.    Zillow relied heavily on its Zestimate to guide its home evaluation process for Zillow Offers. In February 2021, the Company expanded its use, making the Zestimate an actual cash offer to buy from homeowners in certain markets.

128.    However, Zillow realized early on that the Zestimate, the core of its pricing model for Zillow Offers, did not accurately evaluate home prices. In 2016, then Zillow CEO, Spencer

1  Rascoff, sold his Seattle home for $1.05 million, forty percent less than the Zestimate of $1.75

2  million shown on Zillow.[5]

3      129.    Duvora, a real estate publication, conducted a 2019 case study entitled "*Exactly*

4  *How Bad Are Zillow "Zestimates*?"[6] where it took samples of the Zestimates for three homes per

5  city in three major cities (Chicago, New York, and Los Angeles). The study, which selected homes

6  at random, exposed the Zestimate's failings. For cities such as New York, **all the homes** were

7  dramatically undervalued by the Zestimate.[7]

8      130.    As the author of the case study, Derek Devore noted, Zillow has a *Data Coverage*

9  *and Accuracy Table* on their website which has data error rates based on location. The 2019 charts

10  stated that for most major areas, around 90% of the listing Zestimate was "[w]ithin 20% of Sale

11  Price" of the home, and as Devore stressed **"[t]hat's a really large margin for error."** Zillow

12  employees routinely advised that the Zestimate was inaccurate in meetings, but their concerns were

13  left unaddressed.[8]

14      131.    In fact, the Zillow Offers program persistently suffered from the inaccuracy of the

15  Company's Zestimates. As noted in the September 2019 Board Memo, "Zestimates are 4% higher

16  than offers made, so sellers are dissatisfied." ZILLOW-00000236. The problem with Zestimates

17  and the Zillow Offers program continued, a Board Memo from March 2021 noted "issues with

18

19

20

21

22  [5]  Teke Wiggin, *Zillow CEO Spencer Rascoff Sold Home for Much Less than Zestimate*, *Inman*, May 18, 2016, https://www.inman.com/2016/05/18/zillow-ceo-spencer-rascoff-sold-home-for-much-less-than-zestimate/.

23

24  [6]  Derek Devore, *Exactly How Bad Are Zillow "Zestimates"? [Case Study]*, *Duvora*, April 1, 2019, https://hackingrealestate.quora.com/Exactly-How-Bad-Are-Zillow-Zestimates-Case-Study.

25  [7]  *Id.*

26  [8]  *Id.*

27  CONSOLIDATED VERIFIED
   STOCKHOLDER DERIVATIVE
28  COMPLAINT - 41

   Case No. 2:22-cv-288

being too conservative are muddying the picture on conversion and profitability." ZILLOW-00000143.[9]

132.    In Zillow's public filings, the Company reported large losses in its Zillow Offers division despite reporting substantial revenues. For example, on February 21, 2019, the Company filed with the SEC its Annual Report for the period ended December 31, 2018 (the "2018 10-K"), signed by Defendants Barton, Blachford, Bohutinsky, Frink, Hoag, Maffei, Stephenson, and Underwood.[10] In the 2018 10-K, Zillow disclosed Zillow Offers had yet to prove profitable, reporting a $62.3 million loss on $52.3 million in revenue for the year in its Homes segment. The Company reported a cost of revenue of $49.3 million for the Homes segment, swallowing up 94.2% of the revenues recognized.

133.    On February 19, 2020, the Company filed with the SEC its Annual Report on Form 10-K for the period ended December 31, 2019 (the "2019 10-K"), signed by Defendants Barton, Blachford, Bohutinsky, Frink, Hoag, Maffei, Stephenson, and Underwood.[11] In the 2019 10-K, Zillow disclosed further losses from the Zillow Offers division, reporting a loss of $312.1 million on $1.37 billion in revenue for the year in the Homes segment. Zillow reported a cost of revenue of $1.31 billion for the Homes segment, swallowing up 95.6% of the revenues reported, and reflecting no operational improvements year over year.

---

[9]    *Plaintiffs* do not know the attendees of the September 2019 Board meeting because the accompanying minutes were omitted from the Company's books and records produced to the Plaintiffs.

[10]    *Pursuant* to SOX, Spencer Rascoff, the CEO of Zillow at the time, certified that the 2018 10-K fully complied with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in the 2018 10-K fairly presented, in all material respects, the financial condition and results of operations of the Company.

[11]    Pursuant to SOX, Defendant Barton certified that the 2019 10-K fully complied with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in the 2019 10-K fairly presented, in all material respects, the financial condition and results of operations of the Company.

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 42

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

134.    In an analyst conference call to discuss the 2019 fourth quarter earnings, Barton provided guidance for the first quarter of 2020 with an expected "Homes segment EBITDA" between "a loss of $95 million to a loss of $85 million." Reflecting Zillow's lack of operational improvement, in October and November 2020, Moody's downgraded Zillow from High Yield 1 to High Yield 2, reflecting an increased probability of default.

135.    The Individual Defendants also knew of the substantial risks associated with the Zillow Offers' business model and the importance of managing those risks because they acknowledged the potential risks in the Company's more recent public filings, including in the Company's Form 10-K for fiscal year 2020.

136.    What the Individual Defendants failed to do was properly inform its shareholders and the investing public that the risks associated with the Zillow Offers program were coming to fruition. As outlined in the documents received from Zillow, and cited *supra*, from almost the beginning of the Zillow Offers program, right up through its surprise termination, the program struggled with inventory, pricing, repair, and resale of the homes purchased by Zillow— basically, every facet of the Zillow Offers program.

### D.    The Truth Begins to Emerge

137.    The truth started to emerge on October 4, 2021, when analysts from RBC Capital Markets lowered their price target for Zillow, stating that "[a]n analysis of Zillow-owned homes for sale in Phoenix" suggests that Zillow Offers would likely miss quarterly expectations. RBC Capital Markets noted that home price decline for Zillow's listings in Phoenix demonstrate that "the company likely still has meaningful inventory to work through into Q4 that was bought at too high a price and thus we would expect Q3 results and Q4 guidance to reflect this, as contemplated in our lowered/below-Street Q3 and Q4 estimates. We lower '22E as well on views of stable pricing at the new lower levels." The price target was lowered to $145 from $155."

138.    On October 4, 2021, Zillow's Class A common stock (ZG) price fell to $85.68 per share, a 6.2 % decrease from the previous trading day's closing price. That same day, Zillow's

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 43

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

1  Class C capital stock (Z) price fell to $85.38, a 5.5% decrease from the previous trading day's

2  closing price.

3      139.    On October 18, 2021, Zillow announced that, "[d]ue to a backlog in renovations

4  and operational capacity constraints," Zillow Offers "will not sign any new, additional contracts

5  to buy homes through the end of the year." In response to the news, Defendant Wacksman, the

6  Company's COO, stated "We're operating within a labor- and supply-constrained economy inside

7  a competitive real estate market, especially in the construction, renovation and closing

8  spaces…We have not been exempt from these market and capacity issues and we now have an

9  operational backlog for renovations and closings. Pausing new contracts will enable us to focus on

10  sellers already under contract with us and our current home inventory."

11      140.    On this news, On October 18, 2021, Zillow's Class A common stock (ZG) price

12  fell to $85.46 per share, a 9.3% decrease from the previous trading day's closing price. That same

13  day, Zillow's Class C capital stock (Z) price fell to $86 per share, a 9.4% decrease from the

14  previous trading day's closing price.

15      141.    Just one day later, however, on October 19, 2021, Board Minutes show that the

16  Individual Defendants discussed the implementation of Project Grapefruit, a project that

17  contemplated the wind down of the Zillow Offers business. ZILLOW-0000092.  The October 2021

18  Board meeting was attended by Individual Defendants Barton, Frink, Stephenson, Thielke, Hoag,

19  Maffei, Blachford, Bohutinsky, Underwood, Wacksman, Spaulding, and Parker.

20      **E.    The Truth Fully Emerges**

21      142.    On November 1, 2021, a day ahead of its third quarter earnings report, Zillow's

22  stock took a hit as new analyst reports highlighted how many homes purchased by the Company

23  were now underwater. Bloomberg, among other media companies, published an article titled

24  *Zillow Seeks to Sell 7,000 Homes for $2.8 Billion After Flipping Halt*.[12]   The article reviewed

25  ──────────────

26  [12]    https://www.bloomberg.com/news/articles/2021-11-01/zillow-selling-7-000-homes-for-2-8-billion-after-flipping-halt.

27  CONSOLIDATED VERIFIED                    **WEISS LAW**
    STOCKHOLDER DERIVATIVE              305 Broadway, 7th Floor
28  COMPLAINT - 44                            New York, New York 10007
                                          Telephone: (212) 682-3025
    Case No. 2:22-cv-288                  Facsimile: (212) 682-3010

KeyBanc Capital Markets' analysis of Zillow's inventory: "[a]n analysis of 650 homes owned by Zillow showed that two-thirds were priced for less than the company bought them for, according to an Oct. 31 note from KeyBanc Capital Markets."

143.    The Bloomberg article further stated that "The decision [to pause buying] came after the company tweaked the algorithms that power the business to make higher offers, leaving it with a bevy of winning bids just as home-price appreciation cooled off a bit." Bloomberg opined on Zillow's issues regarding not having enough contractors to complete renovations, "the [C]ompany bought more than 3,800 houses in the second quarter, making progress toward its stated goal of acquiring 5,000 homes a month by 2024. The increase in purchases left the company struggling to find workers to renovate the properties." In other words, the longer the Company holds onto a house, the more it costs Zillow.

144.    KeyBanc analyst Edward Yruma said in his report, dated November 2, 2021,[13] that most of the homes the Company had purchased—to fix up and flip—were now worth less than what Zillow paid for them. "Zillow may have leaned into home acquisition at the wrong time, and we believe earnings may be at risk due to its current home inventory ($1.17 billion at 2Q21)," Yruma wrote in a note to clients, as reported by *MarketWatch.*[14] Yruma's note said an analysis of 650 homes in Zillow's inventory found that 66% are currently listed below the purchase price at an average discount of 4.5%. Cities with the highest percentage of homes in this situation include San Diego (94.3%), Phoenix (93.4%) and Mesa, Ariz. (92.6%).

---

[13]     https://www.gobankingrates.com/investing/real-estate/zillow-shares-drop-home-value-leak-sell-off-announcement/?utm_campaign=1146957&utm_source=yahoo.com&utm_content=12&utm_medium=rss

[14] *Id.*

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 45

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

145.    Mike DelPrete ("DelPrete"), an independent real estate technology strategist, was surprised by the sudden halt of new purchases by Zillow,[15] stressing that Zillow failed to leverage the tremendous amount of data it possesses:

> iBuyers have access to a tremendous amount of data, they can see months into the future and plan their inventory. So, the fact that Zillow didn't see this coming and wasn't able to make adjustments before it had to resort to an iBuying lockdown is pretty surprising.
>
> ***
>
> If you're trying to be number one in the market, slamming on the brakes is one of the worst things you can do.

146.    On November 2, 2021, the Company filed with the SEC its Quarterly Report on Form 10-Q for the period ended September 30, 2021 (the "3Q21 10-Q"). Pursuant to SOX, Defendant Barton certified that the 3Q21 10-Q fully complied with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in the 3Q21 10-Q fairly presented, in all material respects, the financial condition and results of operations of the Company.

147.    In the 3Q21 10-Q and in an accompanying press release, Zillow disclosed dismal financial results for the third quarter. Zillow lost $169 million driven by an EBITDA loss of almost $381 million in the Zillow Offers segment. As a result, the Company announced its plan to "wind down Zillow Offers." However, the Company disclosed that it would continue to sustain losses, expecting "an additional $240 million to $265 million of losses to be recognized in Q4 primarily on homes it expects to purchase in Q4."

148.    In the 3Q21 10-Q, the Company disclosed further details relating to the closing of the Zillow Offers division:

---

[15]    https://reintelligent.com/zillow-slams-the-brakes-on-home-buying-as-it-struggles-to-manage-its-backlog-of-inventory/.

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 46

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

*Wind Down of Zillow Offers Operations*

On November 2, 2021, the Board of Directors of the Company made the determination to wind down Zillow Offers operations. This decision was made in light of home pricing unpredictability, capacity constraints and other operational challenges faced by Zillow Offers that were exacerbated by an unprecedented housing market, a global pandemic and a difficult labor and supply chain environment. ***The wind down is expected to take several quarters and result in approximately a 25% reduction of the Company's workforce.*** During the wind down period, the Company expects to continue to complete the purchase of homes currently under contract and renovate and sell properties currently in inventory. As a result of the decision to wind down Zillow Offers operations, the Company plans to report Zillow Offers as a discontinued operation beginning with the period during which disposition of the business is complete. ***In connection with the preparation of financial statements for the three months ended September 30, 2021, the Company recorded a $304.4 million write-down of inventory associated with Zillow Offers as a result of purchasing homes during the third quarter at higher prices than the Company's current estimates of the future selling prices after selling costs.***

149.    In an earnings call to discuss the third quarter earnings, Defendant Barton told investors that "further scaling up Zillow Offers is too risky, too volatile to our earnings and operations, too low of a return on equity opportunity and too narrow in its ability to serve our customers." Defendant Barton blamed the Company's algorithms and pricing models, stating that "fundamentally, we have been unable to predict future pricing of homes to a level of accuracy that makes this a safe business to be in." Defendant Barton also blamed labor issues and renovations backlogs that were concealed during the Relevant Period on Zillow Offers wind down:

We have also experienced significant capacity and demand planning challenges, exacerbated by an admittedly difficult labor and supply chain environment. The combination of these factors has caused a meaningful backup in our processing of homes in the Zillow pipeline, which we announced 2 weeks ago. We judged future significant volume volatility to be a tough ***impediment*** to ramp a scaled operation, and any interruptions in the supply chain like we recently experienced will result in increased holding times, further increasing our exposure to volatility and lowering our return on equity.

150.    The Company also pinned some of the blame for the Zillow Offers shutdown on the labor issues and resulting renovations backlog that it had concealed during the Class Period, noting that it had "experienced significant capacity and demand planning challenges," which had "caused a meaningful backup in our processing of homes in [the] Zillow pipeline."

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 47

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

151.    Defendant Barton admitted to CNBC's "Closing Bell" that Zillow's ultimate failure was its inability to properly analyze and use its extensive data to accurately assess the value of the homes it was buying and selling and stated that "the unpredictability in forecasting home prices *far exceeds what we anticipated*."[16] Defendant Barton acknowledged that the Company was not positioned to accurately evaluate where home prices will be in six months "within a narrow margin of error."[17]

152.    Lastly, Defendant Barton disclosed, that despite previous representations to the contrary, Zillow Offers had failed to significantly penetrate the Company's potential market of homebuyers and sellers across the country.[18] Barton warned that iBuying had turned Zillow into a "leveraged housing trader" which if continued could put "the whole company at risk."[19]

153.    On this news, the Company's stock prices plummeted. On November 3, 2021, Zillow's Class A common stock (ZG) price fell to $65.86, a 22.9% decrease from the previous trading day's closing price. On November 3, 2021, Zillow's Class C capital stock (Z) fell to $65.47, a 24.9% decrease from the previous trading day's closing price.

154.    In a *Wall Street* Journal article entitled, *Zillow Quits Home-Flipping Business, Cites Inability to Forecast Prices*, Benjamin Keys, a professor of real estate at the Wharton School of the University of Pennsylvania, wondered how Zillow had managed to lose money in "a time frame where prices have gone up in a lot of places, dramatically."[20]

---

[16]  Ari Levy, *Zillow Says it's Closing Homebuying Business, Cutting 25% of Workforce; Earnings Miss Estimates, CNBC*, Nov. 2, 2021, https://www.cnbc.com/2021/11/02/zillow-shares-plunge-after-announcing-it-will-close-home-buying-business.html.

[17]  *Id.*

[18]  *Id.*

[19]  Kim *Velsey, Why Did So Many Homeowners Sell to Zillow? Because It Overpaid*, *Curbed*, Nov. 4. 2021, https://www.curbed.com/2021/11/zillows-i-buying-algorithm-house-flipping.html.

[20]   https://www.wsj.com/articles/zillow-quits-home-flipping-business-cites-inability-to-forecast-prices-11635883500.

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

155.     Matthew Frankel, a contributor, and analyst for *The Motley Fool*, commented on Zillow's business failure despite having "the most real estate data of any of their peers":[21]

> The fact that the company with **the most real estate data of any of their peers** that has been developing a way to algorithmically price homes for over a decade in the form of the Zestimate couldn't do a better job with iBuying than the other peers . . . **just screams failure of management to me.**

156.     A Bloomberg Businessweek article pinned Zillow Offers' failure on the inadequate utilization and analysis of its collected real estate data.[22]

157.     On November 17, 2021, *The Wall Street Journal* published an article titled *What Went Wrong With Zillow? A Real-Estate Algorithm Derailed Its Big Bet.*[23] The article stated that the Company acknowledged it "was paying too much money for homes, and buying too many of them, just when price increases were starting to slow." The article revealed that Zillow's market capitalization which had "closed at a peak of $48.35 billion in February, is  now around $16 billion." Regarding outlook for revenue, *The Wall Street Journal* reported that:

> In the spring, around the time that Zillow started worrying about the accuracy of its algorithm, company executives and managers came together for a tense meeting, according to a person who attended.
>
> As first-quarter numbers trickled in, it became clear that even though it was making more money than anticipated, **the company was on track to significantly miss its annual target for the number of homes it wanted to buy**. Worse, it was falling behind its top competitor, Opendoor.
>
> "This is code red," Joshua Swift, senior vice president of Zillow Offers, said during the **virtual** meeting, according to the person who attended. Mr. Swift declined to comment through the company.

158.     Project Ketchup was then hatched, "a plan to speed up the pace and volume of home purchases, dubbing it Project Ketchup—which employees took as a play on the team's mission to catch up to Opendoor. Zillow planned to buy more homes by spending more money,

---

[21] https://www.fool.com/investing/2021/11/19/2-major-red-flags-with-zillows-ibuying-failure/.

[22]  https://www.bloomberglaw.com/product/blaw/bloombergterminalnews/bloomberg-terminal-news/R29AWDT0AFC1

[23] https://www.wsj.com/articles/zillow-offers-real-estate-algorithm-homes-ibuyer-11637159261

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 49

Case No. 2:22-cv-288

**WEISS LAW**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

offering prices well above what its algorithm and analysts picked as market value, people familiar

with the matter said." Regarding Zillow's major problems with inventory and renovations, the

article stated that:

> In the second quarter, Zillow Offers bought more than 3,800 homes—more than double the previous quarter. In the third quarter, it bought 9,680 homes. The company was buying so many homes that its overstretched staff started running behind on closings and renovations, people familiar with the matter said.
>
> **It struggled to find contractors and renovation materials amid a broader labor and supply shortage. That meant Zillow was in danger of sitting on** homes **for longer, adding to insurance and debt bills.** It also meant many homes bought during the summer would likely have to be sold in the winter, when the housing market is usually weaker.
>
> Staffers grew concerned Zillow was paying too much, people familiar with the matter said. **Analysts whose job it was to confirm the prices of homes found that they were routinely overruled, those people said, because the company had retooled the system to raise the analysts' suggested prices. Automatic price add-ons coded into the company system, including one called the "gross pricing overlay" that could add as much as 7%, would boost offering prices to get more home sellers to say yes.**

159.    The losses incurred by the Zillow Offers division cannot be ascribed to market

uncertainties. Notably, other iBuying firms, such as Zillow's competitors Redfin and Opendoor,

had far better results in the same market.

160.    Indeed, real estate strategists, such as DelPrete, point out that Zillow's chief

competitor in the iBuying space, Opendoor, did a superior job of utilizing its collected real estate

data and emerged relatively unscathed despite all of the market fluctuations:

> A comparison of Zillow Offers and Opendoor highlights the critical importance of **pricing** in iBuying. There's an understated elegance in the detail; it's not just buying low and selling high. A successful pricing *operation* -- not just an algorithm, but people! -- needs to work at scale, needs to improve over time, and needs to be more nuanced than a brute-force bell curve.[24]

---

[24] Mike DelPrete, *Opendoor vs. Zillow: A Tale of Two Pricing Models*, Dec. 16, 2021, https://www.mikedp.com/articles/2021/12/16/opendoor-vs-zillow-a-tale-of-two-pricing-models.

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 50

Case No. 2:22-cv-288

**WEISS LAW**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

161.    On February 10, 2022, the Company filed with the SEC its Annual Report on Form 10-K for the period ended December 31, 2022 (the "2021 10-K"). In the 2021 10-K, the Company reported a more than $880 million loss in its Zillow Offers division for fiscal year 2021.

## DAMAGES TO ZILLOW

162.    As a direct and proximate result of the Individual Defendants' misconduct, Zillow has lost and will continue to lose and expend many millions of dollars.

163.    Such expenditures include, but are not limited to, costs and fees associated with the Securities Class Action filed against the Company and certain of the Individual Defendants. As a direct and proximate result of the Individual Defendants' conduct, Zillow has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

164.    Furthermore, the materially false and misleading statements has exposed the Company to myriad reputational and financial damages, including but not limited to: (a) possible restatements and goodwill impairments; (b) hundreds of millions in inventory write-downs; (c) the continued investment in Zillow Offers with the knowledge that the program was failing and the subsequent termination of the Zillow Offers program; (d) the loss of 25% of Zillow's workforce; (e) the loss of credibility with customers and suppliers; and (f) legal costs associated with litigation, investigations, and restatements.

## DERIVATIVE AND DEMAND ALLEGATIONS

165.    Plaintiffs incorporate by reference and realleges each and every allegation set forth above, as though fully set forth herein.

166.    Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

167.    Plaintiffs are owners of Zillow common stock and were owners thereof at all times relevant hereto.

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 51

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

168.     Plaintiffs will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

169.     As a result of the facts set forth herein, Plaintiffs have not made any demand on the Zillow Board to institute this action against the Individual Defendants. Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

170.     At the time this action was commenced, the Board consisted of nine directors: Defendants (1) Barton, (2) Blachford, (3) Bohutinsky, (4) Thielke, (5) Frink, (6) Hoag, (7) Maffei, (8) Stephenson, and (9) Underwood (the "Demand Board"). Although Plaintiffs need only to allege demand futility as to a majority (five) of the Directors who are on the Board at the time this action is commenced, all nine members of the Board are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

### A.    Demand Is Futile As To The Entire Demand Board Because They Each Face a Substantial Likelihood of Liability

171.     The nine members of the Demand Board all face a substantial likelihood of liability for their individual misconduct. Defendants Barton, Blachford, Bohutinsky, Frink, Hoag, Maffei, Stephenson, Thielke, and Underwood were directors during the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

172.     Moreover, Defendants Barton, Blachford, Bohutinsky, Frink, Hoag, Maffei, Stephenson, Thielke, and Underwood as directors owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company was acting legally and its internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, they reviewed, authorized and/or caused

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 52

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

the publication of the materially false and misleading statements and the issuance of the public statements and presentations on behalf of the Company discussed above that caused the Company's stock to trade at artificially inflated prices.

173.    Defendants Barton, Blachford, Bohutinsky, Frink, Hoag, Maffei, Stephenson, Thielke, and Underwood each face a substantial likelihood of liability for knowingly and consciously allowing the authorization of false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence, all of which constitute breaches of the fiduciary duties of loyalty and good faith. If Defendants Barton, Blachford, Bohutinsky, Frink, Hoag, Maffei, Stephenson, Thielke, and Underwood were to bring a suit on behalf of Zillow to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason, demand is futile as to Defendants Barton, Blachford, Bohutinsky, Frink, Hoag, Maffei, Stephenson, Thiekle and Underwood.

**B.    Barton, Frink, Hoag, And Maffei Are Neither Independent Nor Disinterested**

174.    As Zillow admits in its SEC filings, including the 2021 Proxy, Defendant Barton, the Company's Co-Founder and CEO, is not an independent director. Defendant Barton is not independent for purposes of demand futility because his principal occupation is Co-Founder and CEO of Zillow. For compensation in this position, Barton received $8,446,226 for fiscal year 2020 and $20.9 million in compensation for the fiscal year ended December 31, 2021. Barton's executive compensation amount is material to him. Per the 2023 Proxy, Barton owns 4,194,265 Class A common stock; 3,763,725 Class B common stock; and 8,225,199 Class C capital stock. Barton holds 31.7 % total voting power. If Barton admitted that he, Zillow, or others engaged in

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 53

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

1   misconduct, his investment in Zillow would be substantially devalued. Further, if Barton

2   acknowledged that executives at Zillow had engaged in the wrongdoing alleged, he would

3   necessarily acknowledge that he, as a major investor with long-term involvement in the Company,

4   either knew of the wrongdoing or should have known of the wrongdoing. Moreover, Barton

5   received a material personal benefit in the form of insider trading that would be the subject of a

6   litigation demand. Barton's sales during the Relevant Period totaled over $85 million. Also, Barton

7   signed the 2021 Proxy, the 2020 10-K, and SOX certifications for the May 4, 2021 10-Q and

8   August 5, 2021 10-Q which contained materially false and misleading statements and therefore he

9   faces a substantial likelihood of liability.

10      175.    Zillow also admits in its SEC filings, including the 2021 Proxy, that Defendant

11  Frink, the Company's Co-Founder, Executive Chairman and President is not an independent

12  director. Defendant Frink is not independent for purposes of demand futility because his principal

13  occupation is Co-Founder, Executive Chairman and President of Zillow. For compensation in this

14  position, Frink received $6,843,116 for fiscal year 2020. Frink's executive compensation amount

15  is material to him. Per the 2023 Proxy, Frink owns more than 3.2 million shares of Class A

16  common stock; more than 2.4 million shares of Class B common stock; and almost 4.8 million

17  shares of Class C stock. Fink holds 20.6% of Zillow's total voting power. If Frink admitted that

18  he, Zillow, or others engaged in misconduct, his investment in Zillow would be substantially

19  devalued. Further, if Frink acknowledged that executives at Zillow had engaged in the wrongdoing

20  alleged, he would necessarily acknowledge that he, as a major investor with long-term involvement

21  in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

22      176.    Defendant Hoag has been a Zillow director for more than sixteen years. Hoag will

23  not sue those responsible for the wrongdoing pled herein because doing so would harm him and

24  his investments. Hoag holds 516,531 shares of Zillow Class A common stock and 5,923,366 shares

25  of Class C capital stock. If Hoag admitted that he, Zillow, or others engaged in misconduct, his

26  investment in Zillow would be substantially devalued. Further, if Hoag acknowledged that

27  CONSOLIDATED VERIFIED
    STOCKHOLDER DERIVATIVE
28  COMPLAINT - 54

    Case No. 2:22-cv-288

1    executives at Zillow had engaged in the wrongdoing alleged, he would necessarily acknowledge

2    that he, as a major investor with long-term involvement in the Company, either knew of the

3    wrongdoing or should have known of the wrongdoing.

4        177.    Defendant Maffei has been a Zillow director for more than sixteen years. Maffei

5    will not sue those responsible for the wrongdoing pled herein because doing so would harm him

6    and his investments. Maffei holds 316,485 shares of Zillow Class A common stock and 711,548

7    shares of Class C capital stock. If Maffei admitted that he, Zillow, or others engaged in misconduct,

8    his investment in Zillow would be substantially devalued. Further, if Maffei acknowledged that

9    executives at Zillow had engaged in the wrongdoing alleged, he would necessarily acknowledge

10   that he, as a major investor with long-term involvement in the Company, either knew of the

11   wrongdoing or should have known of the wrongdoing. Moreover, Maffei received a material

12   personal benefit in the form of insider trading that would be the subject of a litigation demand.

13   Maffei's sales during the Relevant Period totaled over $380,000. Also, Maffei signed the 2021

14   Proxy and the 2020 10-K, which contained materially false and misleading statements and

15   therefore faces a substantial likelihood of liability.

16       178.    Defendants Barton and Frink are also incapable of considering a demand to

17   commence and vigorously prosecute this action because they face additional substantial likelihood

18   of liability as they are named as defendants in the Securities Class Action.

19       179.    Barton, Frink, and Hoag are also interested because they signed the 2021 Proxy

20   Statement containing false and misleading statements and material omissions and face a substantial

21   likelihood of liability therefor.

22       180.    Demand is also futile as to Defendants Barton and Frink because of their

23   longstanding relationship with one another. Frink and Barton first met at Stanford University as

24   classmates. In 1994, Barton was recruited by a mutual friend to join Frink at Microsoft.[25]

---

25   [25] Greg Scheiderer, *Ammo For The House Hunt, Stanford Magazine,* July/August 2015,
26   https://stanfordmag.org/contents/ammo-for-the-house-hunt. According to this article, "Barton and

27   CONSOLIDATED VERIFIED                    WEISS LAW
     STOCKHOLDER DERIVATIVE                   305 Broadway, 7th Floor
28   COMPLAINT - 55                           New York, New York 10007
                                              Telephone: (212) 682-3025
     Case No. 2:22-cv-288                     Facsimile: (212) 682-3010

According to a *Stanford Magazine* article, "Frink was one of the first team members to join Barton at Expedia, which marked the beginning of [their] collaboration and ***close friendship***."[26]Zillow came about because the pair had worked together at Microsoft and Expedia. Indeed, Barton and Frink started Expedia together in 1996, with Frink working as a senior vice president at Expedia, the travel company founded by Barton. After they left, they were sharing an office and dreaming about their next big business idea. We realized the business idea was right in front of us," Barton recalls. To that end, the pair founded Zillow in 2005. In addition, Barton was a venture partner at Benchmark, a venture capital firm that has been an early-stage investor in companies like Netflix, Instagram, WeWork and Zillow, from 2005 until 2018. While Barton worked as a venture partner at Benchmark Capital, the firm invested heavily in Grubhub, where Frink has been on the supervisory board since 2013.

### C.    Demand Is Futile As To Defendant Blachford

181.    Demand on Blachford is futile because he is a Company director since 2005 and he received a material personal benefit in the form of insider trading that would be the subject of a litigation demand. Blachford's sales during the Relevant Period totaled over $2.3 million.

182.    In addition, per the 2023 Proxy, Blachford owns 49,019 Class A common stock and 119,787 Class C common stock and continues to receive compensation for his role as a director as described herein, which is material to him. If Blachford admitted that he, Zillow, or others engaged in misconduct, his investment in Zillow would be substantially devalued. Further, if Blachford acknowledged that executives at Zillow had engaged in the wrongdoing alleged, he would necessarily acknowledge that he, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

---

Frink are close friends outside the office. Their families enjoy activities together, and Barton and Frink have attended the Burning Man arts and music festival for the past several years. They ski together, and Frink is working on luring Barton onto the golf links for a good walk spoiled. They share tickets to the Seattle Seahawks and Seattle Sounders games."

[26] *Id.*

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 56

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

183.    Blachford also signed and thus personally made the false and misleading statements in the 2020 10-K and he benefitted further from the false and misleading 2021 Proxy because he was re-elected as a result.

184.    Blachford knew or should have known that Zillow Offers was creating significant losses for the Company. He either did investigate and knew or failed to investigate the damages Zillow Offers caused the Company.

185.    For these reasons, Blachford breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

### D.    Demand Is Futile As To Defendants Blachford, Maffei, And Stephenson Because They Face A Substantial Likelihood Of Liability As Members Of The Audit Committee

186.    Defendants Blachford, Maffei, and Stephenson as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the filing of false financial statements and allowed the Company to repeatedly make other false and misleading statements through public statements and presentations to the investing public. More specifically, as members of the Audit Committee, Defendants Blachford, Maffei, and Stephenson were obligated to review the Company's annual and quarterly reports to ensure their accuracy. Instead, Defendants Blachford, Maffei, and Stephenson, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls and other financial information provided by the Company, as required by the Audit Committee Charter. For this reason, demand is futile as to Defendants Blachford, Maffei, and Stephenson.

187.    Defendant Stephenson has been a Zillow director for more than sixteen years. Stephenson will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments. Stephenson holds 41,647 shares of Zillow Class A common stock and 150,840 shares of Class C capital stock. If Stephenson admitted that he, Zillow, or others

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 57

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

engaged in misconduct, his investment in Zillow would be substantially devalued. Further, if Stephenson acknowledged that executives at Zillow had engaged in the wrongdoing alleged, he would be acknowledging that he, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

188.    Stephenson authorized the 2021 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

189.    Further, Stephenson benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Zillow Board through the false and misleading statements and material omissions in the 2021 Proxy Statement. In addition, Stephenson received a material personal benefit in the form of insider trading that would be the subject of a litigation demand. Stephenson's sales during the Relevant Period totaled almost $2 million.

190.    Finally, according to the 2022 Proxy, "Stephenson participates in Zillow Group's Premier Agent program, a business relationship that has been an ordinary course dealing." According to an article published by Inman, Stephenson accumulated $10 million in wealth from March 2014 through March 2015 through being a Zillow Premier Agent.[27] According to the article, Stephenson "met Rich Barton through a Stanford classmate, Christian Acker, who was Barton's first hire at Zillow." According to Stephenson's profile on Zillow's website, he currently has twenty listings ranging from $595,000 to $3,500,000.[28] His profile also lists that he sold 171 homes in 2022 alone. The homes sold in 2022 so far had an aggregate closing price of approximately $143 million. Therefore, Stephenson derives a substantial source of his income from his status as a Zillow Group Premier Agent. Because Barton and Frink as the Company's upper management

---

[27]  Brad Inman, How this Zillow Premier Agent made $10 million, Inman, March 5, 2015, https://www.inman.com/2015/03/05/how-this-zillow-premier-agent-made-10-million/ (last visited July 11, 2022).

[28]  See https://www.zillow.com/profile/Gordon (last visited Jan. 23, 2024).

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 58

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

can influence whether Stephenson retains his status as a Zillow Group Premier Agent, Stephenson

lacks independence from Barton and Frink.

**E.    Demand Is Futile As To Defendants Barton, Blachford, Bohutinsky, And Maffei Because They Lack Independence From One Another**

191.    Demand is also futile as to Defendants Barton, Blachford, Bohutinsky, and Maffei,

given the longstanding, intertwined relationships they have with one another as of the date this

action was commenced, as follows:

- Hoag is the General Partner of TCV, and is a direct or indirect director, limited partner, or member of the general partners of various private equity and venture capital funds of TCV that have been invested in by Barton, Wacksman, Maffei, Blachford, and Bohutinsky. Defendants Blachford and Bohutinsky consult as an executive advisor and venture partner of TCV, respectively. Blachford and Bohutinsky also may provide certain consulting or other services to TCV, for which they may receive indirect economic interests or value in certain investments by TCV's affiliated investment funds. In fact, according to the 2023 Proxy Statement, TCV beneficially owns more than 4.4 million Zillow shares.

- Hoag serves on the board of directors of Netflix, Inc. since 1999 and Barton since 2002. As Chair of Netflix's Nominating and Governance Committee, Hoag holds significant influence over Barton's status as a director of Netflix. And Barton received $350,675 in compensation during 2021 for his role as a director of Netflix.

- Hoag serves on the board of directors of Peloton Interactive, Inc. with Blachford. Blachford served as a director of Peloton from 2015 until February 5, 2022. Hoag has served as a director of Peloton since 2018. According to Peloton's proxy statement filed October 25, 2021, entities affiliated with TCV hold 37.5% of Peloton's total voting power.

- Hoag serves on the board of directors of TripAdvisor, Inc. with Maffei. Maffei is also the Chief Executive Officer and Chairman of the Board of Liberty TripAdvisor Holdings, which currently holds approximately a 23% equity interest and 58% voting interest in TripAdvisor, Inc. Maffei also serves on Tripadvisor's compensation committee. According to Tripadvisor's proxy statement filed April 26, 2023, Hoag received $314,984 in compensation from Tripadvisor for his role as a director.

- Maffei is Chairman of the board of directors of Qurate Retail, Inc., since 2005, owning approximately 20% of its voting power of shares, where Barton also serves as a director since 2016 and from where Barton received $259,087 of compensation in 2022.

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 59

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

- Blachford and Barton are 50% co-owners of a condominium. Barton and Blachford also "have an arrangement pursuant to which Mr. Barton is expected to purchase up to all of Mr. Blachford's limited partnership interest in one or more TCV investment funds" according to the 2022 Proxy.

**F.    Demand Is Futile As To Defendant Bohutinsky**

192.    Demand is futile as to Defendant Bohutinsky because she lacks independence. Defendant Bohutinsky spent 13 years in leadership roles at Zillow, beginning as a founding team member at Zillow in 2005, and serving first as the Company's Chief Operating Officer from August 2015 until January 2019; Chief Marketing Officer from March 2011 until August 2015; Vice President of Marketing and Communications from September 2010 until March 2011; Vice President of Communications from August 2008 until September 2010; and Director of Communications from August 2005 until August 2008. The Company's 2021 Proxy stated that Bohutinsky is not an independent director. As such, Bohutinsky is a Company insider and against her demand is futile.

193.    Bohutinsky will not sue those responsible for the wrongdoing pled herein because doing so would harm her and her investments. Bohutinsky holds 31,250 shares of Zillow Class A common stock and 211,487 shares of Class C capital stock. If Bohutinsky admitted that she, Zillow, or others engaged in misconduct, her investment in Zillow would be substantially devalued. Further, if Bohutinsky acknowledged that executives at Zillow had engaged in the wrongdoing alleged, she would necessarily acknowledge that she, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

**G.    Demand Is Futile As To Defendant Underwood**

194.    Demand on Defendant Underwood is futile because Underwood has served as a Company director since 2017. She has received and continues to receive compensation for her role as a director as described herein, which is material to her. Underwood signed and thus personally made the false and misleading statements in the 2020 10-K. She also faces a substantial likelihood of liability for authorizing the 2021 Proxy.

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 60

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

195.    According to the 2022 Proxy, Underwood owns 48,000 shares of Class C capital stock. Therefore, Underwood will not bring a suit against the Individual Defendants because it would harm her investment in the Company.

196.    Underwood knew or should have known that Zillow Offers was creating significant losses for the Company. She either did investigate and knew or failed to investigate the damages Zillow Offers caused the Company.

197.    For these reasons, Underwood breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

**H.    Other Factors Demonstrating That Demand Is Futile**

198.    Zillow has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board has not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

199.    The members of the Board have received substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

200.    Publicly traded companies, such as Zillow, typically carry director & officer liability insurance from which the Company could potentially recover some or all its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover Zillow's damages.

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 61

Case No. 2:22-cv-288

**WEISS LAW**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

1

2

**COUNT I**
**Against the Individual Defendants for**
**Violations of Section 14(a) of the Exchange Act**

3      201.    Plaintiffs incorporate by reference and realleges each and every allegation set forth

4   above as if fully set forth herein.

5      202.    The Section 14(a) claim alleged herein is based solely on negligence.  It is not based

6   on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants.

7   The Section 14(a) claim alleged herein does not allege and does not sound in fraud.  Plaintiffs

8   specifically disclaim any allegations of, reliance upon any allegation of, or reference to any

9   allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

10      203.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall

11   be unlawful for any person, by use of the mails or by any means or instrumentality of interstate

12   commerce or of any facility of a national securities exchange or otherwise, in contravention of

13   such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public

14   interest or for the protection of investors, to solicit or to permit the use of his name to solicit any

15   proxy or consent or authorization in respect of any security (other than an exempted security)

16   registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

17      204.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no

18   proxy statement shall contain "any statement which, at the time and in the light of the

19   circumstances under which it is made, is false or misleading with respect to any material fact, or

20   which omits to state any material fact necessary in order to make the statements therein not false

21   or misleading." 17 C.F.R. § 240.14a-9.

22      205.    The 2021 Proxy Statement was false and misleading because contrary to the 2021

23   Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's

24   responsibilities, the Board and its committees were not adequately exercising these functions, were

25   causing or permitting the Company to issue false and misleading statements, and thus the

26   Individual Defendants on the Board were breaching their fiduciary duties.

27   CONSOLIDATED VERIFIED                          WEISS LAW
     STOCKHOLDER DERIVATIVE                        305 Broadway, 7th Floor
28   COMPLAINT - 62                                New York, New York 10007
                                                   Telephone: (212) 682-3025
     Case No. 2:22-cv-288                          Facsimile: (212) 682-3010

206.    The 2021 Proxy Statement further was false and misleading because it failed to disclose to investors that: (a) the Company knew that it did not have the ability to properly price homes for its Zillow Offers business; (b) this inability, in addition to labor and supply shortages, resulted in a backlog of inventory in the Zillow Offers business; (c) as a result of the foregoing, the Company was reasonably likely to wind-down its Zillow Offers business, which would have a material adverse impact of the Company's financial results; and (d) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

207.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2021 Proxy Statement were materially false and misleading. These misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for shareholder determination in the Proxy Statement, including, but not limited to the election of directors, as discussed herein.

208.    The misleading information contained in the 2021 Proxy Statement was material to Zillow's shareholders in determining whether to elect Blachford, Stephenson, and Thielke to the Board.

209.    The material misstatements and omissions in the 2021 Proxy Statement damaged the Company.

210.    Plaintiff, on behalf of Zillow, seeks relief for damages inflicted upon the Company based on the misleading 2021 Proxy Statement in connection with the improper election of certain members of the Board.

**COUNT II**
**Against the Individual Defendants for**
**Violations of Section 20(a) of the Exchange Act**

211.    Plaintiffs incorporate by reference and realleges each allegation contained above, as though fully set forth herein.

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 63

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

212.    The Individual Defendants, by virtue of their positions with Zillow and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Zillow and officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause Zillow to engage in the misconduct and practices complained of herein.

213.    Plaintiffs, on behalf of Zillow, have no adequate remedy at law.

**COUNT III**
**Against the Individual Defendants**
**for Breach of Fiduciary Duty**

214.    Plaintiffs incorporate by reference and realleges each allegation contained above, as though fully set forth herein.

215.    The Individual Defendants each owed Zillow fiduciary obligations during the Relevant Period. By reason of their fiduciary relationships, the Individual Defendants owed Zillow the highest obligation of good faith, fair dealing, loyalty and due care.

216.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

217.    The Individual Defendants had actual or constructive knowledge regarding the problems associated Zillow Offers as alleged herein and also knowingly made false and misleading statements regarding the Company's business operations, practices, and internal controls in connection therewith, as alleged herein. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

218.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Zillow has sustained significant and actual damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

219.    Plaintiffs, on behalf of Zillow, have no adequate remedy at law.

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 64

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

1

2

**COUNT IV**
**Against the Individual Defendants for Unjust Enrichment**

3

220.    Plaintiffs incorporate by reference and realleges each allegation contained above,

4

as though fully set forth herein.

5

221.    By their wrongful acts, violations of law, false and misleading statements, and

6

omissions of material fact that they made and/or caused to be made, the Individual Defendants

7

were unjustly enriched at the expense and to the detriment of Zillow.

8

222.    The Individual Defendants either benefitted financially from the improper conduct,

9

received unjust compensation tied to the false and misleading statements, received bonuses, stock

10

options, or similar compensation from Zillow tied to the performance or artificially inflated

11

valuation of Zillow, or received compensation that was unjust in light of the Individual

12

Defendants' bad faith conduct, or sold stock at artificially inflated prices during the Relevant

Period.

13

223.    Plaintiffs, as stockholders and representatives of Zillow, seek restitution from the

14

Individual Defendants and an order from this Court disgorging all profits— including benefits,

15

performance-based, valuation-based, and other compensation—obtained by the Individual

16

Defendants due to their wrongful conduct and breach of their fiduciary duties.

17

224.    Plaintiffs, on behalf of Zillow, have no adequate remedy at law.

18

**COUNT V**
**Against Defendants Barton, Beitel, Blachford,**
**Daimler, Maffei, and Stephenson for Insider Trading**

19

20

225.    Plaintiffs incorporate by reference and realleges each allegation contained above,

21

as though fully set forth herein.

22

226.    When Defendants Barton, Beitel, Blachford, Daimler, Maffei, and Stephenson

23

collectively sold over $116 million worth of stock, they were in possession of material non-public

24

information regarding the Company's true organic growth from Zillow Offers and Project

25

26

Ketchup's artificial effects on the Company's financial results, both of which would have an

27

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 65

28

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

adverse effect on the stock price. The revelation of this adverse information and the full truth concerning Zillow Offers' growth would destroy billions in market capitalization and cause the Company to write down losses of more than half a billion dollars when revealed to the market. The foregoing information was proprietary, material, adverse, and non-public information regarding the Company's operations known only by Zillow insiders. The information which formed the basis of the sales of stock made by Defendants Barton, Beitel, Blachford, Daimler, Maffei, and Stephenson, was the type of information upon which they were specifically barred from trading. This information was a proprietary asset belonging to Zillow, which was usurped for the benefit of Defendants Barton, Beitel, Blachford, Daimler, Maffei, and Stephenson, Wacksman and to the detriment of the Company.

227.    The use of this information by Defendants Barton, Beitel, Blachford, Daimler, Maffei, and Stephenson was a breach of their fiduciary duty of loyalty. Their insider sales of stock were predicated upon their possession of material, adverse, non-public information to which they had access as Zillow insiders.

228.    Plaintiffs, on behalf of Zillow, have no adequate remedy at law.

## COUNT VI
### Against the Individual Defendants for Aiding and Abetting

229.    Plaintiffs incorporate by reference and realleges each allegation contained above, as though fully set forth herein.

230.    In committing the wrongful acts pled herein, each of the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct. In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

231.    Because the actions described herein occurred under the Board's supervision and authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 66

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

232.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

A.    Declaring that Plaintiffs may maintain this action on behalf of Zillow, and that Plaintiffs are adequate representatives of the Company;

B.    Declaring that the Individual Defendants have breached their breach of their fiduciary duties to Zillow and other violations of law;

C.    Declaring that the Individual Defendants violated Section 14(a) of the Exchange Act;

D.    Determining and awarding to Zillow the damages sustained by it as a result of the misconduct set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

E.    Awarding Zillow restitution from the Individual Defendants, and ordering disgorgement of all profits, benefits and other compensation obtained by them;

F.    Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: March 22, 2024

Respectfully submitted,

**YANICK LAW & DISPUTE RESOLUTION PLLC**

By:/s/Miles A. Yanick
Miles A. Yanick
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 67

Case No. 2:22-cv-288

**WEISS LAW**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

Telephone: (206) 455-5924
Email: myanick@yanicklaw.com

**BRESKIN JOHNSON & TOWNSEND PLLC**

By: *s/Roger Townsend*
Roger M. Townsend, WSBA No. 25525
1000 Second Avenue, Suite 3670
Seattle, WA 98104
Telephone: (206) 652-8660
Email: rtownsend@bjtlegal.com

**WEISS LAW**
David C. Katz (pro hac vice pending)
Mark D. Smilow (pro hac vice pending)
Joshua M. Rubin (pro hac vice pending)
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010
Email: dkatz@weisslawllp.com
         msmilow@weisslawllp.com
         jrubin@weisslawllp.com

**LEVI & KORSINSKY, LLP**
Daniel Tepper (*pro hac vice* anticipated)
Gregory M. Nespole (*pro hac vice* anticipated)
33 Whitehall Street, 17th Floor
New York, NY 10004
Phone: (212) 363-7500
Facsimile: (212) 363-7171
Email: dtepper @zlk.com
         gnespole@zlk.com

**HYNES & HERNANDEZ, LLC**
Michael J. Hynes
Ligaya T. Hernandez
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
Telephone: (484) 875-3116
Email: mhynes@hh-lawfirm.com
         lhernandez@hh-lawfirm.com

*Counsel for Plaintiffs*

CONSOLIDATED VERIFIED
STOCKHOLDER DERIVATIVE
COMPLAINT - 68

Case No. 2:22-cv-288

WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

## **VERIFICATION**

I, Leah Rosenfeld IRA, hereby verify that I am a stockholder of Zillow Group Inc. ("Zillow" or the "Company") and am ready, willing, and able to pursue this stockholder derivative action on behalf of Zillow. I first acquired Zillow stock in November 2020 and have held those shares continuously since that time. As such, I was a stockholder at the time of the transactions complained of in the Consolidated Verified Stockholder Derivative Complaint ("Complaint"). I have reviewed the allegations in the Complaint, and as to those allegations of which I have personal knowledge, I know those allegations to be true, accurate and complete. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation, and for that reason I believe them to be true. Having received a copy of the foregoing complaint, and having reviewed it with my counsel, I hereby authorize its filing.

Leah Rosenfeld IRA

**VERIFICATION**

I, Brian Sisson, have authorized the filing of the attached Consolidated Verified Stockholder Derivative Complaint.  I have read the Complaint, and the allegations therein are true to the best of my knowledge, information, and belief based upon information provided by counsel. I declare under penalty of perjury that the foregoing is true and correct.


02/01/2024
_____
Date

*Brian Sisson*
Brian Sisson (Feb 1, 2024 13:04 EST)
_____
Brian Sisson

**VERIFICATION**

I, Bruce Taylor, under penalties of perjury, hereby do declare that I am a plaintiff in the foregoing complaint, that I have read the complaint, and that the facts therein are true to my own knowledge, except to matters stated therein to be alleged upon information and belief, and as to those matters, I believe them to be true and correct to the best of my knowledge, information, and belief.

Date:   March ___21___, 2024

*Bruce Taylor*
Bruce Taylor (Mar 21, 2024 15:30 EDT)
_____
Bruce Taylor